Hassan A. Zavareei (SBN 181547)
hzavareei@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2000 L Street, N.W., Suite 808
Washington, DC 20036
Tel.: (202) 973-0900
Fax: (202) 973-0950

*Attorney for Plaintiffs Kerry Reardon,*
*James Lathrop, Julie McKinney, Sandeep Pal,*
*Jennifer Reilly, Justin Bartolet, and Jonathan Grindell*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLAINTIFFS KERRY REARDON, JAMES LATHROP, JULIE MCKINNEY, SANDEEP PAL, JENNIFER REILLY, JUSTIN BARTOLET, and JONATHAN GRINDELL on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.<br><br>Defendant. | **FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Civil Action No. 14-cv-05678-JCS** |

Plaintiffs Kerry Reardon, James Lathrop, Julie McKinney, Sandeep Pal, Jennifer Reilly, Justin Bartolet, and Jonathan Grindell ("Plaintiffs"), through their undersigned attorneys, on behalf of themselves and all persons similarly situated, complain against Uber Technologies, Inc. ("Uber" or "Defendant"), as follows:

## **INTRODUCTION**

1.     Plaintiffs bring this class action complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of Uber in sending text messages to Plaintiffs on their cellular telephones, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA").

2.     The TCPA exists to prevent communications like the ones described within this complaint.  "Voluminous consumer complaints about abuses of telephone technology—for

example, computerized calls dispatched to private homes—prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

3.     When it passed the TCPA, Congress intended to provide consumers a choice as to how telemarketers may call them and found that "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer."  Pub. L. No. 102–243, § 11.  Congress also found that "the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance . . . "  *Id.* at §§ 12-13.

4.     The TCPA's ban on telephone calls made using an automatic telephone dialing system ("ATDS" or "autodialer"), as defined by 47 U.S.C. § 227(a)(1), has been interpreted to extend to unsolicited autodialed text messages sent to cellular phones.  *E.g.*, FCC Declaratory Ruling, 27 F.C.C.R. 15391, 2012 WL 5986338 (Nov. 29, 2012); *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 876 (9th Cir. 2014); *Gager v. Dell Fin. Servs., Inc.*, 727 F.3d 265, 269 n.2 (7th Cir. 2013).

5.     Uber is a nationwide passenger transportation service that connects riders and drivers through a cellular telephone application.

6.     The Uber cellular telephone application allows users to request and pay for on-demand car services.

7.     Uber drivers use their own cars to provide the car services but receive requests from Uber users via the cellular telephone application.

8.     Uber has rapidly expanded since its founding in 2009 and now provides services in over 200 cities across 45 different countries.

9.     Uber's website states: "With millions of riders and ever-increasing demand for more rides in even more cities, we are always working hard to recruit new drivers onto the platform." Craig, *Uber's Marketing Program to Recruit Drivers: Operation Slog,* Uber (Aug. 26, 2014), *available at* http://blog.uber.com/operation-slog.

10.     Uber's recruiting tactics include sending prolific text messages to prospective Uber drivers.

FIRST AMENDED COMPLAINT

11.     On December 11, 2014, Vice published an article titled, "Uber's Text Message Spam is Driving People Crazy."  Jason Koebler, *Uber's Text Message Spam is Driving People Crazy,* Motherboard (Dec. 11, 2014), *available at* http://motherboard.vice.com/read/ubers-text-message-spam-is-driving-people-crazy.

12.     The article discusses complaints filed with the Federal Trade Commission that describe the high volume of text messages people have received from Uber and their inability to make them stop.  According to the article, people have been unable to get Uber to stop sending them text messages even after telling Uber multiple times to stop doing so.  One person filed a complaint stating, "Uber has been texting me for the past month. They texted me on Christmas eve at 1:44am and 4:10am. I returned texts saying STOP. I wrote them an email asking them to remove my number from their lists. And I'm still getting text messages."  Another person reported receiving 42 text messages from Uber in two weeks.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d).  Plaintiffs and members of the Classes have suffered aggregate damages exceeding $5,000,000, exclusive of interest and costs, and is a class action in which any member of the classes of plaintiffs is a citizen of a state different from any defendant.

14.     This Court also has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331, pursuant to Defendant's violation of the TCPA.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Uber is a resident of this District and significant events giving rise to this case took place in this District.

## PARTIES

16.     Plaintiff Kerry Reardon is a citizen residing in Nashua, New Hampshire.

17.     Plaintiff James Lathrop is a citizen residing in Gresham, Oregon.

18.     Plaintiff Julie McKinney is a citizen residing in Lees Summit, Missouri.

19.     Plaintiff Sandeep Pal is a citizen residing in Glen Oaks, New York.

20.     Plaintiff Jennifer Reilly is a citizen residing in Tarpon Springs, Florida.

21.     Plaintiff Justin Bartolet is a citizen residing in Toledo, Ohio.

22.     Plaintiff Jonathan Grindell is a citizen residing in Salem, Oregon.

23.     Defendant Uber is a transportation service which connects passengers to drivers via a cellular telephone application.  Uber is a Delaware corporation with its principal place of business at 1455 Market Street, 4th Floor, San Francisco, CA 94103.

## FACTS AS TO PLAINTIFF JULIE MCKINNEY

24.     Plaintiff McKinney has never been an Uber member, driver, or user.  She has never applied to be an Uber driver and has never given Uber her cellular telephone number.

25.     In or around December of 2014, McKinney received at least three text messages on her cellular telephone from Uber about working for Uber as a driver.

26.     The text messages are not personalized to McKinney and are large automated text distributions from Uber to multiple recipients.

27.     For example, on December 4, 2014, at 6:50 p.m., McKinney received a message from Uber stating, "Do your first trip before 12/12 and qualify for Uber's $215 guaranteed 12/12-12/14. Finish sign up today partners.uber.com for details t.uber.com/KCapplied."  *See* Ex. A, at 1.[1]

28.     On December 17, 2014, at 7:40 p.m., Uber sent McKinney a message stating, "UBER: Start driving before 12/31 & make up to $35/hr on New Year's Eve!  Finish your application: partners.uber.com."  *See id.*

29.     The text messages that Uber sent to McKinney were to a cellular telephone number for which McKinney is charged for incoming calls and text messages pursuant to 47 U.S.C. § 227(b)(1)(A)(iii).  The last four digits of McKinney's cellular telephone number are "5947."

30.     The text messages that Uber sent were not for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

31.     Uber sent the text messages via an ATDS or autodialer as defined by 47 U.S.C. § 227(a)(1).  The ATDS has the capability to both (1) store or produce telephone numbers to be texted using a random or sequential number generator, and (2) automatically send text messages from a list or database of telephone numbers, without human intervention.

---

[1] Attached hereto at Exhibit A is a sampling of screenshots of text messages Plaintiff McKinney received from Uber.

32.     The text messages from Uber also constitute artificial or prerecorded voice calls pursuant to 47 U.S.C. § 227(b)(1).

33.     The automated text messages that Uber sent to McKinney were sent without McKinney's prior express consent.

34.     The automated text messages that Uber sent to McKinney were telemarketing, as defined by 47 C.F.R. § 64.1200.

35.     McKinney alleges that each text message she received from Uber violated 47 U.S.C. § 227(b)(1).

## FACTS AS TO PLAINTIFF KERRY REARDON

36.     During the summer of 2014, Reardon signed up to become an Uber driver through Uber's website.  Although she was approved to become a driver, she decided against it since she did not have the time.

37.     Reardon did not, at any point during the sign-up process, provide express consent to receive automated text messages to her cell phone.

38.     Soon after applying to be an Uber driver, Reardon started to receive multiple automated text messages from Uber from several different phone numbers. She would often receive several text messages in a single day.

39.     Reardon did not expect to receive a barrage of text messages from Uber as a result of providing Uber with her cell phone number.

40.     Uber never sent Reardon a text message informing her that she could opt out of receiving text messages.

41.     Reardon has received dozens of automated text messages since the summer of 2014 from many different phone numbers connected with Uber.

42.     Most of the text messages are not personalized for Reardon and are large automated text distributions from Uber to multiple recipients. For example, on December 3, 2014, Reardon received a message at 12:28 p.m. from (402) 807-2947 stating, "Happy holidays from Uber! December is our busiest month of the year – cash in on this flurry of demand! . . ."  *See* Ex. B, at 2.[2]

---

[2] Attached hereto at Exhibit B is a sampling of screenshots of text messages Plaintiff Reardon received from Uber.

43.     Some of Uber's text messages are addressed to "Kerry" from "Andrew."  However, the text messages from "Andrew" originate from several different numbers.

44.     For example, on November 18, 2014, Reardon received an automated text message at 9:27 p.m. from (508) 214-4502 stating, "Hi Kerry, Andrew here from Uber Manchester. Just a reminder – peak demand times in Manchester are Thursday nights 5-11pm . . ."  *See id.* at 1.

45.     On December 11, 2014, Reardon received an automated text message at 10:37 a.m. from (201) 467-4069 stating, "Hi Kerry, Andrew here from Uber Manchester. This weekend should be our biggest of the year -- sign online Thursday, Friday, and Saturday to take advantage! . . ."  *See id.* at 3.

46.     The automated text messages that Uber sent to Reardon were to a cellular telephone number for which Reardon is charged for incoming calls and text messages pursuant to 47 U.S.C. § 227(b)(1)(A)(iii).  The last four digits of Reardon's cellular telephone number are "0151."

47.     The text messages that Uber sent were not for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

48.     Uber sent the text messages via an ATDS or autodialer as defined by 47 U.S.C. § 227(a)(1).  The ATDS has the capability to both (1) store or produce telephone numbers to be texted using a random or sequential number generator, and (2) automatically send text messages from a list or database of telephone numbers, without human intervention.

49.     The text messages from Uber also constitute artificial or prerecorded voice calls pursuant to 47 U.S.C. § 227(b)(1).

50.     The automated text messages that Uber sent to Reardon were sent without Reardon's prior express consent.

51.     The automated text messages that Uber sent to Reardon were telemarketing, as defined by 47 C.F.R. § 64.1200.

52.     Reardon alleges that each text message she received from Uber violated 47 U.S.C. § 227(b)(1).

FIRST AMENDED COMPLAINT

## FACTS AS TO PLAINTIFF JAMES LATHROP

53.     In July of 2014, Lathrop was interested in becoming a driver for Uber.  He began the sign-up process to learn about the requirements to become an Uber driver.

54.     Lathrop provided his personal information at the beginning of the sign-up process, but he decided not to complete the process to become a driver after learning that his car did not meet Uber's requirements.

55.     Lathrop never finished the process to become an Uber driver.

56.     Lathrop did not, at any point during the sign-up process, provide express consent to receive automated text messages to his cell phone.

57.     In October of 2014, Lathrop began to receive automated text messages from Uber.

58.     Uber never sent Lathrop a text message informing him that he could opt out of receiving text messages.

59.     Between October of 2014 and December 22, 2014, Lathrop received approximately 19 automated text messages from Uber from approximately 13 different numbers.

60.     The text messages are not personalized to Lathrop and are large automated text distributions from Uber to multiple recipients.

61.     For example, on October 7, 2014, Lathrop received a message at 11:13 a.m. from (484) 228-7030 stating, "Uber: We are expanding our footprint in Oregon and want to get you on the road! Please check your email for next steps."  *See* Ex. C, at 1.[3]

62.     On December 3, 2014, Lathrop received a message at 11:37 a.m. from (484) 575-4191 stating, "UBER: Come to our Onboarding Event TOMORROW to claim your $100 Bonus!" *See id.* at 3.

63.     The automated text messages that Uber sent to Lathrop were to a phone number for which Lathrop is charged for incoming calls and text messages pursuant to 47 U.S.C. § 227(b)(1)(A)(iii).  The last four digits of Lathrop's phone number are "6425."

64.     The text messages that Uber sent were not for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

---

[3] Attached hereto at Exhibit C is a sampling of screenshots of text messages Plaintiff Lathrop received from Uber.

65.    Uber sent the text messages via an ATDS or autodialer as defined by 47 U.S.C. § 227(a)(1).  The ATDS has the capability to both (1) store or produce telephone numbers to be texted using a random or sequential number generator, and (2) automatically send text messages from a list or database of telephone numbers, without human intervention.

66.    The text messages from Uber also constitute artificial or prerecorded voice calls pursuant to 47 U.S.C. § 227(b)(1).

67.    The automated text messages that Uber sent to Lathrop were sent without Lathrop's prior express consent.

68.    The automated text messages that Uber sent to Lathrop were telemarketing, as defined by 47 C.F.R. § 64.1200.

69.    Lathrop alleges that each text message he received from Uber violated 47 U.S.C. § 227(b)(1).

### FACTS AS TO PLAINTIFF JONATHAN GRINDELL

70.    In or around October of 2014, Grindell began an application to become an Uber driver through Uber's website.  As part of that application process, Grindell provided Uber with his cellular phone number.  Grindell did not complete the process to become an Uber driver.

71.    Grindell did not, at any point during the sign-up process, provide express consent to receive automated text messages to his cell phone.

72.    Soon after providing Uber with his cellular phone number, Grindell started to receive multiple automated text messages from Uber from several different phone numbers.

73.    Grindell tried to stop the text messages several times. He has replied to Uber's text messages saying, "Remove" and still continues to receive automated text messages from Uber.

74.    Grindell has received automated text messages daily during the last two weeks of December of 2014.

75.    Most of the text messages are not personalized for Grindell and are large automated text distributions from Uber to multiple recipients. For example, on December 31, 2014, Reardon received a message at 10:25 a.m. from (402) 807-2771, stating "LAST CHANCE to get on Uber before the New Year's Eve rush. Earn up to $31/hr on the biggest night of the year! . . ."

76. The automated text messages that Uber sent to Grindell were to a cellular telephone number for which Grindell is charged for incoming calls and text messages pursuant to 47 U.S.C. § 227(b)(1)(A)(iii). The last four digits of Grindell's cellular telephone number are "2116."

77. Grindell's cell phone plan only provides for 1000 text messages a month. Due to Uber's incessant text messages, Grindell has had to alter his cell phone usage patterns, resorting to Facebook messages and other means of communication in order to reach his family and friends.

78. The automated text messages that Uber sent Grindell were not for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

79. Uber sent the text messages to Grindell via an ATDS or autodialer as defined by 47 U.S.C. § 227(a)(1). The ATDS has the capability to both (1) store or produce telephone numbers to be texted using a random or sequential number generator, and (2) automatically send text messages from a list or database of telephone numbers, without human intervention.

80. The automated text messages from Uber also constitute artificial or prerecorded voice calls pursuant to 47 U.S.C. § 227(b)(1).

81. The automated text messages that Uber sent to Grindell were sent without Grindell's prior express consent. Moreover, Uber continued to send Grindell text messages even after Grindell explicitly asked to be removed.

82. The automated text messages that Uber sent to Grindell were telemarketing, as defined by 47 C.F.R. § 64.1200.

83. Grindell alleges that each text message he received from Uber violated 47 U.S.C. § 227(b)(1).

## **FACTS AS TO PLAINTIFF SANDEEP PAL**

84. Plaintiff Pal has never been an Uber member, driver, or user. He has never applied to be an Uber driver and has never given Uber his cellular telephone number.

85. In January of 2015, Pal received three text messages on his cellular telephone from Uber about working for Uber as a driver.

86. The text messages were not personalized to Pal and are large automated text distributions from Uber to multiple recipients.

87.     For example, on January 4, 2015, at 1:21 p.m., Pal received a message from Uber stating, "Sagar Roy sent you an invite to drive with Uber! Use the following link to sign up: https://partners.uber.com/drive/?invite_code=g01th."

88.     Plaintiff Pal does not know any person named Sagar Roy.

89.      On January 5, 2015, Pal received a message from Uber from the same number stating, "Ayman Zeerban sent you an invite to drive with Uber! . . ."

90.     Plaintiff Pal does not know any person named Ayman Zeerban.

91.     On January 20, 2015, Pal received another message from Uber inviting him to drive with Uber.  Pal responded, "Stop Regards, True Pal," to which Uber replied, "Uber does not accept messages at this time."



92.     The text messages that Uber sent to Pal were to a cellular telephone number for which Pal is charged for incoming calls and text messages pursuant to 47 U.S.C. § 227(b)(1)(A)(iii).  The last four digits of Pal's cellular telephone number are "5396."

-10-

FIRST AMENDED COMPLAINT

93.     The text messages that Uber sent were not for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

94.     Uber sent the text messages via an ATDS or autodialer as defined by 47 U.S.C. § 227(a)(1).  The ATDS has the capability to both (1) store or produce telephone numbers to be texted using a random or sequential number generator, and (2) automatically send text messages from a list or database of telephone numbers, without human intervention.

95.     The text messages from Uber also constitute artificial or prerecorded voice calls pursuant to 47 U.S.C. § 227(b)(1).

96.     The automated text messages that Uber sent to Pal were sent without Pal's prior express consent.

97.     The automated text messages that Uber sent to Pal were telemarketing, as defined by 47 C.F.R. § 64.1200.

98.     Pal alleges that each text message he received from Uber violated 47 U.S.C. § 227(b)(1).

## FACTS AS TO PLAINTIFF JENNIFER REILLY

99.     In or around August 11, 2014, Reilly started the application to become an Uber driver through Uber's website but ultimately decided not to complete the application because she was no longer interested.

100.     Reilly did not, at any point during the sign-up process, provide express consent to receive automated text messages to her cell phone.

101.     Soon thereafter, Reilly started receiving automated text messages from Uber from several different phone numbers pestering her about finishing her application.

102.     For example, on August 30, 2014, Reilly received a message at 1:00 p.m. from (813) 642-7019 stating, "Hi, it's Mark from Uber! Make sure you upload your documents on your partners.uber.com account so you can get on the road ASAP!"

103.     On October 3, 2014, Reilly received an automated text message at 12:58 p.m. from a different number, (484) 228-7048, stating, "Hi, it's Tony from Uber! Make sure you upload your documents on your partners.uber.com account so you can get on the road ASAP!"

104.    On October 14, 2014, Reilly received another text message from "Tony," from a third telephone number, (484) 575-4162, to which she replied, "Can you please take me off of this list."

105.    Despite Reilly's request, Uber sent Reilly another message on October 24, 2014, from a fourth telephone number, asking her to finalize her application.

106.    The automated text messages that Uber sent to Reilly were to a cellular telephone number for which Reilly is charged for incoming calls and text messages pursuant to 47 U.S.C. § 227(b)(1)(A)(iii).  The last four digits of Reilly's cellular telephone number are "2119."

107.    The text messages that Uber sent were not for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

108.    Uber sent the text messages via an ATDS or autodialer as defined by 47 U.S.C. § 227(a)(1).  The ATDS has the capability to both (1) store or produce telephone numbers to be texted using a random or sequential number generator, and (2) automatically send text messages from a list or database of telephone numbers, without human intervention.

109.    The text messages from Uber also constitute artificial or prerecorded voice calls pursuant to 47 U.S.C. § 227(b)(1).

110.    The automated text messages that Uber sent to Reilly were sent without Reilly's prior express consent.

111.    The automated text messages that Uber sent to Reilly were telemarketing, as defined by 47 C.F.R. § 64.1200.

112.    Reilly alleges that each text message she received from Uber violated 47 U.S.C. § 227(b)(1).

## FACTS AS TO PLAINTIFF JUSTIN BARTOLET

113.    In or around October of 2014, Bartolet began an application to become an Uber driver through Uber's website.  As part of that application process, Bartolet provided Uber with his cellular phone number.  Bartolet did not complete the process to become an Uber driver.

114.    Bartolet did not, at any point during the sign-up process, provide express consent to receive automated text messages to his cell phone.

FIRST AMENDED COMPLAINT

115.     Soon after providing Uber with his cellular phone number, Bartolet started to receive multiple automated text messages from Uber from several different phone numbers. Between October of 2014 and January of 2015, Bartolet received at least 44 text messages from 23 different numbers.

116.     Bartolet tried to stop the text messages several times. For example, on October 31, 2014 at 10:01 a.m. (pictured below, left), he responded to one of Uber's text messages by stating "Stop texting this number." Bartolet received at least 29 text messages (exemplars pictured below, right) from Uber after sending this message.




117.     The automated text messages that Uber sent to Bartolet were to a cellular telephone number for which Bartolet is charged for incoming calls and text messages pursuant to 47 U.S.C. § 227(b)(1)(A)(iii).  The last four digits of Bartolet's cellular telephone number are "1351."

118.     The automated text messages that Uber sent Bartolet were not for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

119.    Uber sent the text messages to Bartolet via an ATDS or autodialer as defined by 47 U.S.C. § 227(a)(1).  The ATDS has the capability to both (1) store or produce telephone numbers to be texted using a random or sequential number generator, and (2) automatically send text messages from a list or database of telephone numbers, without human intervention.

120.    The automated text messages from Uber also constitute artificial or prerecorded voice calls pursuant to 47 U.S.C. § 227(b)(1).

121.    The automated text messages that Uber sent to Bartolet were sent without Bartolet's prior express consent.  Moreover, Uber continued to send Bartolet text messages even after Bartolet explicitly asked Uber to stop sending him text messages.

122.    The automated text messages that Uber sent to Bartolet were telemarketing, as defined by 47 C.F.R. § 64.1200.

123.    Bartolet alleges that each text message he received from Uber violated 47 U.S.C. § 227(b)(1).

## CLASS ACTION ALLEGATIONS

124.    Plaintiffs Julie McKinney and Sandeep Pal bring this action on behalf of themselves and a class of all others similarly situated ("Class A"), defined as follows:

> All persons domiciled within the United States who, within the last four years, received a non-emergency text message on their cellular telephone from Uber, without their prior express consent, via an ATDS, and prior to receiving the text message had not provided Uber with the cellular telephone number at which they received the text message from Uber.

125.    Plaintiffs Kerry Reardon, James Lathrop, Jennifer Reilly, Justin Bartolet, and Jonathan Grindell bring this action on behalf of themselves and a class of all others similarly situated ("Class B") defined as follows:

> All persons domiciled within the United States who, within the last four years, received a non-emergency text message on their cellular telephone from Uber, without their prior express consent, via an ATDS, after providing Uber with the telephone number at which they received the text message from Uber through Uber's website.

126.    Defendant and its employees or agents are excluded from the Classes.

127. Members of the Classes are so numerous that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed that the Classes are comprised of thousands of members geographically disbursed throughout the United States. The Classes are readily identifiable from information and records in the possession of Uber and third parties.

128. Common questions of law and fact exist as to all members of the Classes. These questions predominate over questions that may affect only individual class members because Defendant has acted on grounds generally applicable to the Classes. Such common and legal factual questions include:

a. Whether the Defendant's conduct violates the TCPA;

b. Whether the Defendant's text messages were sent for an emergency purpose;

c. Whether the Defendant obtained valid express consent from the automated text message recipients;

d. Whether Defendant adhered to requests by Class members to stop sending text messages;

e. Whether the Defendant keeps records of text message recipients who revoked consent to receive text messages;

f. Whether Plaintiffs and members of the Classes are entitled to damages, costs, or attorney's fees from Defendant;

g. Whether Defendant's conduct caused Plaintiffs and members of the Classes inconvenience or annoyance;

h. Whether Plaintiffs and members of the Classes are entitled to compensatory damages;

i. Whether Plaintiffs and members of the Classes are entitled to treble damages based on the willfulness of Defendant's conduct;

j. Whether Plaintiffs and members of Class A and Class B are entitled to a permanent injunction enjoining Defendant from continuing to engage in its unlawful conduct;

FIRST AMENDED COMPLAINT

129.    Plaintiff McKinney's and Plaintiff Pal's claims are typical of the members of Class A as all members of the Class A are similarly affected by the Defendant's actionable conduct. Defendant's conduct that gave rise to the claims of Plaintiffs McKinney and Pal and members of the Class A (*i.e.* using an autodialer to send unsolicited text messages to cellular phones owned by Plaintiffs McKinney and Pal and members of Class A) is the same for all members of Class A.

130.    Plaintiff Reardon's, Plaintiff Lathrop's, Plaintiff Reilly's, Plaintiff Bartolet's, and Plaintiff Grindell's claims are typical of the members of Class B as all members of the Class B are similarly affected by the Defendant's actionable conduct.  Defendant's conduct that gave rise to the claims of Plaintiffs Reardon, Lathrop, Reilly, Bartolet, Grindell, and members of the Class B (*i.e.* using an autodialer to send unsolicited text messages to cellular phones owned by Plaintiffs Reardon and Lathrop, Grindell, Reilly, Bartolet and members of Class B) is the same for all members of Class B.

131.    Plaintiffs will fairly and adequately protect the interests of the Classes because they have no interests antagonistic to, or in conflict with, the Classes that Plaintiffs seek to represent. Furthermore, Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action litigation.

132.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.  The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

133.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

134.    Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## COUNT I

### Violation of the Telephone Consumer Protection Act (47 U.S.C. § 227 *et seq.*)

135.    Plaintiffs incorporate by reference all above paragraphs as though fully repeated herein.

136.    The TCPA prohibits the use of an ATDS or autodialer to make any call or send any text message to a wireless phone number without the prior express consent of the contacted party or in the absence of an emergency.

137.    The foregoing acts and omissions of Defendant constitute numerous and multiple violations of the TCPA, including but not limited to each and every one of the above-cited provisions of  47 U.S.C. § 227 *et seq.*

138.    As a result of Uber's violations of 47 U.S.C. § 227 *et seq.*, Plaintiffs and members of the Classes are entitled to an award of $500.00 in statutory damages, for each and every negligent violation, pursuant to 47 U.S.C. § 227(b)(3).

139.    As a result of Uber's violations of 47 U.S.C. § 227 *et seq.*, Plaintiffs and members of the Classes are entitled to an award of $1,500.00 in statutory damages, for each and every knowing and/or willful violation, pursuant to 47 U.S.C. § 227(b)(3).

140.    Plaintiffs and members of the Classes also suffered damages in the form of text message, data, and other charges to their cellular telephone plans.

141.    Plaintiffs and members of the Classes are also entitled to and seek injunctive relief prohibiting Uber's illegal conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.    Statutory damages of $500.00 for each negligent violation of the TCPA over the last four years;

2.      Statutory damages of $1,500.00 for each knowing or willful violation of the TCPA over the last four years;

3.      Actual and punitive damages arising from Defendant's wrongful and illegal conduct;

4.      A permanent injunction prohibiting Defendant from sending text messages via the use of an ATDS or autodialer without recipients' prior express consent;

5.      Attorney's fees;

6.      Litigation expenses and costs of the instant suit; and

7.      Such other or further relief as the Court deems proper.

## **JURY DEMAND**

Plaintiffs demand trial by jury on all counts for which a jury trial is permitted.

Dated: January 30, 2015               Respectfully submitted,

   /s/ Hassan A. Zavareei
Hassan A. Zavareei (SBN 181547)
hzavareei@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2000 L Street, N.W., Suite 808
Washington, DC 20036
Tel.: (202) 973-0900
Fax: (202) 973-0950

*Attorney for Plaintiffs Kerry Reardon, James Lathrop, Julie McKinney, Sandeep Pal, Jennifer Reilly, Justin Bartolet, and Jonathan Grindell*

FIRST AMENDED COMPLAINT

## **CERTIFICATE OF SERVICE**

The undersigned certifies that, on January 30, 2015, I caused the foregoing document to be filed electronically through the Court's CM/ECF System and served on all counsel of record.

/s/ Hassan A. Zavareei

Hassan A. Zavareei
*Attorney for Plaintiffs*