Hassan A. Zavareei (SBN 181547)
hzavareei@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2000 L Street, N.W., Suite 808
Washington, DC 20036
Tel.: (202) 973-0900
Fax: (202) 973-0950

*Attorney for Plaintiffs Kerry Reardon,*
*James Lathrop, Julie McKinney,*
*Jonathan Grindell, Sandeep Pal,*
*Jennifer Reilly, and Justin Bartolet*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLAINTIFFS KERRY REARDON, JAMES LATHROP, JULIE MCKINNEY, JONATHAN GRINDELL, SANDEEP PAL, JENNIFER REILLY, and JUSTIN BARTOLET on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>UBER TECHNOLOGIES, INC.<br><br>Defendant. | Civil Action No. 14-cv-05678-JST<br><br>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS<br><br>Hearing Date: April 16, 2015<br>Time: 2:00 pm<br>Courtroom: 9 -19th Floor<br><br>Judge Jon S. Tigar |

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT OF FACTS ..................................................................................... 2

III.  LEGAL STANDARD ............................................................................................ 5

IV.   ARGUMENT ......................................................................................................... 6

      A.    Plaintiffs Adequately Alleged That Uber's Text Message
            Spam Constitutes Telemarketing And/Or Advertisements ......................... 6

      B.    Plaintiffs Did Not Expressly Consent To Receiving
            Text Messages From Uber. ...................................................................... 13

      C.    Even If The Court Finds That The Text Messages Were Not
            Advertising And/Or Telemarketing And That The Class B Plaintiffs
            Gave Prior Express Consent, Plaintiffs Reilly, Bartolet, and Grindell
            Revoked Any Such Consent. ..................................................................... 17

V.    CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Adamcik v. Credit Control Servs., Inc.*,
  832 F. Supp. 2d 744 (W.D. Tex. 2011) ........................................................................ 18

*AL & PO Corp. v. Med-Care Diabetic & Med. Supplies, Inc.*,
  No. 14 C 01893, 2014 WL 6999593 (N.D. Ill. Dec. 10, 2014) .......................... 9, 10, 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................ 5

*Beal v. Wyndham Vacation Resorts, Inc.*,
  956 F. Supp. 2d 962 (W.D. Wis. 2013) ........................................................................ 18

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................ 5

*Brenner v. Am. Educ. Servs.*,
  575 F. App'x 703 (8th Cir. 2014) .................................................................................. 18

*Brodsky v. HumanaDental Ins. Co.*,
  No. 10 C 3233, 2014 WL 2780089 (N.D. Ill. June 12, 2014) .................................. 12, 13

*Buchholz v. Valarity, LLC*,
  No. 4:13CV362 TIA, 2014 WL 5849434 (E.D. Mo. Nov. 12, 2014) ........................... 18

*Chesbro v. Best Buy Stores, L.P.*,
  705 F.3d 913 (9th Cir. 2012) .......................................................................................... 7

*Consumer Prot. Corp. v. Neo-Tech News*,
  No. CV 08-1983-PHX-JAT, 2009 WL 2132694 (D. Ariz. July 16, 2009) ........... 5, 7, 13

*Friedman v. Torchmark Corp.*,
  No. 12 CV 2837, 2013 WL 4102201 (S.D. Cal. Aug. 13, 2013) .................................. 10

*Gager v. Dell Fin. Servs., LLC*,
  727 F.3d 265 (3d Cir. 2013) ..................................................................................... 18, 19

*Gutierrez v. Barclays Grp.*,
  Case No. 10CV1012 DMS BGS, 2011 WL 579238 (S.D. Cal. Feb. 9, 2011) .............. 18

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*,
  847 F. Supp. 2d 1253 (S.D. Cal. 2012) ........................................................................ 15

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) .......................................................................................... 5

*Legg v. Voice Media Grp., Inc.*,
  990 F. Supp. 2d 1351 (S.D. Fla. 2014).................................................................. 18

*Lesher v. Law Offices of Mitchell N. Kay, PC*,
  650 F.3d 993 (3d Cir. 2011)................................................................................ 19

*Lucas v. Dep't of Corrections*,
  66 F.3d 245 (9th Cir. 1995)................................................................................... 5

*Luna v. Shac, LLC*,
  No. C14-00607 HRL, 2014 WL 5324291 (N.D. Cal. Oct. 17, 2014)..................... 5

*Lusskin v. Seminole Comedy, Inc.*,
  No. 12-62173-Civ., 2013 WL 3147339 (S.D. Fla. June 19, 2013) ....................... 16

*Lutz Appellate Servs. v. Curry*,
  859 F. Supp. 180 (E.D. Pa. 1994) ....................................................................... 10

*Magic, Inc. v. 127 High St., Inc.*,
  No. 14 C 4344, 2014 WL 6806941 (N.D. Ill. Dec. 2, 2014)................................ 11

*Masuda v. Citibank, N.A.*,
  38 F. Supp. 3d 1130 (N.D. Cal. 2014) .................................................................. 5

*Munro v. King Broad. Co.*,
  No. C13-1308JLR, 2013 WL 6185233 (W.D. Wash. Nov. 26, 2013).................. 18

*Murphy v. DCI Biologicals Orlando, LLC*,
  No. 6:12-CV-1459-ORL, 2013 WL 6865772 (M.D. Fla. Dec. 31, 2013) ............ 11

*Navarro v. Block*,
  250 F.3d 729 (9th Cir. 2001)................................................................................. 5

*Neder v. United States*,
  527 U.S. 1 (1999) ............................................................................................... 19

*Osorio v. State Farm Bank, F.S.B.*,
  746 F.3d 1242 (11th Cir. 2014) .......................................................................... 18

*Paldo Sign & Display Co. v. Wagener Equities, Inc.*,
  No. 09 C 07299, 2014 WL 4376216 (N.D. Ill. Sept. 4, 2014)............................ 12

*Pimental v. Google Inc.*,
  No. C-11-02585-YGR, 2012 WL 691784 (N.D. Cal. Mar. 2, 2012)..................... 8

*Retiree Support Grp. of Contra Costa Cnty. v. Contra Costa Cnty.*,
  944 F. Supp. 2d 799 (N.D. Cal. 2013) ............................................................... 5, 6

*Satterfield v. Simon & Schuster, Inc.*,
  569 F.3d 946 (9th Cir. 2009)......................................................................... *passim*

*St. Louis Heart Ctr., Inc. v. Caremark, L.L.C.*,
    No. 4:12CV2151 TCM, 2012 WL 9988795 (E.D. Mo. Apr. 19, 2013)......................................... 12

*Thrasher-Lyon v. CCS Commercial, LLC*,
    No. 11 C 04473, 2012 WL 3835089 (N.D. Ill. Sept. 4, 2012) .................................................. *passim*

*Thrasher-Lyon v. CCS Commercial, LLC*,
    No. 11 C 04473, 2012 WL 5389722 (N.D. Ill. Nov. 2, 2012) ...................................................... 16

*Walling v. Beverly Enters.*,
    476 F.2d 393 (9th Cir. 1973)........................................................................................................... 5

**<u>Statutes</u>**

47 U.S.C. § 227(b)(1)(A)(iii) ............................................................................................................... 13

Pub. L. 102–243, 105 Stat. 2394, § 2(5) ............................................................................................ 16

Telephone Consumer Protection Act, 47 U.S.C. § 227 ........................................................................ 1

**<u>Rules and Regulations</u>**

7 FCC Rcd. 8752, 8769 (1992) ........................................................................................................... 13

23 FCC Rcd. 559, 564 (2008)....................................................................................................... 14, 16

27 FCC Rcd. 15391 (2012) ................................................................................................................. 19

47 C.F.R. § 64.1200 (a)(2) .................................................................................................................... 6

47 C.F.R. § 64.1200(a)(1)(i) ............................................................................................................... 13

47 C.F.R. § 64.1200(a)(4) ..................................................................................................................... 9

47 C.F.R. § 64.1200(f) ..................................................................................................................... 6, 9

**<u>Other Authorities</u>**

Black's Law Dictionary 323 (8th ed. 2004).................................................................................. 13, 14

Restatement (Second) of Torts § 892A, cmt. 1 (1979) ....................................................................... 18

## I.     INTRODUCTION

Defendant Uber Technologies, Inc. ("Uber") is a software company that promotes and licenses mobile-based software the ("Uber App") to connect commercial drivers with passengers. Pursuant to its license agreement with the drivers, Uber generates income by taking a portion of the money that the passengers pay to the drivers.  Plaintiffs Kerry Reardon, James Lathrop, Jennifer Reilly, Justin Bartolet, and Jonathan Grindell (the "Class B Plaintiffs") all considered using the Uber App as drivers and provided some information, including their phone numbers, to Uber in this process.  When they all decided not to complete that process, Uber began texting them repeatedly to try to change their minds.  The Class B Plaintiffs allege that Uber's text message spam violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA") because the text messages constituted telemarketing or advertising and were sent to them without prior express consent— written or otherwise. In the instant Motion to Dismiss ("Motion" or "Mot."), Uber asks the Court to dismiss the claims of all of the Class B Plaintiffs based on a single argument.  Namely, Uber argues that the text messages were not telemarketing or advertising and, thus, Uber was only required to obtain prior express consent, not prior express *written* consent, to send the messages.  Uber contends that the Class B Plaintiffs provided that express consent simply by giving Uber their phone numbers.   Uber is wrong and the Motion should be denied for three reasons.

First, under the TCPA, Uber's text messages are telemarketing and advertising.  In its Motion, Uber claims that the text messages were hiring solicitations, and relies on employment-related cases that have held that such hiring solicitations do not constitute telemarketing or advertising. Mot. at 4-6.  In other litigation in this Court, however, Uber has made admissions that are fatal to its argument that its text spam is related to hiring.  Specifically, Uber considers itself a software company that markets and sells its Uber App to both commercial drivers and passengers. As an initial matter, Uber's self-proclaimed efforts to promote its Uber App to licensees plainly amounts to advertising and telemarketing.  Moreover, numerous decisions evaluating messaging wherein businesses promote lucrative revenue opportunities to intermediaries have concluded that such messages constitute telemarketing and advertising.  Because Uber has admitted that its conduct vis-à-vis its drivers amounts to advertising and telemarketing, it was not permitted to text the Class

-1-

B Plaintiffs without their express *written* consent.  There is no basis for any argument that the Class B Plaintiffs ever provided express written consent.  Thus, because the text messages constituted advertising and telemarketing, the Motion must be denied.

Second, assuming, *arguendo*, that the subject text messages did not constitute telemarketing or advertising, Uber was still required to obtain prior express consent from the Class B Plaintiffs.  It did not.  Uber argues that the Court should find that when the Class B Plaintiffs simply provided their cellular telephone numbers to Uber, they expressly consented to receiving automated text message spam.  While some courts have adopted this approach, other courts have described this as "bizarre" logic that essentially finds that the act of providing a telephone number can be implied to mean that the consumer expressly consented to receiving automated texts via an Automated Telephone Dialing System ("ATDS").  Such a holding is inconsistent with the pronouncement of the Ninth Circuit, which held that "[e]xpress consent is '[c]onsent that is clearly and unmistakably stated.'"  Class B Plaintiffs urge the Court to adhere to this definition and hold that the Class B Plaintiffs did not implicitly provide express consent to receive text spam from Uber merely by disclosing their phone numbers.

Finally, the claims of three of the Class B Plaintiffs cannot be dismissed because even if the Court finds that the text messages were not advertising or telemarketing *and* these Plaintiffs expressly consented to receiving text messages, they each asked Uber to stop texting them, thereby revoking consent.  All of the post-revocation text messages that they received from Uber are covered by the TCPA.

## II.   STATEMENT OF FACTS

The Class B Plaintiffs all allege that they began to sign up as drivers for Uber but decided not to complete the process and did not wish to become Uber drivers.  First Amended Complaint ("FAC"), ¶¶ 36, 53-55, 70, 99, 113.  During this process, they provided Uber with their cellular telephone numbers.  *Id.* ¶ 125.  At no time during this process did any of the Class B Plaintiffs expressly indicate (in writing or orally) that they were consenting to Uber sending them text messages at the number they provided.  *Id.* ¶¶ 37, 56, 71, 100, 114.  The Class B Plaintiffs are situated somewhat differently from the other plaintiffs in this lawsuit—who seek to represent "Class

A."  Specifically, the Class A Plaintiffs never had any prior communication with Uber of any kind.  *Id.* ¶¶ 24, 84, 124.  Uber texted the Class A Plaintiffs out of the blue, even though they never provided their cell phone numbers to Uber or otherwise indicated an interest in any sort of commercial relationship with Uber.  *Id.* ¶¶ 24-25, 84-85.

After the Class B Plaintiffs provided their cell phone numbers, Uber bombarded them with automated text messages.  *Id.* ¶¶ 38-45, 57-62, 72-76, 101-05, 115-16.  Bartolet, for example, received at least 44 text messages from 23 different telephone numbers.  *Id.* ¶ 115.  Reardon received dozens of text messages.  *Id.* ¶ 41.  Lathrop received approximately 19 text messages.  *Id.* ¶ 59.  Grindell received text messages daily for at least two weeks.  *Id.* ¶ 74.  Three of the Class B Plaintiffs, Reilly, Bartolet, and Grindell (the "Revoking Plaintiffs") replied to Uber's unwanted text messages and asked Uber to stop texting them.  *Id.* ¶¶ 73, 104, 116.  Even after the Revoking Plaintiffs asked Uber to stop texting them, Uber continued to do so.  For instance, Grindell sent Uber a text message with the word "Remove," but Uber continued to text her.  *Id.* ¶ 73.  Reilly sent a text message to Uber asking, "Can you please take me off this list," but in spite of that, she received another message from Uber asking her to finalize her application.  *Id.* ¶¶ 104-05.  Bartolet instructed Uber to "[s]top texting this number," among other requests to stop, but he received at least 29 messages from Uber after making his request.  *Id.* ¶ 116.

Judicial admissions made by Uber in another case pending before this Court establish that Uber's communications with the Class B Plaintiffs were made for the purpose of enticing the Class B Plaintiffs to license software from Uber.  Those facts are now properly before the Court for purposes of this motion through a concurrently filed Request for Judicial Notice ("RJN").  Specifically, the admissions establish that Uber is a software company that develops and licenses a mobile software application (the "Uber App") to commercial drivers for those drivers to connect with passengers.  Uber does not employ drivers and, instead, licenses the Uber App to drivers to use it to find passengers in exchange for a fee for each ride.  Uber affirmatively markets its Uber App to drivers, the people from whom it receives a payment for each ride.  In Uber's eyes, drivers are every bit as much its customers as its passengers.  Uber has explicitly and repeatedly stated that (1) it is *not* an employer, (2) it provides its Uber App to drivers in exchange for a fee, and (3) it

-3-

affirmatively *markets* and *promotes* its Uber App to drivers:

- [Uber] developed and licenses a mobile application (the "Uber App") that transportation providers can use to receive trip requests from a pool of potential passengers. **Plaintiffs and [Uber] are not in an employment relationship.** Instead, as the undisputed facts make clear, **[Uber] is in a commercial relationship with Plaintiffs** and other transportation providers where, on agreed terms, [Uber] conveys trip requests from passengers to them via the Uber App and processes payments for any trips they agree to provide. . . . **Plaintiffs pay [Uber] for access to leads via the Uber App** and to benefit from [Uber]'s marketing efforts and payment processing. *Like passengers, Plaintiffs and other drivers are customers who receive a service from* [*Uber*]. Precisely because drivers are not employees subject to its control, **[Uber] must promote the benefits of the Uber App to them and incentivize its use, just as [Uber] markets and promotes the Uber App to passengers**. RJN Ex. 1, Defendant's Motion for Summary Judgment, *O'Connor et al. v. Uber Technologies, Inc.*, No. 13-03826-EMC (N.D. Cal.), Dkt. 211, at 1 (italicized emphasis in original; bolded emphasis added).

- [Uber], by providing leads, connecting drivers to passengers, and seamlessly processing payment of fares, **provides a service to drivers and receives a fee for that service** in return. *Id.* at 18.

- **Uber is a software technology company that provides lead generation services for transportation companies and drivers.** Uber has developed a mobile application and associated software that enable members of the public to request transportation services from nearby drivers who have signed a software license agreement to use Uber's driver application. . . . The driver has the option to accept or decline each request for transportation received via the driver application. **Uber does not own or lease any for-hire vehicles, does not employ any drivers, and does not itself provide any transportation services.** *Id*. at p. 1. RJN Ex. 2, Defendant's Reply in Support of Motion to Dismiss, *O'Connor et al. v. Uber Technologies, Inc.*, No. 13-03826-EMC (N.D. Cal.), Dkt. 45, at 1 (emphasis added) (citations omitted).

Thus, according to Uber, it was never a "prospective employer" to the Class B Plaintiffs. Rather, Uber engaged in a text message campaign marketing the Uber App to the Class B Plaintiffs in an effort to attract more drivers to obtain and use it in exchange for fees paid to Uber. Had the Class B Plaintiffs actually become drivers for Uber, they would not become employees. Instead, they would be licensees of Uber's lead generation application. This is evidenced by the fact that the agreement between drivers and Uber is not an "employment agreement" but, rather, is a "Software License and Online Services Agreement." RJN Ex. 1, at 8. In short, Uber's own admissions in

1   another case in this courthouse establish that Uber was not trying to hire the Class B Plaintiffs.  It

2   was marketing to them to entice them to license its lead generation service.

3   **III.    LEGAL STANDARD**

4           A complaint must "state a claim for relief that is plausible on its face" in order to survive a

5   motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550

6   U.S. 544, 570 (2007).  In evaluating a motion to dismiss, "all material allegations in the complaint

7   must be taken as true and construed in the light most favorable to the claimant."  *Luna v. Shac, LLC*,

8   No. C14-00607 HRL, 2014 WL 5324291, at *1 (N.D. Cal. Oct. 17, 2014) (citing *Navarro v.*

9   *Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  And "[a]ny existing ambiguities must be resolved in

10  favor of the pleadings."  *Id.* (citing *Walling v. Beverly Enters.*, 476 F.2d 393, 396 (9th Cir. 1973)).

11  "Although the court generally may not consider material outside the pleadings when resolving a

12  motion to dismiss for failure to state a claim, the court may consider matters that are properly the

13  subject of judicial notice."  *Masuda v. Citibank, N.A.*, 38 F. Supp. 3d 1130, 1133 (N.D. Cal. 2014)

14  (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001)) (other citations omitted).

15          Here, because the Class B Plaintiffs have stated a claim under the TCPA that is plausible on

16  its face, Uber's Motion should be denied.  However, should the Court be inclined to grant Uber's

17  Motion, it should provide Class B Plaintiffs an opportunity to amend the complaint in order to cure

18  any deficiencies related to their allegations that the text messages were telemarketing.  *See, e.g.*,

19  *Retiree Support Grp. of Contra Costa Cnty. v. Contra Costa Cnty.*, 944 F. Supp. 2d 799, 803 (N.D.

20  Cal. 2013) (citing *Lucas v. Dep't of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995)).  Uber argues

21  that the Class B Plaintiffs cannot re-plead around their allegations that they provided their cell

22  phone numbers to Uber and that those allegations, alone, equate to prior express consent and

23  mandate dismissal with prejudice.  Mot. at 2-3.  But that is not a dispositive issue in this case.  The

24  Class B Plaintiffs have also alleged that Uber's text messages were telemarketing, thereby requiring

25  prior express *written* consent.  Plaintiffs were not required to allege in great detail how the text

26  messages at issue were telemarketing and/or advertising.  *See, e.g.*, *Consumer Prot. Corp. v. Neo-*

27  *Tech News*, No. CV 08-1983-PHX-JAT, 2009 WL 2132694, at *3 (D. Ariz. July 16, 2009) ("On a

28  motion to dismiss, we are required to assume that all general allegations embrace whatever specific

facts might be necessary to support them.  Therefore, requiring Plaintiff to demonstrate in detail how the Fax constitutes an advertisement is unnecessary.") (citation omitted).  However, should the Court deem the Class B Plaintiffs' allegations as to telemarketing insufficient, the Class B Plaintiffs should be granted leave to amend as to that issue.  *See, e.g.*, *Retiree Support Grp.*, 944 F. Supp. 2d at 803 ("When dismissing a complaint, leave to amend must be granted unless it is clear that a complaint's deficiencies cannot be cured by amendment.").

## IV.   ARGUMENT

### A.   Plaintiffs Adequately Alleged That Uber's Text Message Spam Constitutes Telemarketing And/Or Advertisements.

The crux of Uber's Motion is that the text messages sent to the Class B Plaintiffs were not sent for telemarketing or advertising purposes.  Thus, Uber claims that that it did not have to obtain the "stricter prior express *written* consent . . . applicable to advertisements and telemarketing." Mot. at 4 (internal quotations omitted) (emphasis added).  Indeed, Uber does not argue that it obtained prior express written consent.  Instead, Uber contends that obtaining the less stringent "prior express consent" is sufficient to permit Uber to barrage Plaintiffs with text messages, and that Plaintiffs implicitly provided that form of express consent merely by providing their telephone numbers to Uber.  Mot. at 3-9.  Thus, the threshold question in Uber's Motion is whether Class B Plaintiffs' allegations, together with Uber's admissions, are sufficient to establish that the text messages amount to telemarketing and advertising.  As discussed below, they are.  Thus, because Uber has not argued that Plaintiffs provided prior express *written* consent, the Motion has no merit and should be denied.

Through its implementing regulations, the TCPA prohibits Uber from "initiat[ing], or caus[ing] to be initiated, any telephone call that includes or introduces an *advertisement* or constitutes *telemarketing*, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the *prior express written consent* of the

called party . . ." 47 C.F.R. § 64.1200(a)(2) (emphasis added).[1]  The FCC has defined "advertisement" to mean "any material advertising the commercial availability or quality of any property, goods, or services," and "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services."  *Id.* at § 64.1200(f).  Importantly, the Ninth Circuit has instructed that whether a call may be considered an advertisement does not turn on whether the call explicitly mentions the item being marketed or whether it also contains additional information:  "Neither the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context. Any additional information provided in the calls does not inoculate them."  *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012).

Each of the Plaintiffs alleged that Uber's text messages were telemarketing (*see* FAC at ¶¶ 34, 51, 68, 82, 97, 111, 122) and pled specific facts to show that Uber was advertising its Uber App. For instance, Plaintiff Grindell alleged that Uber texted him that it was his "LAST CHANCE to get on Uber before the New Year's Eve rush." *Id.* ¶ 75.  These allegations alone are sufficient to defeat Uber's Motion.  *See Consumer Prot. Corp.*, 2009 WL 2132694, at *3 ("[R]equiring Plaintiff to demonstrate in detail how the Fax constitutes an advertisement is unnecessary").

Uber ignores Plaintiffs' allegations and argues that its text messages are not advertisements or telemarketing because the messages are "prospective employment, independent contractor, or recruiting messages." Mot. at 6.  Uber's contention that its text messages are employment-related—rather than advertising or telemarketing of its Uber App—contradicts its position that Uber drivers are *not* employees of Uber.  *See* Mot. at n.7.  Uber attempts to get around this inconsistency by arguing that drivers are independent contractors and that "calls related to prospective independent contractor relationships" are not telemarketing.  *Id.*  Similarly, Uber insists that its text messages were neither advertising nor telemarketing because Uber was "not asking Plaintiffs to purchase, rent, or invest in anything."  Mot. at 6.

Uber's arguments are belied by its own statements, made in other litigation before this same

---

[1] As Uber concedes, text messages are "calls" for purposes of the TCPA.  Mot. at n.3 (citing *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009)).

Court about the nature of its business model. Although Uber now claims that its text messages are not advertisements, Uber has described itself as "marketer" and "promoter" of its mobile application, the Uber App, and its drivers as its "customers":

> Uber developed and licenses a mobile application (the "Uber App") that transportation providers can use to receive trip requests from a pool of potential passengers.

> * * *

> Plaintiffs pay [Uber] for access to leads via the Uber App and to benefit from [Uber]'s marketing efforts and payment processing. Like passengers, **Plaintiffs and other drivers are customers who receive a service from [Uber]**. Precisely because drivers are not employees subject to its control, **[Uber] must promote the benefits of the Uber App to them and incentivize its use, just as [Uber] markets and promotes the Uber App to passengers.**

*See* RJN Ex. 1, at 1 (Uber's Motion for Summary Judgment in *O'Connor*) (emphases added). Uber also tries to convince this Court that it was not selling anything to Plaintiffs, but Uber has told this Court in another lawsuit that Uber's relationship with its drivers fits squarely within the FCC's definition of advertising as encouraging the sale of services: "[Uber], by providing leads, connecting drivers to passengers, and seamlessly processing payment of fares, ***provides a service to drivers and receives a fee for that service in return***." *Id.* (emphasis added). In other words, Uber sells its service—the Uber App—to prospective drivers (its "customers") and gets paid for that service.

For this reason, any text messages that Uber sent to potential drivers was a direct solicitation of its product. By Uber's own admission, it is marketing to the drivers to license its application. The only purpose of the text messages is to sell its product to the drivers. In a different legal context, this Court has held that text messages promoting mobile applications like the Uber App are commercial in their very nature. In *Pimental v. Google Inc.*, No. C-11-02585-YGR, 2012 WL 691784 (N.D. Cal. Mar. 2, 2012), this Court considered Google's argument that a text message involving the promotion of a mobile application was "non-commercial speech" deserving of First Amendment protection from the TCPA's reach. The mobile application at issue was Google's "Disco" group texting service, which allowed members to add the phone numbers of others and send group texts without the recipients opting in. *Id.* at *1. The plaintiffs alleged that Google

harvested all of the phone numbers added without the recipients' consent and sent text message spam "promoting their Disco service and Disco mobile application." *Id.* In the context of its constitutional challenge, Google argued that the text messages were "informational" and did not "fall within the definitions of solicitation or advertisement regulated by statute." *Id.* Rejecting this argument, the court found that because the plaintiffs alleged that the texts were "promoting [Defendants'] service and mobile application," the "text messages are commercial." *Id.* at *3.

Similarly, Uber's effort to promote its Uber App is part of a commercial transaction aimed at generating revenue from potential drivers. By its own admission, Uber's entire business model is centered around recruiting drivers to use the Uber App. Indeed, Uber admits that it markets the Uber App to drivers just as it markets to riders. Under these facts, there can be no question that Uber's zealous efforts to accumulate users of the Uber App constitutes advertisement under the FCC's definition of that term because it is "material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f). The property, goods, or services are the Uber App. And the text messages are promoting its commercial availability. Similarly, the text messages constitute "telemarketing" because it is "the initiation of a . . . message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services"—again, the Uber App. *Id.*

The fact that the money that Uber ultimately receives first comes from the end-users (*i.e.*, the passengers) as opposed to the drivers, makes no difference. No matter where the money comes from first, Uber is still marketing the Uber App to the drivers in order to promote a commercial opportunity. Quite recently a court faced with very similar facts—where a business was promoting to intermediaries an opportunity to make money—concluded that the message constituted an advertisement under the TCPA. In *AL & PO Corp. v. Med-Care Diabetic & Med. Supplies, Inc.*, No. 14 C 01893, 2014 WL 6999593, at *1 (N.D. Ill. Dec. 10, 2014), the district court analyzed fax messages sent by the defendant Med-Care, a corporation that "sells medical and pharmaceutical supplies to a through a network of subcontractors that market products and services on its behalf."[2]

---

[2] Although *Med-Care* concerned the transmission of fax messages, the definition of "unsolicited advertisement" used in the context of fax messages is identical to the general definition of

Med-Care sent a fax message to "a possible candidate for [its] affiliate/subcontractor program" and, in the fax, Med-Care trumpeted how profitable such arrangements could be: "[s]ubcontracting agreements can be a lucrative method for smaller providers to maintain and enlarge their referral sources[.]"  *Id.*  The fax invited the recipient to "call or email us if you are interested in taking advantage of this opportunity" and provided a toll-free number and email address.  *Id.*

Med-Care argued, as Uber does here, that the fax transmission was not an advertisement because "it did not seek to sell anything, but rather simply made a proposal akin to an offer of employment."  *Med-Care*, 2014 WL 6999593, at *2.  Indeed, Med-Care relied on the same two cases that Uber cites in support of its position: *Lutz Appellate Servs. v. Curry*, 859 F. Supp. 180 (E.D. Pa. 1994) and *Friedman v. Torchmark Corp.*, No. 12 CV 2837, 2013 WL 4102201 (S.D. Cal. Aug. 13, 2013).  The court flatly rejected Med-Care's argument, distinguishing both *Lutz* and *Friedman* on their facts.  Specifically, the court explained that the message in *Med-Care* was "an entirely different form of message" from a job posting.  *Id.*  The fax in *Med-Care*—like the text messages sent by Uber—are "solicitations for independent contractors specifically aimed at recruiting someone (or some corporation) to market the [ ] sender's products."  *Id.*

Such solicitations are unlike the call at issue in *Friedman*, which the *Med-Care* court distinguished as "an open-ended invitation to attend a webinar[,]" and the fax at issue in *Lutz*, which the *Med-Care* court called "[a] barebones 'help wanted' notice."  *Id.*  The *Med-Care* court found that the communications in *Friedman* "on their own, do not promote any property, goods, or services."  *Id.*  But the communications sent by Med-Care and Uber are different—they "herald a lucrative opportunity to do business" with the sending company.  *Id.*  Uber concedes that it is in a "commercial relationship" with its drivers.  *See* RJN Ex. 1, at 1.  And the text messages sent by Uber to Plaintiffs trumpeted a lucrative business opportunity.  Uber was promoting the use of its service—the Uber App—as a way for recipients to earn a lot of money doing business with Uber. For example, Uber texted Plaintiff Reardon, telling her that "December is [Uber's] busiest month of the year" and urging her to "cash in on this flurry of demand!" FAC at ¶ 42.  Just a few days later,

"advertisement" used in the context of calls and text messages.  *Compare* 47 C.F.R. § 64.1200(a)(4) *with* 47 C.F.R. § 64.1200(f).

Uber pressed Reardon to "sign online [to the Uber App] Thursday, Friday, and Saturday to take advantage" because "[t]his weekend should be our biggest of the year[.]" *Id*. at ¶ 45.

The *Med-Care* court also rejected Med-Care's second argument that the fax messages were not advertisements because, even if the faxes did highlight available goods or services, "the recipient, as a potential intermediary only, was never the intended buyer" of those goods or services. *Med-Care*, 2014 WL 6999593, at *3. The court called Med-Care's definition of advertising "too constrained" because the common sense understanding of advertising does not restrict the audience "to a direct consumer of the publicized good or any other party." *Id*. According to the court:

> Med–Care has a strong interest in cultivating a base of subcontractors and, even accepting for the moment that these subcontractors are not themselves direct purchasers of Med–Care's goods, Med–Care is trying to reach them as a means of ultimately selling its goods and services through them. A fax that calls attention to goods or products in order to facilitate this kind of commercial exchange fits with a natural understanding of the term advertising.

*Id*.

The same is true of Uber. Even though the person who pays Uber and the driver for the ride was not the recipient of the text messages at issue, Uber must cultivate a strong base of drivers to use the Uber App and, ultimately, sell rides through them. That is precisely the commercial exchange that Uber was advertising via its text spam to Plaintiffs.[3] The text messages Uber spammed to the Class B Plaintiffs called attention to the Uber App in order to facilitate this commercial exchange between drivers, passengers, and Uber.

Other decisions have held that advertising the availability of a business opportunity is advertising for purposes of the TCPA. In *Magic, Inc. v. 127 High St., Inc.*, No. 14 C 4344, 2014 WL 6806941 (N.D. Ill. Dec. 2, 2014), the United States District Court for the Northern District of Illinois denied the defendants' motion to dismiss and held that a fax message that made "an overt pitch to recipients to join its 'Get Paid for Faxes Program' and receive a compensation of 'a $ 0.50

---

[3] The only other case cited by Uber, *Murphy v. DCI Biologicals Orlando, LLC*, No. 6:12-CV-1459-ORL, 2013 WL 6865772 (M.D. Fla. Dec. 31, 2013), is similarly distinguishable. In *Murphy*, the calls at issue were not deemed "telephone solicitations" covered by the TCPA because the defendant was trying to buy something (blood) from the recipients, not selling anything to them. *Id*. at *10. Here, Uber is not trying to buy anything from Plaintiffs—but it is marketing its Uber App to them.

bounty for each unique fax advertisement' submitted to the defendants" was advertising under the TCPA. The district court noted that, unlike *Lutz* (cited by Uber), the fax did not offer employment—instead, it "invite[d] the recipients to do business with [d]efendants by soliciting recipients to submit advertisements in return for a fee through what amounts to a commercial 'fax-buying' service." *Id.* at *2. Just a few months earlier, the same court decided *Paldo Sign & Display Co. v. Wagener Equities, Inc.*, No. 09 C 07299, 2014 WL 4376216 (N.D. Ill. Sept. 4, 2014), wherein it confirmed that "advertising the availability of services is covered by the TCPA" and held that a fax transmission containing a link to a free database was advertising. *Id.* at *4. Even though the database was free, the court concluded that there was "no genuine dispute of material fact that the fax here advertises the commercial availability of WEI's services—a free database of industrial real estate listings that is owned and managed by WEI." *Id.* at *5. The "purpose of the fax was to direct traffic to WEI's database" with the goal that the recipients would "contact WEI about those properties." *Id. See also Brodsky v. HumanaDental Ins. Co.*, No. 10 C 3233, 2014 WL 2780089, at *7 (N.D. Ill. June 12, 2014) *opinion modified on denial of reconsideration*, No. 10 C 3233, 2014 WL 4813147 (N.D. Ill. Sept. 29, 2014) (noting that the "TCPA does not require that an unwanted and uninvited fax make an overt sales pitch" and holding that faxes, which were "open invitations to do business with Humana[,]" could be considered by a jury to be advertisements.)

The United States District Court for the Eastern District of Missouri reached a similar conclusion in *St. Louis Heart Ctr., Inc. v. Caremark, L.L.C.*, No. 4:12CV2151 TCM, 2012 WL 9988795 (E.D. Mo. Apr. 19, 2013), wherein it considered whether faxes from CVS pharmacy to doctors introducing its "Pharmacy Advisor" program were advertising under the TCPA. *Id.* at *3. The "Pharmacy Advisor" program was "designed to encourage people to adhere to a medication regimen." *Id.* at *2. While the court recognized that the fax did not offer the recipient any property, goods, or services for sale, or contain an "overt sales pitch[,]" the court noted the broad definition of "promote" as "[t]o advance the interests of, move to a stronger or more prominent position" and concluded that the fax "encourage[ed] [p]laintiff's patients to participate in the program, and thereby promot[ed] a service[.]" *Id.* Since the fax at issue concerned a commercially available program or service, it did not "share any characteristics with faxes found on motions to dismiss not

-12-

to be unsolicited advertisements." *Id.* at *4.

Here, even if the Court determines that the text messages sent by Uber did not contain an "overt sales pitch" for Uber's mobile application, *see id.* at *2, it does not follow that the text messages were not advertising or telemarketing under the TCPA.[4]  Like the communications discussed in the cases outlined above, the text messages sent by Uber to Plaintiffs promoted Uber's commercially available Uber App.  The text messages were "open invitations [for Plaintiffs] to do business" with Uber.  *See Brodsky*, 2014 WL 2780089, at *7.

**B.      Plaintiffs Did Not Expressly Consent To Receiving Text Messages From Uber.**

Even if the Court finds that the text messages Uber sent to the Class B Plaintiffs were not telemarketing or advertising, Uber still needed the Class B Plaintiffs' "prior express consent" in order to text them.  47 U.S.C. § 227(b)(1)(A)(iii); *see also* 47 C.F.R. § 64.1200(a)(1)(i).  Uber places great weight on an FCC statement equating the provision of a phone number to "express consent" and cases adopting that rationale.  Mot. at 7-8.  But in addition to the FCC statement being less clear then Uber would have the Court believe, the Ninth Circuit has specified that "[e]xpress consent is '[c]onsent that is clearly and unmistakably stated.'"  *Satterfield*, 569 F.3d at 955 (citing Black's Law Dictionary 323 (8th ed. 2004)).  Although Uber cites many non-binding trial court decisions supporting its position, others have followed *Satterfield* or applied similar reasoning, and Plaintiffs respectfully request that the Court interpret the term "express consent" to mean that consent must be given clearly and unmistakably, rather than implicitly.

First, however, it is important to understand the FCC statement on which Uber relies.  The FCC's 1992 implementing regulations stated that persons who provide their telephone numbers have "in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary," 7 FCC Rcd. 8752, 8769 (1992).  But as the court in *Thrasher-Lyon v. CCS Commercial, LLC*, No. 11 C 04473, 2012 WL 3835089 (N.D. Ill. Sept. 4,

---

[4] At the pleading stage, plaintiffs are not required to "demonstrate in detail how the [communication] constitutes an advertisement" under the TCPA.  *Consumer Prot. Corp.*, 2009 WL 2132694, at *3.  However, should the Court determine that Plaintiffs have not alleged, in sufficient detail, how the text messages are telemarketing and/or advertising, Plaintiffs should be granted leave to amend to include additional allegations.

2012), observed, while the 1992 statement might have dealt with consent to being contacted in general, it did not go to consent to being contacted via the sort of automated telephone dialing system ("ATDS") at issue in this matter. *Id.* at 3-4. Moreover, a 2008 FCC implementing regulation (not cited by Uber) clarified that the provision of a telephone number constitutes "express consent" in the narrow context of debt collection because a consumer providing his or her number to a debtor is consenting to being contacted at that number:

> Because we find that autodialed and prerecorded message calls to wireless numbers provided by the called party in connection with an existing debt are made with the "prior express consent" of the called party, we clarify that such calls are permissible. We conclude that the provision of a cell phone number *to a creditor, e.g., as part of a credit application*, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt.

23 FCC Rcd. 559, 564 (2008) (emphasis added). If the 1992 statement meant what Uber—and indeed, many courts—interpret it to mean, there would be no need for the FCC to have made the clarification that it made in 2008 with respect to debt collection. *See Thrasher-Lyon*, 2012 WL 3835089, at *5. And to be sure, no such clarification has been made outside of the debt collection context.

In *Satterfield*, the plaintiff signed up for a free ringtone from one company (Nextones) which, in turn, provided the plaintiff's cell phone number to an unrelated defendant, which sent the plaintiff a text message promoting a new book. 569 F.3d at 949. In that case, the plaintiff checked a box consenting to "receiv[ing] promotions from Nextones affiliates and brands," but not from third parties. *Id.* Therefore, although the "express consent" analysis dealt with whether or not the consent extended to being contacted by a third party, the Ninth Circuit unequivocally stated that simply providing a cell phone number cannot amount to express consent to being contacted by *anyone*:

> [T]he district court erred in granting summary judgment based upon Satterfield expressly consenting to receiving the message. While the TCPA exempts those calls "made with the prior express consent of the called party," 47 U.S.C. § 227(b)(1)(A), no express consent was given in this case. ***Express consent is "[c]onsent that is clearly and unmistakably stated."*** Black's Law Dictionary 323 (8th ed. 2004).

*Id.* at 954-55 (emphasis added).  Just as consenting to receiving promotions from one company cannot amount to "consent that is clearly and unmistakably stated" to receive messages from a third party, it is equally true that simply providing a cell phone number to Uber, like the Class B Plaintiffs in this case, is not "consent that is clearly and unmistakably stated" to receive text message spam from Uber.

At least one trial court in the Ninth Circuit has endorsed this common sense approach.  In *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012), the defendant argued that the plaintiff expressly consented to being contacted by virtue of providing a phone number on oil change invoices.  *Id.* at 1258.  The court noted that merely providing a phone number could not amount to prior express consent:

> The court notes that even if it were to take judicial notice of the invoices, ***it is not persuaded that a customer's provision of a telephone number on the invoice in question would constitute prior express consent.***  Heartland's citations to FCC documents are not particularly convincing, and it is doubtful that Plaintiffs' alleged consent was "clearly and unmistakably stated." *Satterfield,* 569 F.3d at 955.

*Id.* at 1258 n.7 (emphasis added).  This Court should follow the *Jiffy Lube* court and similarly find that the mere act of providing a cell phone number does not amount to prior express consent under the TCPA.

The court in *Thrasher-Lyon* examined whether providing a phone number amounted to express consent outside the debtor-creditor realm as codified by the FCC in 2008.  It found that it did not:

> [Defendant's] argument is inconsistent with the rationale behind the 2008 FCC order that envisions an individual who voluntarily makes contact with a provider of services, whether medical, financial, or otherwise, and takes on debt as a result. Nothing in the FCC's rulings suggests that it was intended to apply outside the context of a debtor-creditor relationship.

2012 WL 3835089, at *5.  Elaborating further, the court in *Thrasher-Lyon* discussed the inherent problem with reading the TCPA to require anything less than the clear and unmistakable consent contemplated by the "express consent" language:

> [Defendant] insists that it would be "bizarre" to interpret the statute to require

"elaborate" consent using "magic words," but there is nothing bizarre about giving effect to all of the words in the statutory language. It is what courts are required to do. ***Bizarre would be to read "express consent" as "implied consent." In ordinary parlance, there is no such thing as "implied express consent"—that is an oxymoron.*** Giving out one's phone number, at least outside of the special [debtor-creditor] relationship sanctioned by the FCC, is not "express" consent to besiegement by automated dialing machines. One "expresses" consent by, well, expressing it: stating that the other party can call, or checking a box on form or agreeing to terms of service that explicitly permit automated telephone contact. *See Satterfield* [], 569 F.3d [at] 955 [] ("Express consent is consent that is clearly and unmistakably stated.") (citation omitted). "Express" connotes a requirement of specificity, not "general unrestricted permission" inferred from the act of giving out a number, as [defendant] urges . . .

[T]here is nothing absurd about Congress's determination to require express consent before subjecting telephone consumers to a barrage of automated phone calls or prerecorded messages. As the statute's title advertises, it was enacted for the benefit of telephone consumers and, accordingly, Congress required consumers to opt *in*—expressly—to robocalls than to take steps to opt out or to expressly limit the scope of their consent any time they disseminate their phone numbers, as [defendant] would have it. The language of the statute makes consent the exception, not the default.

*Id.* (emphasis added). The *Thrasher-Lyon* court later denied a motion to reconsider its ruling, holding that its interpretation of the TCPA in no way conflicted with either the 1992 or 2008 FCC regulations. *Thrasher-Lyon v. CCS Commercial, LLC*, No. 11 C 04473, 2012 WL 5389722, at \*1-2 (N.D. Ill. Nov. 2, 2012); *see also Lusskin v. Seminole Comedy, Inc.*, No. 12-62173-Civ., 2013 WL 3147339 (S.D. Fla. June 19, 2013) (holding that although it may "be reasonable to infer that a person who gives his or her cell number to another party has consented to later be contacted, by that party, at that number through an automatic-dialing-system," that is "just an inference" and does not amount to express consent).

The policy rationale behind the TCPA also supports a finding that express consent to receive text messages cannot be implicitly given by simply providing a cell phone number. In implementing the TCPA in 1991, Congress found that "[u]nrestricted telemarketing [] can be an intrusive invasion of privacy." Pub. L. 102–243, 105 Stat. 2394, § 2(5). It also found that the FCC "should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution."

*Id.* at § 2(13).  The FCC did just that in 2008 when it eased the rules for debt collectors, explicitly allowing for consent to be obtained implicitly through the provision of a telephone number.  23 FCC Rcd. 559, 564.  The FCC has not taken a similar step for other sorts of calls or text messages.  And text messages—which did not exist when the TCPA was implemented in the early 1990's—are in some ways even more "intrusive" than telephone calls.  For example, when a cell phone customer does not want to answer a telephone call, s/he can ignore it, and avoid incurring charges for minutes; conversely, unsolicited text messages appear on cell phones whether consumers want them or not, causing charges and/or a reduction in the number of available text messages.  *See, e.g.*, FAC at ¶ 77.  To provide bad actors like Uber with additional protection found neither on the face of the statute nor in the FCC's implementing regulations would contravene the TCPA's express purpose. Instead, the Court should follow those courts that require nothing less than "clearly and unmistakably stated" prior express consent to receive text messages.

To be clear, Plaintiffs are calling on the Court to reject the illogic of numerous other non-binding decisions (including from sister courts in this Circuit) finding that the provision of a telephone number implicitly amounts to express consent.  As the court in *Thrasher-Lyon* summed it up: "there is no such thing as 'implied express consent'—that is an oxymoron."  2012 WL 3835089, at *5.  In this Circuit, the consent is only express if it is "clearly and unmistakably stated." *Satterfield*, 569 F.3d at 955.   Under that definition, the Class B Plaintiffs did not clearly and unmistakably consent to receive automated text messages when they provided their phone number online as they explored the prospect of utilizing the Uber App.

           **C.**    **Even If The Court Finds That The Text Messages Were Not Advertising And/Or Telemarketing *And* That The Class B Plaintiffs Gave Prior Express Consent, Plaintiffs Reilly, Bartolet, And Grindell Revoked Any Such Consent.**

If the Court determines that the text spam sent by Uber to Plaintiffs was not unsolicited advertisements and/or telemarketing *and* that the Class B Plaintiffs provided prior express consent to receive such messages, the Court should still deny Defendant's Motion on alternate grounds. Namely, Plaintiffs Reilly, Bartolet, and Grindell (the "Revoking Plaintiffs") each specifically alleged that they requested, in writing, that Uber cease texting them.  In other words, even if the

Court finds both that (1) express written consent was not required, and (2) that the Revoking Plaintiffs expressly consented to receive texts from Uber by merely providing Uber with their telephone numbers, the Motion should still be denied because the Revoking Plaintiffs unmistakably revoked that consent when they told Uber to stop sending them text messages.

Although the TCPA is silent with respect to the issue of revocation, the two Courts of Appeal that have addressed the issue of revocation under the TCPA have held that consent may be revoked either in writing or orally. *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255–56 (11th Cir. 2014) (holding that oral revocation was possible under the TCPA); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270–72 (3d Cir. 2013) (same). And the Eighth Circuit has indicated that it also believes that consent may be revoked under the TCPA. *See Brenner v. Am. Educ. Servs.*, 575 F. App'x 703 (8th Cir. 2014) (vacating award of summary judgment in defendant's favor and remanding case back to the district court on issue of revocation). Rulings by numerous district courts are consistent with this appellate authority. *See Munro v. King Broad. Co.*, No. C13-1308JLR, 2013 WL 6185233, at *3 (W.D. Wash. Nov. 26, 2013) ("[T]he weight of authority suggests that consent may be revoked under the TCPA and that if messages continue after consent is revoked, those messages violate the TCPA."); *Gutierrez v. Barclays Grp.*, Case No. 10CV1012 DMS BGS, 2011 WL 579238, at *4 (S.D. Cal. Feb. 9, 2011) ("[P]rior express consent may be revoked orally and need not be in writing."); *Legg v. Voice Media Grp., Inc.*, 990 F. Supp. 2d 1351, 1355 (S.D. Fla. 2014) (denying motion to dismiss because plaintiff sufficiently alleged that he revoked consent to receive text messages); *Buchholz v. Valarity, LLC*, No. 4:13CV362 TIA, 2014 WL 5849434, at *7 (E.D. Mo. Nov. 12, 2014) (oral revocation of consent is cognizable under TCPA); *Adamcik v. Credit Control Servs., Inc.*, 832 F. Supp. 2d 744, 753 (W.D. Tex. 2011) ("[O]ral revocation of consent is legally effective under the TCPA, even in the debt-collection context."); *Beal v. Wyndham Vacation Resorts, Inc.*, 956 F. Supp. 2d 962, 979 (W.D. Wis. 2013) (granting, in part, plaintiff's motion for summary judgment and awarding plaintiff $14,500 for the 27 calls and two prerecorded voice messages she received after revocation of consent).

Several important factors point to the conclusion that consent may be revoked under the TCPA and that post-revocation texts and/or calls violate the statute. First, "consent" must be read

1    consistent with its common law meaning, and at common law consent is revocable.  *See, e.g.,*

2    *Gager*, 727 F.3d at 270–71 (citing *Neder v. United States*, 527 U.S. 1, 21 (1999) ("[W]here

3    Congress uses terms that have accumulated settled meaning under . . . the common law, a court

4    must infer, unless the statute otherwise dictates, that Congress means to incorporate the established

5    meaning of these terms.")); *see id.* at 271 (citing Restatement (Second) of Torts § 892A, cmt. 1

6    (1979)).  Second, the TCPA is a remedial statute passed to protect consumers from unwanted

7    automated calls and text messages—permitting revocation is "in line with the purpose of the

8    TCPA[.]"  *Id.* at 271 (citing *Lesher v. Law Offices of Mitchell N. Kay, PC*, 650 F.3d 993, 997 (3d

9    Cir. 2011)).  Third, the FCC has indicated that consent can be revoked.  In its decision in *In the

10   Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,

11   *Soundbite Commc'n, Inc.*, 27 FCC Rcd. 15391 (Nov. 26, 2012), the FCC noted that "consumer

12   consent to receive . . . messages is not unlimited," and that a consumer may "fully revoke" prior

13   consent by transmitting an opt-out request to the sending party.  *Id.* at 15397 ¶¶ 8, 11.

14          Here—assuming, *arguendo*, that this Court finds that the text messages sent to Plaintiffs by

15   Uber were not telemarketing or advertising *and* that the Class B Plaintiffs initially provided express

16   consent (they did not)—the Revoking Plaintiffs each specifically revoked consent in writing and,

17   thus, their claims should not be dismissed.  Plaintiff Reilly, who received multiple text messages

18   from Uber from four different numbers, told Uber to take her off of its call list.  FAC ¶ 104 ("On

19   October 14, 2014, Reilly received another text message from 'Tony,' from a third telephone

20   number, (484) 575-4162, to which she replied, 'Can you please take me off of this list.'").  Despite

21   her written request, Uber continued to text Reilly.  *Id.* at ¶ 105.  Uber texted Plaintiff Bartolet at

22   least 44 times from 23 different numbers.  FAC ¶ 115.  Like Reilly, Bartolet pleaded with Uber to

23   stop barraging him with texts—he tried several times.  *Id.* at ¶116.  For instance, Bartolet responded

24   to one of Uber's many texts by writing "Stop texting this number."  *Id.*  Uber didn't listen—instead,

25   it texted Bartolet at least 29 more times.  *Id.*  Finally, Plaintiff Grindell also repeatedly asked Uber

26   to stop texting him, to no avail.  FAC ¶¶ 72-74.  Grindell has replied to Uber's text messages with

27   the term "Remove," yet Uber still sent him daily text messages.  *Id.* at ¶ 74.  These allegations

28   plainly evince these Plaintiffs' revocation of any consent previously given, and, at the very least,

-19-

1    Uber's Motion must be denied as to the claims of the Revoking Plaintiffs.

2    **V.       CONCLUSION**

3             The Court should deny the Motion because (1) the subject text messages constituted

4    telemarketing and/or advertising, and the Class B Plaintiffs never gave Uber prior express written

5    consent, (2) the Court should not infer that the Class B Plaintiffs implicitly gave their prior express

6    consent to Uber simply by revealing their telephone numbers, and (3) to the extent there ever was

7    legally valid prior express consent, the Revoking Plaintiffs revoked any and all such consent.

8    Dated: March 13, 2015                                Respectfully submitted,

9

10                                                          /s/ Hassan A. Zavareei

11                                                       Hassan A. Zavareei (SBN 181547)
                                                         hzavareei@tzlegal.com
12                                                       **TYCKO & ZAVAREEI LLP**
                                                         2000 L Street, N.W., Suite 808
13                                                       Washington, DC 20036
                                                         Tel.: (202) 973-0900
14                                                       Fax: (202) 973-0950

15                                                       *Attorney for Plaintiffs Kerry Reardon,*
                                                         *James Lathrop, Julie McKinney,*
16                                                       *Jonathan Grindell, Sandeep Pal,*
                                                         *Jennifer Reilly, and Justin Bartolet*

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
Civil Action No. 14-cv-05678-JST

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on March 13, 2015, I caused the foregoing document to be filed electronically through the Court's CM/ECF System and served on all counsel of record.

/s/ Hassan A. Zavareei
Hassan A. Zavareei
*Attorney for Plaintiffs*

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
Civil Action No. 14-cv-05678-JST