1  Debra Bernard (admitted *pro hac vice*)
   DBernard@perkinscoie.com
2  PERKINS COIE LLP
   131 South Dearborn Street, Suite 1700
3  Chicago, IL 60603-5559
   Tel: (312) 324-8400
4  Fax: (312) 324-9559

5  Attorneys for Defendant
   Uber Technologies, Inc.
6

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10 PLAINTIFFS JAMES LATHROP, JULIE          Case No. 14-cv-05678-JST
   MCKINNEY, SANDEEP PAL,
11 JENNIFER REILLY, JUSTIN                  **DECLARATION OF DEBRA R. BERNARD
   BARTOLET, and JONATHAN                   IN SUPPORT OF PLAINTIFFS'
12 GRINDELL on behalf of themselves and     ADMINISTRATIVE MOTION TO FILE
   all others similarly situated,           DOCUMENTS UNDER SEAL**
13
                  Plaintiff,                Judge Jon S. Tigar
14
15       v.

16 UBER TECHNOLOGIES, INC.,

17               Defendant.

18         I, DEBRA R. BERNARD, declare as follows:

19         1.      I am an attorney with the law offices of Perkins Coie LLP, counsel for Defendant

20 Uber Technologies, Inc. ("Uber") in the above-entitled action.  I am submitting this declaration in

21 support of Plaintiffs' Administrative Motion to File Documents Under Seal, Dkt. No. 129.

22         2.      The Joint Letter Brief includes highly sensitive, proprietary, and confidential

23 information that Uber maintains as a trade secret as well as specific, technical information about

24 the records maintained by Twilio, but not all of the Joint Letter Brief qualifies as Uber's or

25 Twilio's confidential information.  Attached to this Declaration as Exhibit A is a redacted version

26 of the Joint Letter Brief to be filed in the public record.  The redacted information includes

27

28

specific, technical, confidential information about records maintained by Twilio and the systems used by Uber and Twilio to conduct business pursuant to the contract between them.  The contract between Uber and Twilio requires Uber to use commercially reasonable efforts to protect Twilio's confidential information, and to take precautions at least as great as those taken to protect Uber's own confidential information of a similar nature.  *See* Bernard Decl., Dkt. No. 127-3, Ex. C, para. 4.3. The redacted information also describes or makes statements derived from Uber's methodology for writing log files, as well as the content, organization, volume, and storage location of those files.  All of this information is central to the operation of Uber's business and its ability to secure and monitor the health of its systems for purposes of providing services to its users.  Uber's logging techniques therefore constitute highly sensitive, proprietary, and confidential information that Uber maintains as a trade secret.  Finally, the redacted portions of the Joint Letter Brief provide information about the systems Uber has developed to provide services to users.  Information about Uber's systems constitutes highly sensitive, proprietary, and confidential information that Uber maintains as a trade secret.  Although Uber has produced information regarding the operation of its proprietary systems in this litigation, it has designated that information as "HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY" pursuant to the protective order in this matter, Dkt. No. 53.  There is accordingly good cause seal the redacted portions of the Joint Letter Brief.

       3.    The information in the redacted portions of the Joint Letter Brief contains substantial references to and descriptions of Uber's highly sensitive, proprietary, and confidential source code, systems, and logging techniques.  Revelation of how Uber's systems operate or Uber's analysis and description of this operation in a public court filing could have an effect on the trade secret nature of Uber's systems and could cause significant harm to Uber's competitive and financial position within its industry.  In addition, revelation of the redacted information could cause significant harm to Twilio's competitive and financial position within its industries.  These confidentiality interests outweigh the public's interest in disclosure, and there is accordingly good cause to seal the redacted portions of the Joint Letter Brief.

-2-

4.      Paragraphs 3, 26, 27, 31-35, and 37-40 of the Snyder Declaration discuss specific, technical, confidential information about records maintained by Twilio and the systems used by Uber and Twilio to conduct business pursuant to the contract between them.  The contract between Uber and Twilio requires Uber to use commercially reasonable efforts to protect Twilio's confidential information, and to take precautions at least as great as those taken to protect Uber's own confidential information of a similar nature.  Good cause therefore exists to seal paragraphs 3, 26, 27, 31-35, and 37-40 of the Snyder Declaration.

5.      Exhibit B to the Snyder Declaration contains specific, technical information about the records maintained by Twilio and concerns Twilio's commercially sensitive, confidential information.  The contract between Uber and Twilio requires Uber to use commercially reasonable efforts to protect Twilio's confidential information, and to take precautions at least as great as those taken to protect Uber's own confidential information of a similar nature.  Good cause therefore exists to seal Exhibit B to the Snyder Declaration.

6.      Exhibit C to the Snyder Declaration contains specific, technical, confidential information about records maintained by Twilio and the systems used by Uber and Twilio to conduct business pursuant to the contract between them and thus concerns Uber's and Twilio's commercially sensitive, confidential information.  The contract between Uber and Twilio requires Uber to use commercially reasonable efforts to protect Twilio's confidential information, and to take precautions at least as great as those taken to protect Uber's own confidential information of a similar nature.  Exhibit C to the Snyder Declaration also concerns how Uber uses Twilio's systems, which is confidential information that pertains to the operation of Uber's business.  Good cause therefore exists to seal Exhibit C to the Snyder Declaration.

7.      Revelation of the information in the Snyder Declaration and Exhibits B and C thereto could cause significant harm to Uber's and Twilio's competitive and financial positions within their industries.  These confidentiality interests outweigh the public's interest in disclosure, and there is accordingly good cause to seal Paragraphs 3, 26, 27, 31-35, and 37-40 and Exhibits B and C of the Snyder Declaration.

-3-

8.      Paragraphs 3, 14, 18-39, 41-43, and 45 of the Olsen Declaration, and paragraphs 5-13, 61-20, and 22-24 of the Supplemental Olsen Declaration describe or make statements derived from Uber's methodology for writing log files, as well as the content, organization, volume, and storage location of those files.  All of this information is central to the operation of Uber's business and its ability to secure and monitor the health of its systems for purposes of providing services to its users.  Uber's logging techniques therefore constitute highly sensitive, proprietary, and confidential information that Uber maintains as a trade secret.  These paragraphs also describe Uber's source code and provide information about the systems it has developed to provide services to users.  Uber's source code and information about its systems constitute highly sensitive, proprietary, and confidential information that Uber maintains as a trade secret. Although Uber has produced portions of its source code and information regarding the operation of its proprietary systems in this litigation, it has designated that information as "HIGHLY CONFIDENTIAL - SOURCE CODE" or "HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY" pursuant to the protective order in this matter, Dkt. No. 53.  Finally, these paragraphs discuss the systems used by Uber and Twilio to conduct business pursuant to the contract between them, which constitutes confidential information that Uber is obligated to protect under the terms of that contract.  There is accordingly good cause to seal paragraphs 3, 14, 18-39, 41-43, and 45 of the Olsen Declaration, and paragraphs 5-13, 61-20, and 22-24 of the Supplemental Olsen Declaration.

9.      Paragraphs 3, 14, 18-39, 41-43, and 45 of the Olsen Declaration, and paragraphs 5-13, 16-20, and 22-24 of the Supplemental Olsen Declaration contain substantial references to and descriptions of Uber's highly sensitive, proprietary, and confidential source code, systems, and logging techniques.  Revelation of how Uber's systems operate or Uber's analysis and description of this operation in a public court filing could have an effect on the trade secret nature of Uber's systems and could cause significant harm to Uber's competitive and financial position within its industry.  Accordingly, Uber's confidentiality interests outweigh the public's interest in

-4-

disclosure and there is good cause to seal paragraphs 3, 14, 18-39, 41-43, and 45 of the Olsen

Declaration, and paragraphs 5-13, 16-20, and 22-24 of the Supplemental Olsen Declaration.

10. Exhibit 3 to Plaintiffs' section of the Joint Letter Brief (excerpts of the deposition transcript of Michael Kadin) describes or makes statements derived from Uber's methodology for writing log files, as well as the content, organization, volume, and storage location of those files. All of this information is central to the operation of Uber's business and its ability to secure and monitor the health of its systems for purposes of providing services to its users. Uber's logging techniques therefore constitute highly sensitive, proprietary, and confidential information that Uber maintains as a trade secret. Exhibit 3 to Plaintiffs' portion of the Joint Letter Brief also describes Uber's source code and provides information about the systems it has developed to provide services to users. Uber's source code and information about its systems constitute highly sensitive, proprietary, and confidential information that Uber maintains as a trade secret. Although Uber has produced portions of its source code and information regarding the operation of its proprietary systems in this litigation, it has designated that information as "HIGHLY CONFIDENTIAL - SOURCE CODE" or "HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY" pursuant to the protective order in this matter, Dkt. No. 53. Finally, the Exhibit discusses the systems used by Uber and Twilio to conduct business pursuant to the contract between them, which constitutes confidential information that Uber is obligated to protect under the terms of that contract. There is accordingly good cause to seal Exhibit 3 to Plaintiffs' section of the Joint Letter Brief.

11. Exhibit 3 to Plaintiffs' section of the Joint Letter Brief contains substantial references to and descriptions of Uber's highly sensitive, proprietary, and confidential source code, systems, and logging techniques. Revelation of how Uber's systems operate or Uber's analysis and description of this operation in a public court filing could have an effect on the trade secret nature of Uber's systems and could cause significant harm to Uber's competitive and financial position within its industry. In addition, revelation of the information in Exhibit 3 to Plaintiffs' section of the Joint Letter Brief could cause significant harm to Twilio's competitive

-5-

and financial position within its industries.  These confidentiality interests outweigh the public's interest in disclosure, and there is accordingly good cause to seal Exhibit 3 to Plaintiff's Portion of the Joint Letter Brief.

12.     Exhibit 4 to Plaintiffs' portion of the Joint Letter Brief was produced in discovery, but was not designated as confidential or highly confidential, as it is a copy of a publicly available document.  Good cause does not exist to seal Exhibit 4.  Attached as Exhibit B is a copy of this exhibit to be filed in the public record.

13.     Uber's proposed sealing is narrowly tailored and no less restrictive means exists to protect the portions that Uber has requested to be sealed.  Accordingly, Uber respectfully requests that the Court enter an order sealing the redacted portions of the Joint Letter Brief; Paragraphs 3, 26, 27, 31-35, and 37-40 of the Snyder Declaration; Exhibits B and C to the Snyder Declaration; Paragraphs 3, 14, 18-39, 41-43, and 45 of the Olsen Declaration; Paragraphs 5-13, 16-20, and 22-24 of the Supplemental Olsen Declaration; and Exhibit 3 to Plaintiffs' Section of the Joint Letter Brief.

-6-

1        I declare under penalty of perjury under the laws of the State of California that the

2   foregoing is true and correct.

3        EXECUTED this 12th day of February, 2016, at Chicago, Illinois.

4

5                      PERKINS COIE LLP

6                      /s/ *Debra R. Bernard*

7                     Debra R. Bernard

8                     Attorneys for Defendant
                      Uber Technologies, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-7-

# EXHIBIT A TO BERNARD DECL. IN SUPPORT OF PLAINTIFF'S ADMIN. MOTION (Dkt. 129)

**VIA CM/ECF**

February 8, 2016

The Honorable Jon S. Tigar
San Francisco Courthouse
Courtroom 9 - 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

| | |
|---|---|
| Hassan A. Zavareei (SBN 181547)<br>hzavareei@tzlegal.com<br>Andrea R. Gold (admitted pro hac vice)<br>agold@tzlegal.com<br>Andrew J. Silver (admitted pro hac vice)<br>asilver@tzlegal.com<br>**TYCKO & ZAVAREEI LLP**<br>1828 L Street, N.W., Suite 1000<br>Washington, DC 20036<br>Tel.: (202) 973-0900<br>Fax: (202) 973-0950<br><br><br>Kristen Law Sagafi (SBN 222249)<br>ksagafi@tzlegal.com<br>**TYCKO & ZAVAREEI LLP**<br>483 Ninth Street, Suite 200<br>Oakland, CA 94607<br>Tel.: (510) 907-7255<br>Fax: (202) 973-0950<br><br>*Attorneys for Plaintiffs James Lathrop,*<br>*Jonathan Grindell, Sandeep Pal,*<br>*Jennifer Reilly, and Justin Bartolet* | James G. Snell (SBN 173070)<br>JSnell@perkinscoie.com<br>**PERKINS COIE LLP**<br>3150 Porter Drive<br>Palo Alto, CA 94304-1212<br>Tel.: (650) 838-4300<br>Fax: (650) 838-4350<br><br>Sarah J. Crooks (admitted pro hac vice)<br>SCrooks@perkinscoie.com<br>**PERKINS COIE LLP**<br>1120 NW Couch Street, 10th Floor<br>Portland, OR 97209<br>Tel.: (503) 727-2252<br>Fax: (503) 346-2252<br><br>Debra R. Bernard (admitted pro hac vice)<br>dbernard@perkinscoie.com<br>**PERKINS COIE LLP**<br>131 South Dearborn, Suite 1700<br>Chicago, Illinois 60603<br>Tel.: (312) 324-8559<br><br>*Attorneys for Defendant Uber Technologies, Inc.* |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES LATHROP, JONATHAN GRINDELL, SANDEEP PAL, JENNIFER REILLY, and JUSTIN BARTOLET on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>    Defendant. | Civil Action No.: 14-cv-05678-JST<br><br>Honorable Jon S. Tigar<br><br>JOINT LETTER BRIEF REGARDING DISCOVERY |

The Honorable Jon S. Tigar
February 8, 2016
Page 1

## <u>PLAINTIFFS' POSITION</u>[1]

      The Court-ordered Rule 30(b)(6) deposition of Defendant Uber Technologies, Inc. ("Uber") establishes beyond cavil that Uber has the ability to generate logs of text messages. Uber never undertook this task. Instead, Uber identified numerous obstacles to obtaining perfect text logs and declared the task impossible. There are three separate data profiles that would contain text messages that Plaintiffs allege are actionable and part of this putative class action: (1) **Refer-A-Friend Profile**: all text messages to and from numbers obtained by Uber through its "refer-a-friend" program; (2) **Prospective Driver Profile**: all text messages to and from prospective drivers; and (3) **Opt-Out Profile**: all text messages sent to and from cell phone users contacted in connection with the first two profiles after the revocation of any purported consent.

      There are two alternative means of attaining these three profiles, each of which will produce sufficiently reliable results. ***First***, as explained by Plaintiffs' telecommunications expert, Randall Snyder,[2] Uber's vendor, SMS aggregator Twilio, ███████████████████████████ ██████████████████████████████████████████████████████████ ***Second***, Uber can be ordered to produce files that it maintains ██████████████ and Plaintiffs' information technology and data management expert, Arthur Olsen, can manipulate the data to capture the necessary information that Uber is unwilling to compile on its own.[4]

## <u>METHOD ONE: Obtain Message Detail Records from Twilio</u>

      The first manner by which Plaintiffs propose to obtain the text messages relevant to this litigation is for Uber to obtain the text messages from Twilio. As more fully explained in the attached declaration of Mr. Snyder, ████████████████████████████████████████ ██████████████████████████████ Mr. Snyder has significant experience working with data from SMS aggregators such as Twilio. *Id.* ¶¶ 12-21. ███████████████████████████████████████████████████████ in fact, Uber's recent Rule 30(b)(6) deponent, Michael Kadin, ██████████████████████████████ ████████████████████████████. Ex. 3, Kadin Tr., at 152:2-153:10.

      **<u>Refer-A-Friend Profile</u>**: ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ Kadin Tr. at 234:17-235:14. ████████████ ██████████████████████████████████████████████████████████

---

[1] Pursuant to the Parties' agreement, Plaintiffs provided Uber with a five-page draft of their Position. Then, Uber provided its five-page Response. Under that agreement, Plaintiffs were permitted to make changes to their portion of the letter. Thus, after receiving Uber's five-page response, Plaintiffs made deletions and non-substantive changes to their original Position and added a Reply section following Uber's Response.
[2] The Declaration of Randall A. Snyder ("Snyder Decl.") is attached hereto as Exhibit 1.
[3] ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████ Plaintiffs have already issued a third-party subpoena to Twilio. Twilio has taken the position that, as a non-party, it does not have to produce the requested information unless Uber cannot.
[4] The Declaration of Arthur Olsen ("Olsen Decl.") is attached hereto as Exhibit 2.

The Honorable Jon S. Tigar
February 8, 2016
Page 2



████████████████████████████████████████████████████████████████
████████████████████████████████████████████ Olsen Decl., ¶¶ 34, 37, 39.

**Prospective Driver Profile**: ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████ Kadin Tr., at 208:24-209:5. █████
███████████████████████████████████████████████████████████████
████████████████████████████████. *Id.* at 193:13-194:2.  Mr. Olsen, can analyze ████████
██████████████████████████████████████. Olsen Decl., ¶
36. In so doing, Mr. Olsen will necessarily isolate the telephone numbers that are only associated
with prospective drivers.  *Id.* at ¶¶ 33, 36, 38. Mr. Olsen can then isolate only the texts sent to, or
received from, the telephone numbers associated with prospective drivers.  *Id.* at ¶¶ 36, 38, 42.

**Opt-Out Profile**: In order to further narrow the Twilio driver text log to capture *only*
those texts sent by Uber to prospective drivers and refer-a-friend cell phone users after they
revoked consent (assuming, *arguendo*, that the Court were to find that these users provided
express consent in first instance), Mr. Olsen can create queries (including terms such as STOP
and CANCEL) to apply across the ████████████████████ Olsen Decl., ¶¶ 40, 44.  Such queries
are possible.████████████████████████████████████████████████████████
████████████████████████████████████

**METHOD TWO: Obtain Message Detail Records From Uber's Server Logs**

████████████████████████████████████████████ Uber can produce the requested text logs by
generating a subset of ████████████████████████████████████████████████
████████████████████████████████████. Dkt. 101-3, at ¶ 8; Kadin Tr., at 86:11-19.
However, by Uber's own admission, ████████████████████████████████. Dkt. 101-3,
at ¶ 8; Kadin Tr., at 99:4-14.  Uber stresses that these ██████████ roughly equals ten terabytes of
files, but Plaintiffs' expert, Mr. Olsen has successfully processed much larger datasets. Olsen
Decl., ¶ 19. Indeed, the sheer number of files associated with these ██████████ does not, as Uber
argues, make production of the logs unduly burdensome. The number of files will not impact
Mr. Olsen's ability to analyze or process the data—other than to increase the processing time. *Id.*
¶ 21. Indeed, Mr. Olsen has reliably and successfully processed data productions containing in
excess of 20 million individual files.  *Id*. Nor will the massive number of lines in a given file
impede Mr. Olsen's analysis. Again, from a processing standpoint, the number of lines does not
make any difference other than to increase the processing time. *Id.* ¶ 22. Mr. Olsen has processed
individual files containing over one hundred billion records.  *Id*. Uber contends that this proposal
is unworkable due to problems ████████████████████████████████ which render any
results unreliable.  Specifically, Uber contends that "the composition and format of Uber's log

The Honorable Jon S. Tigar
February 8, 2016
Page 3

entries have changed multiple times during the relevant time period" and, thus, "there are several
distinct log entry formats in the log files" and in order "to identify all relevant text messages with
accuracy, it is therefore necessary to manually review log entries." Dkt. 101-3, at ¶¶ 14-16.
However, ████████████████████████████████████████████████████████████████████████
████ (Kadin Tr., at 171:12-21), and such changes would not preclude Mr. Olsen from loading the
data into a database for processing and analysis. Olsen Decl., ¶ 25.

## SCREEN FLOWS

Uber contends that it does not possess *any* responsive internal documents showing Screen
Flows over time and, instead, produced scattershot website images from the Internet Archive
Wayback Machine  (https://archive.org/web) ("Wayback") that are substantively deficient in
several respects.  Mr. Kadin testified that while Uber cannot recreate page *images* in this manner,
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████  Kadin Tr., at 219:3-229:25.

## DEFENDANT'S POSITION

The declarations of Plaintiffs' own experts comport with what Uber has tried to explain to
Plaintiffs repeatedly—the "text message logs" that Plaintiffs seek do not already exist and
cannot be easily created.  Instead, they must be pieced together with substantial computing
resources and expert assistance, at significant cost.  Nonetheless, after a review of Plaintiffs'
current (and revised) position as set forth in this letter brief, Uber proposes a sampling approach
as a means to provide Plaintiffs with information that they believe they need within the confines
of the proportionality factors of Fed. R. Civ. P. 26(b).

Proportionality is especially significant here because by the beginning of April, and well
before class certification is briefed in August 2016, Uber intends to file a motion for summary
judgment that will show that *all* of the Class B named Plaintiffs (four of the five named
Plaintiffs) provided prior express consent to be contacted by Uber, because they *all*: (1) input
their phone numbers into a web form on Uber's website; and (2) submitted that form to Uber by
clicking a button to submit that information.[5] Additionally, each Class B named Plaintiff signed
background check agreements (which required submission of their social security numbers),
provided documentation and information to Uber (e.g. copies of driver's licenses, vehicle
information, insurance information), and otherwise evinced a clear intent to become an Uber
partner.[6]  In that same motion, with respect to the Class A Plaintiff, among other arguments,
Uber will also show that an ATDS was not used to contact him, requiring dismissal of his claim.[7]

Given that the named Plaintiffs' claims will not survive summary judgment, it is
unreasonable at this juncture for Plaintiffs to demand that Uber undertake the inordinate expense
of creating text message logs that span a four-year class period and that will infringe upon the
privacy interests of countless individuals—especially since such logs are unnecessary to

---

[5] Contrary to Plaintiffs' suggestions in their supplemental briefing opposing Uber's motion to dismiss, the
record shows that Plaintiffs did, in fact, submit their phone numbers as well as significant other
information to Uber.  *Cf.* Dkt. No. 46 at 7-8.
[6] Uber also will show that it satisfied the applicable legal requirements for respecting opt-outs and did not
continue to text named Plaintiffs who texted "STOP" to Uber.
[7] Two days prior to Plaintiff McKinney's deposition, Uber was informed she was dropping her claims
against Uber.

The Honorable Jon S. Tigar
February 8, 2016
Page 4

litigating class certification. Plaintiffs' two proposals are far less straightforward than Plaintiffs assert, and Plaintiffs' experts ignore key testimony that illustrates the reasons that those proposals are not practically feasible. Moreover, Plaintiffs ignore that even the full set of text logs that Plaintiffs demand cannot reveal which text messages sent by Uber were *received* by putative class members. Only records maintained by carriers or putative class members themselves can prove this critical element because of intervening events, such as carrier filtering. *See Smith v. Microsoft Corp.*, 297 F.R.D. 464, 472 (S.D. Cal. 2014) (noting the difference between "knowing which numbers . . . were *sent* [texts] . . . [and] knowing which of those numbers *received* [texts]" and that only recipients of text messages "could have been harmed by Microsoft's alleged TCPA violation"). *See also* Kadin Decl. ¶ 6; Kadin Tr. at 172:6-174:3.

A sample, as Uber proposes, balances the burden and expense of producing text logs with the needs of the case, considering the importance of the issues at stake, the likely benefit to Plaintiff of obtaining the records, and the importance of the discovery in resolving the issues. *See* Fed. R. Civ. P. 26(b).

## A.    Uber's Proposed Compromise

Uber is willing to offer a compromise solution: Uber will provide Plaintiffs with records of the text messages sent between Uber and 100 telephone numbers during the class period. The telephone numbers in the sample would be selected at random from the set of telephone numbers that (a) are currently associated with potential partners who never became active ("Prospective Partners"), and (b) were sent referrals through Uber's refer-a-friend program. The text log histories of 100 random individuals are more than adequate for Plaintiffs to attempt to satisfy their burden of proving that Rule 23 requirements have been met.[8]

Uber's proposed sampling approach is consistent with the approach taken by courts in this District confronted with similar concerns about the enormous burden and privacy concerns associated with disclosing voluminous data about putative class members prior to certification— including in putative class actions involving Uber partners. *See O'Connor v. Uber Techs. Inc.*, No. C-13-03826 (EMC) DMR, 2014 WL 5794323, at *3 (N.D. Cal. Nov. 6, 2014) (addressing proportionality concerns with producing information about hundreds of thousands of Uber partners by ordering Uber to produce information for a random sample of 100 partners); *see also Feske v. MHC Thousand Trail Ltd. P'ship*, No. 11-CV-4124, 2012 WL 1123587, at *2 (N.D. Cal. April 3, 2012) (agreeing with defendants that, where putative class members' privacy interests were at stake, producing a statistically significant sample of putative class information better addressed proportionality concerns under Rule 26).[9] If the Court accepts this proposal, Uber also requests that the court order Plaintiffs to refrain from contacting putative class members unless and until a class is certified.

---

[8] The "party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them." Fed. R. Civ. P. 26, Advisory Committee Notes (2015) at 23. In this letter, Plaintiffs have abandoned any discussion of how the logs are relevant to their claims, or the Rule 26(b) factors generally, but Uber assumes Plaintiffs believe the logs are relevant to class certification issues. Nonetheless, Plaintiffs are not entitled to information regarding the *identity* of all putative class members before class certification; this information becomes relevant only after a class is certified for purposes of giving notice. *See Dziennik v. Sealift, Inc.*, No. 05-CV-4659 (DLI)(MDG), 2006 WL 1455464, at *1 (E.D.N.Y. May 23, 2006) (collecting cases).

[9] Uber's proposed sample size of 100 is borrowed from *O'Connor,* even though that sample size was later reduced to 80 and was ordered prior to the new proportionality amendments to Rule 26(b).

The Honorable Jon S. Tigar
February 8, 2016
Page 5

With respect to the disclosures available on Uber websites, on February 3rd, Plaintiffs informed Uber that they now only seek the disclaimer language on the website rather than full website reconstructions. Uber is willing to file a verified interrogatory response regarding the disclaimer language that appeared on Uber's websites at the time the named Plaintiffs signed up to drive on the Uber platform. Thus, no additional response on this issue is necessary.[10]

**B.  Plaintiffs' Proposals are not Justified in Light of Uber's Compromise Solution.**

Plaintiffs' competing proposals require Uber to overcome significant technological issues, implicate serious privacy concerns, and come at considerable expense. Because neither proposal provides Plaintiffs with information relevant to class certification that cannot be gleaned from the sample Uber proposes to provide, they should be rejected.

**1.  Plaintiffs' Twilio Proposal is Not Justified Given the Proportionality Concerns of Rule 26(b)**

Plaintiffs' first proposal is that Uber should ███████████████████████████ ██████████ However, the fact that ██████████████████████████ does not mean that it can obtain and export it without significant engineering time and substantial expense. ███████████████████████████████████████████████████████████ ████████████████████████████████████████████

The overriding problem with ██████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████ Plaintiffs seek the records associated with ████████████████ for a four-year period. The time required to ██████████████████████████ renders this approach a non-starter. ███████████████████████████████████████████████████████ ██████████████████████

---

[10]  The Rule 30(b)(6) testimony indicated it may be *possible* to do an investigation to obtain disclaimer language through reviewing Uber's source code base, *see* Kadin Tr. at 229:7-16, but doing so across all websites throughout the entire class period is overbroad in light of the pre-certification status of this case as Uber estimates it would require at least a day of engineering time per website per date.

[11]  Uber repeatedly attempted to meet and confer with Plaintiffs after the Rule 30(b)(6) deposition to see if any of these disputes could be resolved through compromise but Plaintiffs rebuffed these efforts. Uber only learned the specifics of Plaintiffs' Twilio proposal on Thursday evening (2/4)—giving Uber one business day to research its feasibility prior to Uber's deadline to submit its portion of the joint letter on Sunday (2/7).

[12]  This understanding is supported by Mr. Snyder's declaration, in which the only specific methodology identified for performing this "*en masse*" query is by "repeated input of a given parameter"—meaning one long code at a time. *Id.* ¶ 38.

[13]  Because Uber had just one business day to investigate this proposal, it was unable to secure a declaration from the individual who performed this investigation, as he was out of the office on Friday, February 5, 2016. If requested, Uber can submit a declaration in support of these facts promptly.

Plaintiffs' expert, Randall Snyder, claims that Uber can ██████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

And while Uber could run multiple ██████████ requests in parallel across multiple computers, Twilio only permits Uber to send 100 requests at the same time from a single account.  *See* Bernard Decl., Exs. A-B. ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Uber is also exploring another option, which involves ██████████████████████
████████████████.  However given the timing, Uber has not yet been able to fully explore these issues with Twilio.  *See* Bernard Decl., Ex C.  Based on the ████████ records sent by one long code in a single month, there could be ████████ of records for the ████████ long codes over the course of a single year.  This data would be vastly over inclusive, as it would include ██████████████████████████

 Further, moving this quantity of data is not a simple matter of copying and pasting; it requires planning, effort and substantial cost.  *See* McGoveran Decl. ¶ 55.  Requesting the volume of data that Plaintiffs seek will require Uber to negotiate new agreements with Twilio, likely at considerable expense.  Finally, culling the irrelevant records from the relevant ones would require resource-intensive processing.  Because Uber is willing to provide a large sample of data to Plaintiffs, because there is no certified class, and because there are merits issues hanging in the balance, undergoing an engineering effort of this scale is simply unwarranted.

### 2.     Plaintiffs' Log File Proposal is Not Feasible.

Again, Uber's proposed compromise of sampling avoids the need to attempt to untangle the morass of Uber's logs.  Seven hours of deposition testimony and 33 pages of opinions from Plaintiffs' experts have not altered Uber's representations on the infeasibility and excessive burden associated with attempting to create the records Plaintiffs seek from Uber's server log files.  Plaintiffs' expert, Arthur Olsen, opines at length about automating processes that have no bearing on the crux of this dispute, while blithely gliding over the portions of his proposal that require human analysis and input.[14]  He also fails to identify the fact that the software required to analyze and organize Uber's log files is prohibitively expensive—with licensing fees potentially in the $500K range.  McGoveran Decl. ¶¶ 4, 28-31.  Moreover, production of Uber's log files as requested by Plaintiffs implicates serious privacy concerns that cannot be ameliorated through a protective order because Uber may be prohibited from disclosing communications between riders and drivers without a warrant or other appropriate legal process.  *See* 18 U.S.C. § 2703.

---

[14] Further, Plaintiffs insinuate that because Mr. Kadin did not attempt to create the requested records himself, Uber has not adequately investigated this issue.  This is simply untrue.  Uber's legal team has spent significant time and effort investigating this issue and, while the details of that investigation are protected by attorney-client privilege and the work product doctrine, it is inapposite that Mr. Kadin did not himself undertake these efforts.

The Honorable Jon S. Tigar
February 8, 2016
Page 7

As an initial matter, Plaintiffs' new request differs from their original request, which was
not feasible, as the Rule 30(b)(6) deposition confirmed.  Plaintiffs' current proposal seeks
messages sent and received by Uber from and to: (1) "prospective" partners who signed up to
drive on the Uber platform but never became active, and (2) individuals who were referred by
others to sign up to drive using the Uber platform.  However, separating out these text messages
from the log files remains infeasible.



To the extent that
procedures might be automated by proprietary software to reduce—but not eliminate—the need
for human analysis, such options are not without enormous cost.  *See* McGoveran Decl. ¶¶ 30-
31.

Finally, Uber's log files contain anonymized communications between riders and
partners ███████████████████████████ *See* Kadin Decl. ¶ 5;
Kadin Tr. at 118:6-14.  It is an open question whether these anonymized communications are
covered by the Stored Communications Act ("SCA"), but if the Court were to determine that
they are, federal law would prohibit Uber from disclosing the contents of those communications
in civil discovery, notwithstanding the operative protective order.  *See* 18 U.S.C. §§ 2702(a),
2703(a).  With Uber's sampling compromise, there is no need for Mr. Olsen to review Uber's log
files and concomitantly no need for the Court to resolve whether the SCA is applicable here.

## C.   Plaintiffs' Post Hoc Requests for Database Fields and Telephone Number Lists are Overbroad, Improper, and Unnecessary.

Plaintiffs also request a list of telephone numbers submitted through Uber's partner
referral program and a panoply of information from Uber's proprietary databases.  Presumably,
these requests have been made because Plaintiffs believe that they are necessary to obtain a list
of phone numbers for all potential class members.  As described above, this request is premature.

Additionally, these requests implicate Uber's trade secret and proprietary information and
Plaintiffs are not entitled to unfettered access to this information.  *See Raab v. Unum Grp.*, No.
2:10-CV-186, 2011 WL 12614882, at *3 (S.D. Ohio June 6, 2011) (denying plaintiff's motion to
compel information about the fields and structure of defendant's confidential and proprietary
database).  While Plaintiffs may argue that a protective order will safeguard Uber's information,
Plaintiffs have already violated material provisions of the protective order in this case.  *See*
Bernard Decl., Ex. E. More importantly, Uber has already produced all responsive, relevant
information from its databases.

Further, these new requests are not included in any of Plaintiffs' requests for production
and were not raised in the parties' previous joint discovery letter (which this letter supplements),

The Honorable Jon S. Tigar
February 8, 2016
Page 8

preventing Uber from meaningfully raising its objections.  Uber also attempted to meet and confer on these vague requests when it first learned of them less than two weeks ago, yet Plaintiffs' counsel refused to engage.

In light of Uber's compromise proposal, which will allow the parties to fully litigate class certification issues, these additional requests should be denied.  Should Plaintiffs believe that they need the additional information requested, they should be required to follow the proper procedure and propound discovery requests and engage in the meet and confer process, prior to raising the dispute for the Court's consideration.

## CONCLUSION

Plaintiffs' proposals and new requests for information raise significant privacy, trade secret, and proportionality concerns.  Uber respectfully submits that its compromise solution of producing a text log sample comprised of the text messages sent to and from a random sampling of 100 putative class members is more than sufficient to resolve this pre-certification dispute.

## PLAINTIFFS' REPLY & CONCLUSION

Uber's newly proposed compromise—the production of the MDRs sent between Uber and 100 telephone numbers randomly selected from the Prospective Partner Profile and the Refer-A-Friend Profile—is too little, too late.[15] However, Uber's compromise provides newly revealed information that allows for a compromise that Plaintiffs could accept. First, Uber admits that it ███████████████████████████████████.[16] Second, Uber admits that it ███████████████████████████████████████████████████████████████████████████. Third, ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

Most importantly, Uber is conceding for the first time ever (but consistent with the implications of Kadin's careful testimony) that ███████████████████████████ ████████████████████████. Because Kadin was so cagey about this in his deposition, Plaintiffs were proposing methods of obtaining the information using the ██████████████████████████████████. In light of this new information, none of that work is required. Instead, Uber should just produce all of the numbers and other data associated with these two profiles. Then, Uber should generate a script that would query 10,000 of these phone numbers—5,000 from each profile.

---

[15] Uber's contention that Plaintiffs failed to meet and confer is absurd. Plaintiffs have been meeting and conferring for months. After the deposition, Plaintiffs immediately requested documents that they needed to generate the MDRs for the three profiles. Uber refused to provide the documents. Counsel then exchanged numerous emails, spoke on the phone, and continued the discussion again in person during a deposition. Uber did not make its compromise or ███████████████████████████████████████████ until it provided Plaintiff with its portion of this letter brief.

[16] Uber now admits that ███████████████████████████████████████"  With this in mind, Uber should have investigated the feasibility of obtaining the text messages at issue from Twilio months ago, so its claim that it only have one business day to investigate whether Twilio can conduct a full search for all MDRs with the putative class members is a red herring.

The Honorable Jon S. Tigar
February 8, 2016
Page 9



That is an eminently reasonable compromise that Plaintiffs would accept. Unlike the tiny 100 number search proposed by Uber, Plaintiffs proposal would be robust enough to allow Plaintiffs to run searches to estimate the proportion of opt-outs in each profile.[18]

To be clear, Uber should also be required to produce the full list of telephone numbers and other data associated with the Prospective Driver Profile and the Refer-A-Friend profile, as that would provide Plaintiffs with a basis for determining the size of the putative classes. It would also permit Plaintiffs to estimate the number of class member in the Opt-Out Profile by comparing the percentage of the first two Profiles that contain opt-out texts.[19]

Although Plaintiffs are willing to accept this compromise of 10,000 numbers, they reject Uber's contention that this discovery is premature and unnecessary because Uber will prevail on summary judgment.[20] As an initial matter, Uber is not permitted to unilaterally bifurcate

---

[17] Even if the Plaintiffs' average text messages are atypical, doubling the amount of messages per absent class member would still result in a process taking less than twelve hours.

[18] Uber's privacy arguments make no sense in light of its willingness to provide MDRs for 100 telephone numbers. The protective order has the same force whether Uber produces MDRs for 100 or 10,000 numbers. Uber's contention that Plaintiffs violated the protective order is highly misleading. Plaintiffs never improperly disseminated confidential information. The purported violation related to a misunderstanding regarding the reporting requirements of the agreement. That issue has been resolved and Uber has no basis to suggest that Plaintiffs will not comply with the provisions of the protective order.

[19] Uber's request that Plaintiffs be barred from communicating with absent class members must be rejected. First and foremost, that issue is not before the Court. The dispute before the Court is Uber's failure to produce MDRs. Second, Uber has provided no support for that prohibition, which is improper. *E.g.*, *McCowen v. Trimac Transp. Servs. (W.), Inc.*, No. 14-cv-02694-RS (JSC), 2015 WL 5184473, at *4-5 (N.D. Cal. Sept. 4, 2015); *Quintana v. Claire's Boutiques, Inc.*, No. 5:13-cv-00368-PSG, 2014 WL 234219, at *2-3 (N.D. Cal. Jan. 21, 2014); *Benedict v. Hewlett-Packard Co.*, No. 13-CV-0119-LHK, 2013 WL 3215186, at *2-3 (N.D. Cal. June 25, 2013); *Khalilpour v. CELLCO P'ship*, No. C 09-02712 CW (MEJ), 2010 WL 1267749, at *2 (N.D. Cal. Apr. 1, 2010).

[20] Uber tries to dodge liability by drawing a distinction between messages "received" and merely "sent", claiming (wrongly) that the available logs only show the latter. ███████████████████████
████ Further, the TCPA "does not require that the called party receive the call," but, either way, the issue of whether "receipt" is a requirement is an issue common to the classes.  *Silbaugh v. Viking Magazine Servs.*, 278 F.R.D. 389, 393 (N.D. Ohio 2012).  Should this Court find receipt is required, "determining whether individuals received messages will [not] be as difficult as [Uber] argue[s]."  *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 571-72 (W.D. Wash. 2012).  Even Uber's case, *Smith v.*

The Honorable Jon S. Tigar
February 8, 2016
Page 10

discovery based on its self-serving prediction that it will win a summary judgment motion it has not filed. This is a complex case implicating thousands of class members. Uber cannot avoid its discovery obligations by claiming it will win the case later. Indeed, Plaintiffs are confident the discovery will show that each of the Class B Plaintiffs (and absent class members) aborted their applications with Uber—tossing them into the virtual "trash can"—and did not consent. Plaintiffs also expect that the evidence will establish that Uber used an ATDS to text Plaintiffs and the putative classes. Further, even if, *arguendo*, the Court finds that Plaintiffs initially consented, four named Plaintiffs (and presumably thousands of putative class members) received unlawful text messages from Uber after properly opting-out.[21] Uber claims, in a brief footnote, that it has no "opt out" liability because it allegedly stopped texting Plaintiffs who only texted "STOP." But there is no legal requirement that Plaintiffs utilize Uber's self-serving "magic word." As this Court has held, "consumers may revoke consent through any reasonable means." Dkt. 49 at 16.  And, in any event, at least one of the Plaintiffs did use Uber's anointed magic word but continued to receive unwanted text messages. Snyder Decl., Ex. B.

With respect to website screenshots, Uber's offer of a verified interrogatory response appears to be a rejection of Plaintiffs' initial compromise offer, and it is insufficient because it would relate only to Plaintiffs, and not the entire classes. Moreover, if it is too burdensome for Uber to substantiate its claims with documents, an interrogatory response alone is not sufficient for Uber to prevail on the issue of express consent, as that "is an affirmative defense for which the defendant bears the burden of proof." *Grant v. Capital Mgmt. Servs., L.P.*, 449 F. App'x 598, 600 n.1 (9th Cir. 2011). Thus, if Uber cannot provide documents sufficient to show every time the disclaimer language on its driver signup portal changed, it will be stuck with the minimal information provided—which provides that the disclaimer language did not appear before October of 2014.

Plaintiffs respectfully urge the Court to order Uber to (1) produce lists of the phone numbers and all other available database information regarding the Prospective Driver Profile and the Refer-A-Friend Profile, (2) provide MDRs for 5,000 numbers for each of these two profiles (either by doing so itself ██████████ and (3) produce documents sufficient to show the substantive changes Uber made to its driver signup portals over time. In the unlikely event that Uber cannot perform this search itself, the Court should order Uber to ███████████████████████████████████████████████. Alternatively, Plaintiffs have provided ample evidence that the server logs can be used a proxy for ████████ ████████ If the Court adopts this compromise, Uber should be barred from making any arguments in support of summary judgment or in opposition to class certification based on other MDRs or the absence of a full and complete set of all relevant MDRs.



---

*Microsoft Corp.*, 297 F.R.D. 464, 472-73 (S.D. Cal. 2014), does not limit the permissible sources of determining whether a message was "received" to carrier or class member records.

[21] After revoking any purported consent, Plaintiff Bartolet received approximately 57 texts, Plaintiff Pal received five, Plaintiff Reilly received 10, and Plaintiff Grindell received one. *See* Snyder Decl., Ex. B.

The Honorable Jon S. Tigar
February 8, 2016
Page 11

Sincerely,

/s/ Hassan Zavareei                              /s/ Debra Bernard
Hassan A. Zavareei                               Debra R. Bernard
Counsel for Plaintiffs                           Counsel for Defendant

# EXHIBIT B TO BERNARD DECL. IN SUPPORT OF PLAINTIFF'S ADMIN. MOTION (Dkt. 129)

# EXHIBIT 4

Uber



Uber000432