Sarah J. Crooks (admitted *pro hac vice*)
SCrooks@perkinscoie.com
**PERKINS COIE LLP**
1120 NW Couch Street, 10th Floor
Portland, OR  97209
Tel.:  (503) 727-2252
Fax:  (503) 346-2252

Debra R. Bernard (admitted *pro hac vice*)
DBernard@perkinscoie.com
**PERKINS COIE LLP**
131 South Dearborn, Suite 1700
Chicago, Illinois 60603
Tel.:  (312) 324-8559
Fax: (312) 324-9559

Attorneys for Defendant
Uber Technologies, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLAINTIFFS JAMES LATHROP, SANDEEP PAL, JENNIFER REILLY, JUSTIN BARTOLET, and JONATHAN GRINDELL on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>Defendant. | Case No. 14-cv-05678-JST<br><br>**DEFENDANT UBER TECHNOLOGIES, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          Thursday, June 9, 2016<br>Time:         2:00 p.m.<br>Courtroom:  9 – 19th Floor<br>Judge Jon S. Tigar |

1    **TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2           **PLEASE TAKE NOTICE** that on Thursday, June 9, 2016, at 2:00 p.m. in Courtroom 9

3    of the United States District Court for the Northern District of California, located at 450 Golden

4    Gate Avenue, San Francisco, CA, 94102-3661, Uber Technologies Inc. ("Uber") will move, and

5    hereby does move, for an Order granting summary judgment on the Second Amended Complaint

6    pursuant to Federal Rule of Civil Procedure 56(a) on the grounds that there is no genuine dispute

7    as to any material fact and Uber is entitled to judgment as a matter of law.  Because this Motion

8    will resolve all claims asserted by the named Plaintiffs, resolution of this Motion prior to class

9    certification will advance judicial economy.

10          In this action, Plaintiffs assert that Uber sent unsolicited text messages to Plaintiffs' cell

11   phones in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et*

12   *seq.*  Plaintiffs bring these claims on behalf of themselves and a putative nationwide class of

13   persons who purportedly received unsolicited text messages.

14          As detailed below, Plaintiffs' claims fail as a matter of undisputed fact and settled law.

15   *First*, Plaintiffs Bartolet, Grindell, Lathrop, and Reilly provided "prior express consent" to

16   receive text messages within the meaning of the TCPA when they provided their phone numbers

17   to Uber.  *Second*, Uber stopped sending text messages to Plaintiffs that legally revoked their

18   consent.  *Third*, with respect to Plaintiff Sandeep Pal, Uber did not make or initiate the text

19   messages that were sent to Pal and such messages were not sent using an automatic telephone

20   dialing system ("ATDS")—both prerequisites to liability under the TCPA.

21          This Motion is based on this Notice of Motion and Motion, the attached Memorandum of

22   Points and Authorities, the declarations and exhibits submitted concurrently herewith, all

23   pleadings and papers on file in this action, and such other matters as the Court may consider.

24   DATED:  April 18, 2016                    **PERKINS COIE LLP**

25

26                                             By: */s/ Sarah J. Crooks*
                                                   Sarah J. Crooks
27                                                 Attorney for Defendants
                                                   Uber Technologies, Inc.

28

1

**STATEMENT OF THE ISSUES TO BE DECIDED**

2      Pursuant to Civil Local Rule 7-4(a)(3), Uber sets forth the following statement of issues to

3   be decided:

4      1.      Did Plaintiffs Lathrop, Bartolet, Grindell, and Reilly "provide" their phone

5   numbers to Uber within the meaning of the 1992 FCC Order, and therefore give Uber prior

6   express consent to send text messages to those phone numbers?

7      2.      Did Uber respond appropriately if Plaintiffs Lathrop, Bartolet, Grindell, or Reilly

8   revoked their previously-given consent to receive text messages from Uber?

9      3.      Did Uber "make" or "initiate" the text messages received by Plaintiff Pal?

10      4.      Were the text messages sent to Plaintiff Pal sent as the result of human

11   intervention?

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................2

    A.    The Uber Platform...................................................................................2

    B.    Uber's Onboarding Process......................................................................2

    C.    Opting Out of Text Messages from Uber...................................................4

    D.    Uber's Partner Referral Program. .............................................................5

    E.    Allegations Against Uber. ........................................................................6

III.    LEGAL STANDARD ............................................................................................7

IV.     ARGUMENT ........................................................................................................8

    A.    The Putative Class B Plaintiffs Provided Uber with Their
        Prior Express Consent to Receive Text Messages. ............................... 9

        1.    Uber Easily Meets the Standard for Prior Express
            Consent Under the TCPA and the Law of the Case. ...................9

        2.    Class B Plaintiffs Submitted Their Phone Numbers
            to Uber..................................................................................11

            a.    Each of the Class B Plaintiffs Completed and
                Submitted the Uber Sign-Up Form. .............................12

            b.    Because the Class B Plaintiff Submitted
                Their Phone Numbers to Uber, They
                Consented to Receive Text Messages from
                Uber.........................................................................17

    B.    Uber Stopped Sending Text Messages to Class B Plaintiffs
        Who Revoked Consent............................................................................18

        1.    The Revocation of Consent Standard Announced in
            the Omnibus Order Cannot Be Applied
            Retroactively if It Requires Businesses to Discern
            and Honor Idiosyncratic Text Message Opt-Out
            Requests. ...............................................................................20

        2.    The Omnibus Order Confirms that the "STOP"
            Convention Remains the Standard for Revocation of
            Consent via Text Message. .......................................................23

        3.    Uber Did Not Send Text Messages to Class B
            Plaintiffs After They Revoked Their Consent to
            Receive Such Messages. ...........................................................24

            a.    Uber Informed Class B Plaintiffs They Could
                 Revoke Consent by Replying "STOP" and
                 Honored All "STOP" Requests..................................25

MOTION FOR SUMMARY JUDGMENT
Case No. 14-cv-05678-JST

           b.     Plaintiffs' Non-Standard Opt-Out Requests Did Not Meet the Standard for Revocation of Consent Under the TCPA ........................................................... 27

C.    Uber Is Entitled to Summary Judgment Against Plaintiff Pal Because Partner Referral Messages Are Not Actionable Under the TCPA ....................................................................................... 28

       1.     Uber Is Not Liable Under the TCPA for Partner Referral Text Messages Because They Are Not "Made" or "Initiated" by Uber. ............................................. 29

       2.     Partner Referral Messages Are Sent Through Human Intervention and Therefore Are Not Sent Using an ATDS. ................................................................................................. 33

V.     CONCLUSION ............................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

*ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir. Nov. 25, 2015) .................................................. 33

*Aderhold v. Car2go NA LLC*, No. C13-489RAJ, 2014 WL 794802 (W.D. Wash. Feb. 27, 2014) .......................................................................................................................... 10

*Almay, Inc. v. Califano*, 569 F.2d 674 (D.C. Cir. 1977) ...................................................... 19

*Andersen v. Harris & Harris, Ltd.*, No. 13-cv-867-JPS, 2014 WL 1600575 (E.D. Wis. Apr. 21, 2014) .............................................................................................................. 10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................... 8

*AT&T v. FCC*, 454 F.3d 329 (D.C. Cir. 2006) .................................................................... 21

*Baird v. Sabre Inc.*, 995 F. Supp. 2d 1100 (C.D. Cal. 2014) ......................................... 9, 10

*C.A.R. Transp. Brokerage Co. v. Darden Restaurants*, 213 F.3d 474 (9th Cir. 2000)), *aff'd*, __ F. A'ppx __, 2016 WL 424778 (9th Cir. Feb. 3, 2016).................................. 9

*CA Int'l v. FCC*, No. 15-1211 (D.C. Cir. Feb. 16, 2016).................................................... 28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................... 7, 8

*Derby v. AOL, Inc.*, No. 5:15-cv-00452-RMW, 2015 WL 5316403 (N.D. Cal. Sept. 11, 2015)................................................................................... 29, 34

*Duguid v. Facebook, Inc.*, No. 15-CV-00985-JST, 2016 WL 1169365 (N.D. Cal. Mar. 24, 2016) .................................................................................. 29, 35

*Far Out Productions, Inc. v. Oskar*, 247 F.3d 986 (9th Cir. 2001) ................................... 8

*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) ................................... 20, 23

*Hill v. Homeward Residential, Inc.*, No. 2:13-cv-388, 2014 WL 4105580 (S.D. Ohio Aug. 19, 2014).......................................................................................... 18

*Hoffman-La Roche, Inc. v. Kleindienst*, 478 F.2d 1 (3d Cir. 1973) ............................... 21

*Huricks v. Shopkick, Inc.*, No. C-14-2464 MMC, 2015 WL 5013299 |(N.D. Cal. Aug. 24, 2015).................................................................................... 31, 32

*Ibey v. Taco Bell Corp.*, No. 12-CV-0583-H WVG, 2012 WL 2401972 (S.D. Cal. June 18, 2012)........................................................................................... 22

*Kenny v. Mercantile Adjustment Bureau, LLC*, No. 10-CV-1010, 2013 WL 1855782 (W.D.N.Y. May 1, 2013) ........................................................................................... 21

*Legg v. Voice Media Grp*, 20 F. Supp. 3d 1370 (S.D. Fla. 2014)....................................... 19

*Luna v. Shac, LLC,* 122 F. Supp. 3d 936 (N.D. Cal. 2015) .......................................... 35

MOTION FOR SUMMARY JUDGMENT
Case No. 14-cv-05678-JST

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................................... 8

*McKenna v. WhisperText*, No. 5:14-CV-00424-PSG, 2015 WL 5264750 (N.D. Cal. Sept.
   9, 2015), *appeal filed*, No. 15-16997 (9th Cir. Oct. 7, 2015) ........................................ 33, 34, 35

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) .................................................................................... 19

*Munro v. King Broad Co.*, No. C13-1308JLR, 2013 WL 6185233
   (W.D. Wash. Nov. 26, 2013) ...................................................................................................... 22

*Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302 (11th Cir. 2015) ................................ 10

*Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014) .................................. 20, 21, 23

*Parker v. Time Warner Entm'. Co.*, 331 F.3d 13 (2d Cir. 2003) .............................................. 18, 23

*Pinkard v. Wal-Mart Stores, Inc.*, No. 3:12-cv-02902-CLS, 2012 WL 5511039
   (N.D. Ala. Nov. 9, 2012) ............................................................................................................ 10

*Roberts v. PayPal Inc.*, No. C 12-0622 PJH, 2013 WL 2384242 (N.D. Cal. May 30,
   2013), *aff'd*, ___ F. App'x ___, 2015 WL 6524840 (9th Cir. Oct. 29, 2015) .............................. 10

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ............................................ 29

*Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464 (E.D.N.Y. Dec. 19, 2012) ................. 10, 22

*Schweitzer v. Comenity Bank*, No. 9:15-CV-80665-DMM, 2016 WL 412837
   (S.D. Fla. Jan. 28, 2016) ...................................................................................................... 20, 23

*Silver v. Pa. Higher Educ. Assistance Agency*, No. 14-CV-0652-PJH, 2016 WL 1258629
   (N.D. Cal. Mar. 31, 2016) .......................................................................................................... 19

*Steinhoff v. Star Tribune Media Co., LLC*, No. 13-cv-1750, 2014 WL 1207804 (D. Minn.
   Mar. 24, 2014) ............................................................................................................................ 10

*Van Patten v. Vertical Fitness Grp., LLC*, 22 F. Supp. 3d 1069 (S.D. Cal. 2014) ............. 9, 10, 17

*Wright v. Target Corp.*, No. 14-CV-3031 (SRN/HB), 2015 WL 8751582 (D. Minn. Dec.
   14, 2015) ............................................................................................................................... 20, 23

**Statutes**

47 U.S.C. § 227(a)(1) ...................................................................................................................... 33

47 U.S.C. § 227(b)(1) ................................................................................................................. 18, 29

47 U.S.C. § 64.1200(a)(1) ............................................................................................................... 29

**Rules**

Fed. R. Civ. P. 56 .............................................................................................................................. 1

Fed. R. Civ. P. 56(c) .......................................................................................................................... 7

Fed. R. Civ. P. 56(e) .......................................................................................................................... 8

**Other Authorities**

*In re Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of Cal., Illinois. N. C., & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 FCC Rcd. 6574, at 6583 ¶¶ 26-27 (2013) ("*In re Dish Network*") .................................................................................................................... 30

*In re Matter of Cargo Airline Association Petition for Expedited Declaratory Ruling*, 29 FCC Rcd. 3432, 3438, ¶ 18 (Mar. 27, 2014)...................................................... passim

*Petition for Declaratory Ruling Regarding Revocation of Prior Express Consent for Non-Telemarketing Calls, Santander Consumer USA, Inc. Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278, __ FCC Rcd. __, at *9 (2014)........................... 24

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 92-90, Report and Order, 7 FCC Rcd. 8752 (1992) .................................. 10, 11, 17

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Declaratory Ruling and Order*, CG Docket No. 02-278, WC Docket No. 07-135, FCC 15-72 (2015)................................................................................................................ passim

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, GroupMe, Inc./Skype Communications S.A.R.L. Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278, 29 FCC Rcd. 3442 at *2, ¶¶ 11-12 (2014) ............................ 10

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling*, CG Docket No. 02-278, Declaratory Ruling, 23 FCC Rcd. 559, 566, ¶ 10 (2008) ............................................. 10

*SoundBite Declaratory Ruling*, 277 FCC Rcd. 15391 (Nov. 26, 2012) ........................... 21, 25, 29

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Plaintiffs seek to collect millions of dollars for informational text messages that they *consented* to receive from Uber and for text messages that were not even initiated by Uber.  But the Telephone Consumer Protection Act ("TCPA") does not stretch so far.  Unlike the unsolicited, automated telemarketing calls the TCPA was enacted to prevent, the text messages here were informational, "onboarding" text messages sent to individuals who created Uber accounts and signed up to drive on the Uber platform, informing them of the further necessary steps to be approved as Uber partners, and refer-a-friend messages from Uber users inviting friends and contacts to sign up.  These text messages were ordinary, consensual business communications that were never intended to be prohibited by the TCPA.

The undisputed facts demonstrate that the named Plaintiffs are not entitled to relief and cannot represent putative Class A or B.  *First*, Plaintiffs Bartolet, Grindell, Lathrop, and Reilly (Class B) directly and voluntarily provided their phone numbers to Uber when they signed up to become Uber partners, thereby consenting to receive text messages from Uber.  *Second*, Uber ceased texting plaintiffs when they replied "STOP," squarely refuting their allegations that Uber continued to send them text messages after they had revoked their consent to receive those messages.  *Finally*, Plaintiff Sandeep Pal (Class A) cannot establish that Uber made or initiated the text messages he received, nor can he establish that those messages were sent without human intervention using an Automated Telephone Dialing System ("ATDS").

Because the undisputed facts establish that Plaintiffs are not entitled to any relief from Uber and because such claims are barred as a matter of law, Uber moves this Court for an order granting summary judgment in its favor.  *See* Fed. R. Civ. P. 56.  Uber brings this motion in advance of class certification because resolving these dispositive issues now will terminate the case and moot the need for this Court to rule on class certification.

## II.      STATEMENT OF FACTS

**A.      The Uber Platform.**

Founded in 2009, Uber is a software technology company that has developed a cutting-edge mobile application platform ("Uber platform" or "Uber app") that enables third-party transportation companies, providers, and drivers (collectively "Uber partners") to receive requests for transportation from interested riders.  Answer, Dkt. No. 56 ¶¶ 5-6, 8.  The Uber app allows individual riders to pay for rides electronically, and connects riders and Uber partners using the GPS capabilities on their phones.  *Id.* ¶ 6.

**B.      Uber's Onboarding Process.**

Uber's process for onboarding new Uber partners in the United States has undergone various permutations over time and by location.  *See* Decl. of Sarah J. Crooks in Supp. of Def.'s Mot. for Summ. J. ("Crooks Decl.") ¶ 2, Ex. A (Rule 30(b)(6) Deposition Transcript of Uber's Corporate Representative, Michael Kadin, hereinafter "Kadin Tr."), at 199:20-200:4, 203:19-204:9.  Online sign-ups, however, have always required a prospective Uber partner to submit his/her first and last name, phone number, e-mail address, and password in an online sign-up form.  Kadin Tr. at 516:9-17; Decl. of Kevin Roth in Supp. of Def.'s Mot. for Summ. J. ("Roth Decl.") ¶ 4; *see also* Crooks Decl. ¶ 3, Ex. B (Uber's Amended Responses to Plaintiffs' Second Set of Interrogatories).  After inputting information into the fields on the initial online sign-up form, an individual must click a button to submit the information to Uber and the individual is presented with disclosures or links to privacy policies stating that Uber may contact them at the phone number they provided when they submitted their phone numbers to Uber.  *See* Crooks Decl. ¶ 4, Ex. C (screenshots of the Uber sign-up page over time); Roth Decl. ¶ 4; Kadin Tr. at 516:9-17, 521:11-23, 533:14-24, 534:20-535:5.  Information from the partner sign-up form is not captured or stored by Uber before the user affirmatively submits it to Uber.  Roth Decl. ¶ 4; Crooks Decl. ¶ 3, Ex. B; *see also* Kadin Tr. at 334:5-23, 522:14-23.

Each of the four plaintiffs admits that he/she affirmatively submitted the form to Uber and did so because he/she wanted to become an Uber partner.[1]  *See* Crooks Decl. ¶ 5, Ex. D (Jennifer

---

[1] Plaintiffs' admissions directly contradict Plaintiffs' prior unsupported representations to the Court in their briefing on Uber's motion to dismiss.  *See* Pls.' Supp'l Br. in Opp'n to Def.'s Mot.

1   Reilly Deposition Transcript, hereinafter "Reilly Tr."), at 27:13-14, 32:21-22; *id.* ¶ 6, Ex. E

2   (James Lathrop Deposition Transcript, hereinafter "Lathrop Tr."), at 18:20-23; 82:18-25; *id.* ¶ 7,

3   Ex. F (Jonathan Grindell Deposition Transcript, hereinafter "Grindell Tr."), at 50:11-51:9, 53:10-

4   54:19; *id.* ¶ 8, Ex. G (Justin Bartolet Deposition Transcript, hereinafter "Bartolet Tr."), at 95:24-

5   96:3, 96:22-97:5.  When Plaintiffs Grindell and Reilly filled out and submitted their sign-up

6   forms to Uber, the form stated "By signing up, I agree to the Privacy Policy and understand that

7   Uber is a request tool, not a transportation carrier" and the submission button was labeled with

8   text that read "Submit."  *See* Roth Decl. ¶ 6; Crooks Decl. ¶ 9, Ex. H (Uber's Responses to

9   Plaintiffs' Fourth Set of Interrogatories); *see also* Kadin Tr. at 533:14-20.  When Plaintiffs

10  Bartolet and Lathrop filled out and submitted their sign-up forms to Uber, the form stated: "By

11  clicking Become A Driver, I consent that Uber or its representative may contact me about my

12  application.  I understand that Uber is a request tool, not a transportation carrier.  Uber treats your

13  information in accordance with its Privacy Policy," and the submission button was labeled with

14  text that read "Become a Driver."  Roth Decl. ¶ 8; Crooks Decl. ¶ 9, Ex. H.

15          After a prospective Uber partner signs up and creates an Uber account, he or she must

16  meet additional requirements before being approved to drive on the Uber platform.  The

17  additional steps associated with these requirements are part of the "onboarding process" and vary

18  by city, but generally include submitting the type of information provided by Plaintiffs, including

19  driver's license, insurance, and vehicle information, and consenting to a background check

20  (which requires submission of a social security number).  *Id.* ¶ 3, Ex. B (Uber's First Amended

21  Responses to Plaintiffs' Second Set of Interrogatories); *id.* ¶ 9, Ex. H (Uber's Responses to

22  Plaintiffs' Fourth Set of Interrogatories); *see also* Kadin Tr. at 193:23-194:5, 194:23-195:2,

23  195:9-15.  During the onboarding process, Uber communicates with prospective Uber partners by

24  text message and by email using the contact information provided by the prospective Uber

25  _____

26  to Dismiss ("Pls.' Suppl. Br."), Dkt. No. 46.  Specifically, Plaintiffs previously argued that they
    "input their cell phone numbers into an online application that they never completed or
27  submitted."  *Id*. at 3.  They also claimed that their phone numbers were "apparently captured even
    though the application was never completed or submitted."  *Id*. at 3-4.  The undisputed facts from
28  Plaintiffs' own testimony, however, establish that Plaintiffs did in fact *submit* information to
    Uber, including their phone numbers.

partner, informing him or her about what additional information is required in the city where he or she wants to become a partner. *See* Crooks Decl. ¶ 10, Ex. I (Plaintiffs' text message logs); Kadin Tr. at 333:23-334:23. After an individual completes all of the steps in the onboarding process, a prospective Uber partner may be approved and authorized to use the Uber app to connect with riders seeking transportation. Kadin Tr. at 314:5-12; Crooks Decl. ¶ 3, Ex. B.

Plaintiffs Lathrop, Grindell, Reilly, and Bartolet not only signed up for Uber accounts, but also submitted further information to Uber seeking to be approved to drive on the Uber platform, including copies of driver's licenses, social security numbers, and information and documents about their vehicles. *See* Crooks Decl. ¶ 11, Ex. J (information submitted to Uber by Plaintiffs, including phone numbers, email addresses, vehicle information, background check agreements, dates of birth, driver's license images and numbers, and license plate numbers); *see also* Reilly Tr. at 10:21-25 (she provided her date of birth), 11:4-6 (she provided her driver's license number); Lathrop Tr. at 75:1-19 (he provided his date of birth), 76:8-78:23 (he provided his vehicle information); Grindell Tr. at 62:16-63:11 (he agreed to a background check), 66:2-15 (he provided a copy of his driver's license), 67:8-18 (he provided a copy of his vehicle registration card), 67:21-68:8 (he provided a copy of his insurance identification card), 68:10-25 (he submitted evidence of an oil change), 70:6-22 (he provided vehicle information); Bartolet Tr. at 98:23-99:9 (he provided his vehicle's make and model), 101:22-25 (same), 104:10-106:12 (he agreed to background checks), 109:5-7 (he provided his date of birth), 109:17-25 (same), 110:21-25 (he provided his state and license plate number), 112:12-113:9 (he provided his driver's license number), 113:16-22 (he provided a picture of his driver's license), 114:17-116:22 (he provided the colors and capacity of his vehicle). Plaintiffs Lathrop, Grindell, and Bartolet each also contacted Uber to ask for assistance during the onboarding process. *See* Crooks Decl. ¶ 12, Ex. K (email correspondence between Plaintiffs and Uber).

**C.      Opting Out of Text Messages from Uber.**

When Uber begins communicating with prospective Uber partners by text message, it instructs them that they may opt-out of receiving future text messages by replying to Uber with the word "STOP." The first text message that Uber sent Plaintiffs Reilly, Bartolet, Grindell, and

Lathrop after they completed the Uber sign-up form included text that read: "Reply STOP to stop receiving texts" or "Respond STOP to stop getting texts." *See id.* ¶ 10, Ex. I (text message logs), at Uber000108-113, Uber000116-138, Uber000140-143, Uber000148-150.  Because he signed up for two different accounts, Uber sent this message to Plaintiff Bartolet twice. *See id.* at Uber000135, Uber000138.

During the relevant time period, whenever Uber received text messages from prospective Uber partners that said "STOP" or "SMS Off," Uber's systems would send a single text message confirming that the individual who sent the text message had unsubscribed from receiving text messages from Uber.  *See id.* at Uber000108-113, Uber000116-138, Uber000140-143, Uber000148-150.  Uber's systems would then stop sending text messages to that individual.  *See id.*; *see also* Kadin Tr. at 273:7-276:8, 509:4-19.  Texting "STOP" or "SMS Off" was not the exclusive method for individuals to request that Uber stop sending text messages, as individuals could also make the request by contacting Uber support.  *See* Kadin Tr. at 502:21-505:10, 508:3-19, 509:7-19; Crooks Decl. ¶ 13, Ex. L (Uber's Response to Plaintiffs' Fifth Set of Interrogatories).  For example, individuals could opt out of receiving further messages by emailing support@uber.com or visiting a local partner support center.  *See* Kadin Tr. at 502:21-505:10, 508:3-19, 509:7-19; Crooks Decl. ¶ 13, Ex. L, ¶ 14, Ex. M (Uber's privacy policy).

**D.     Uber's Partner Referral Program.**

The partner referral program allows Uber partners to invite friends and contacts to become Uber partners.  Kadin Tr. at 541:17-20.  An Uber partner who invites an individual to use the Uber platform will receive a payment from Uber if the referred individual ultimately: (1) is approved to drive on the Uber platform; and (2) completes a certain number of rides as an Uber partner.  *Id.* at 541:17-20, 552:13-553:12.  The required number of rides for receiving a referral payment has changed over time and across city, as has the amount of the payment.  *Id.*

In January 2015, when Plaintiff Pal was referred, to participate in the partner referral program, an Uber partner needed to click on a button or link within the Uber app or on the Uber website to start the referral process.  Kadin Tr. at 559:17-560:25, 564:24-565:20, 573:18-574:13; *see also* Crooks Decl. ¶ 3, Ex. B.  The Uber partner then needed to manually input the email

address or phone number of the individual he or she chose to refer, and finally had to click a button to send the referral message through Uber's proprietary software systems and an application program interface ("API") provided by Twilio, Inc. ("Twilio").  Kadin Tr. at 559:17-560:25, 564:24-565:20, 573:18-574:13; *see also* Crooks Decl. ¶ 3, Ex. B (Uber's First Amended Response to Plaintiffs' Second Set of Interrogatories).  Each submission of a telephone number resulted in the transmission of only one referral message, and the referral message included the referrer's name.  *See* Kadin Tr. at 575:9-576:5 (explaining that a person would receive more than one referral message only if "multiple users or the same user invited somebody twice"); *see also* Crooks Decl. ¶ 10, Ex. I (Plaintiffs' text message logs) at Uber000146.

**E.     Allegations Against Uber.**

Plaintiffs Lathrop, Reilly, Grindell, Pal, and Bartolet (collectively, "Plaintiffs")[2] bring claims against Uber on behalf of themselves and a putative nationwide class alleging that they received texts from Uber without having expressly consented to receive them, in violation of the TCPA.  Second Am. Compl., Dkt. No. 54 ¶¶ 1, 49, 62, 76, 89, 99.  Further, Plaintiffs Grindell, Pal, Reilly, and Bartolet allege that they received texts after asking Uber to stop sending them texts.  *Id.* ¶¶ 53, 70, 82, 93.

Plaintiffs also assert claims on behalf of two putative classes.  Plaintiff Pal brought this action on behalf of himself and a putative class defined as:

> All persons domiciled within the United States who, within the last four years, received a non-emergency text message on their cellular telephone from Uber, without their prior express consent, via an ATDS, and prior to receiving the text message had not provided Uber with the cellular telephone number at which they received the text message from Uber.

*Id.* ¶ 100 ("Class A").  Plaintiffs Lathrop, Reilly, Bartolet, and Grindell brought this action on behalf of themselves and a putative class defined as:

> All persons domiciled within the United States who, within the last four years, received a non-emergency text message on their cellular telephone from Uber, without their prior express consent, via an ATDS, after

---

[2] The identity of the named Plaintiffs in this lawsuit has varied over time.  Plaintiffs Sandeep Pal and Justin Bartolet joined the suit on January 30, 2015.  First Am. Compl., Dkt. No. 10.  The Court dismissed Plaintiff Reardon's claims on July 19, 2015.  Dkt. No. 49.  Plaintiff McKinney voluntarily dismissed her claim on February 3, 2016.  Dkt. No. 125.  The Second Amended Complaint, the operative complaint in this lawsuit, contains the relevant claims and allegations for the remaining named Plaintiffs.  *See* Dkt. No. 54.

providing Uber with the telephone number at which they received the text
message from Uber through Uber's website.

*Id.* ¶ 101 ("Class B"). Thus, putative Class A consists of individuals who did not directly provide

their phone numbers to Uber and putative Class B consists of individuals who did directly provide

their phone numbers to Uber.

On February 27, 2015, Uber filed a motion to dismiss the claims of all of the Class B

Plaintiffs on the basis that: (1) Uber's text messages did not contain advertising and therefore did

not constitute telemarketing; and (2) each had provided prior express consent to receive the text

messages at issue by providing Uber with his or her cellular telephone number during the

onboarding process. Dkt. No. 25 at 1. The Court granted Uber's motion to dismiss in part,

concluding that Uber's text messages were not telemarketing and that in order to prevail on its

defense, Uber need only show that Plaintiffs provided their prior express consent to receive text

messages. Order Granting Motion to Dismiss in Part, Dkt. No. 49 ("MTD Order"), at 8-9.

However, in supplemental briefing, Plaintiffs argued that "[b]ecause the information was

submitted online, information input was apparently captured  even though the application was

never completed or submitted," Pls.' Suppl. Br., Dkt. No. 46 at 4. Thus, the Court left open the

question of whether Plaintiffs *in fact* provided prior express consent to Uber. MTD Order at 15-

16. The Court also concluded that Plaintiffs Grindell, Reilly, and Bartolet's allegations in the

Complaint that they revoked consent were sufficient to survive the pleading stage. *Id.* at 16.

## III.     LEGAL STANDARD

Summary judgment procedure is an integral part of the Federal Rules. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of

the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a

material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for

the nonmoving party." *See id.* "[I]n ruling on a motion for summary judgment, the judge must

1   view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254.

2   The "mere existence of a scintilla of evidence in support of the plaintiff's position [is]

3   insufficient." *Id.* at 252, 255. "Where the record taken as a whole could not lead a rational trier

4   of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec.*

5   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks

6   omitted).

7       The moving party bears the initial responsibility of demonstrating the absence of a

8   genuine issue of material fact. *Celotex*, 477 U.S. at 323. "When the moving party has carried its

9   burden under Rule 56(c), its opponent must do more than simply show that there is some

10   metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A

11   nonmoving party must "go beyond the pleadings and by its own evidence 'set forth specific facts

12   showing that there is a genuine issue for trial.'" *Far Out Productions, Inc. v. Oskar*, 247 F.3d

13   986, 997 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)); *see also Liberty Lobby*, 477 U.S. at 250

14   (internal citation omitted). "If the evidence is merely colorable, or is not significantly probative,

15   summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50.

16       These standards are clearly met in this case. Plaintiffs' own admissions, other testimony

17   and discovery, and the attached declarations overwhelmingly demonstrate that there is no genuine

18   issue for trial and summary judgment should be granted in Uber's favor.

19   ## IV.   ARGUMENT

20       The undisputed facts establish that not one Plaintiff can support a TCPA claim against

21   Uber. First, each putative Class B Plaintiff intentionally and voluntarily divulged his or her

22   phone number to Uber when signing up to drive on the Uber platform, and further ratified that

23   submission by continuing to communicate with Uber in pursuit of being approved as an Uber

24   partner. The text messages Uber sent them regarding that process were thus sent with their prior

25   express consent. Second, Plaintiffs who texted "STOP" to Uber were properly unsubscribed from

26   receiving text messages. Finally, the partner referral messages sent to putative Class A Plaintiff

27   Sandeep Pal were "made" or "initiated" by the Uber users who invited him, not by Uber, and

28   were not made using an ATDS.

**A.     Each of the Putative Class B Plaintiffs Provided Uber with Their Prior Express Consent to Receive Text Messages.**

This Court has already held that "[p]rior express consent is a complete defense to Plaintiffs' TCPA claim."  MTD Order at 9 (citing *Van Patten v. Vertical Fitness Grp., LLC*, 22 F. Supp. 3d 1069, 1073 (S.D. Cal. 2014)).  This Court further held that "any plaintiff who provided her phone number as part of the Uber application process consented to receive Uber's texts about becoming an Uber driver."  MTD Order at 11.  Here, the undisputed facts show that each of the putative Class B Plaintiffs knowingly released their phone numbers to Uber when they completed and submitted the sign-up form on Uber's website and therefore, each Class B Plaintiff provided prior express consent to receive text messages from Uber.  This Court should conclude as a matter of law that Class B Plaintiffs provided prior express consent to Uber to be contacted at the number they provided to Uber on its website and grant summary judgment.  *See Baird v. Sabre Inc.*, 995 F. Supp. 2d 1100, 1102 (C.D. Cal. 2014) (citing *C.A.R. Transp. Brokerage Co. v. Darden Restaurants*, 213 F.3d 474, 480 (9th Cir. 2000)), *aff'd*, __ F. A'ppx __, 2016 WL 424778 (9th Cir. Feb. 3, 2016).

**1.     Uber Easily Meets the Standard for Prior Express Consent Under the TCPA and the Law of the Case.**

"To prevail on its affirmative defense . . . Uber needs only to show that the Class B Plaintiffs provided 'prior express consent' to receive the texts at issue."  MTD Order at 9.  The FCC has consistently held that providing one's phone number to a third party constitutes prior express consent to be called or texted by that party.[3]  *See, e.g.*, *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 92-90, Report and Order, 7 FCC Rcd. 8752, 8754, ¶ 31 (1992) ("1992 FCC Order") (explaining that under the TCPA "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the

---

[3] The Court previously held that text messages Plaintiffs received from Uber did not contain advertisements, did not constitute telemarketing, and did not trigger the heightened "prior express *written* consent" standard under the TCPA.  MTD Order at 9.  Accordingly, this motion and memorandum focus on the standard for "prior express consent" under the TCPA.  *See also* Seconded Amended Complaint ("SAC") ¶ 112 (alleging TCPA violations based on purported failure to obtain "prior express consent" and removing allegations that the text messages constituted "telemarketing").

contrary"); *see also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Declaratory Ruling and Order*, CG Docket No. 02-278, 30 FCC Rcd. 7961, 7991, ¶ 52 (2015) (the "Omnibus Order") (prior express consent for non-telemarketing and non-advertising calls "can be demonstrated . . . by giving his or her wireless number to the person initiating the autodialed or prerecorded call," in the absence of instructions to the contrary); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, GroupMe, Inc./Skype Communications S.A.R.L. Petition for Expedited Declaratory Ruling,* CG Docket No. 02-278, 29 FCC Rcd. 3442, 3446 ¶¶ 11-12 (2014) (same); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling,* CG Docket No. 02-278, 23 FCC Rcd. 559, 566, ¶ 10 (2008) (same).

Like this Court, the overwhelming majority of courts have agreed that "[e]xpress consent can be demonstrated when the called party gives her wireless number to the person initiating the phone call 'without instructions to the contrary.'"  MTD Order at 11 (citing Omnibus Order ¶ 51); *see also Baird*, 995 F. Supp. 2d at 1103; *Roberts v. PayPal Inc.*, No. C 12-0622 PJH, 2013 WL 2384242, at *3-5 (N.D. Cal. May 30, 2013), *aff'd*, __ F. App'x __, 2015 WL 6524840 (9th Cir. Oct. 29, 2015); *Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 467 (E.D.N.Y. Dec. 19, 2012) ("[A]uthorities are almost unanimous that voluntarily furnishing a cellphone number to a vendor or other contractual counterparty constitutes express consent").[4]

This Court ruled on the standard for prior express consent in this case when it ruled on Uber's motion to dismiss the Class B Plaintiffs' claims.  *See* MTD Order at 14-15.  Though ultimately denying Uber's motion in part, the Court identified the central question in this case as "[w]hether these plaintiffs actually 'provided' their numbers to Uber within the meaning of the 1992 FCC Order."  *Id.*  Further, with respect to what actions qualify as "providing" a phone

---

[4] *See also, e.g.*, *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1307-08 (11th Cir. 2015); *Van Patten v. Vertical Fitness Grp., LLC*, 22 F. Supp. 3d 1069, 1078 (S.D. Cal. 2014); *Andersen v. Harris & Harris, Ltd.*, No. 13-cv-867-JPS, 2014 WL 1600575, at *3, *9 (E.D. Wis. Apr. 21, 2014); *Steinhoff v. Star Tribune Media Co., LLC*, No. 13-cv-1750, 2014 WL 1207804, at *3-4 (D. Minn. Mar. 24, 2014); *Aderhold v. Car2go NA LLC*, No. C13-489RAJ, 2014 WL 794802, at *4-6 (W.D. Wash. Feb. 27, 2014); *Pinkard v. Wal-Mart Stores, Inc.*, No. 3:12-cv-02902-CLS, 2012 WL 5511039, at *4-6 (N.D. Ala. Nov. 9, 2012).

number to Uber, the Court explained that "[t]he 1992 FCC Order describes providing a number as the knowing *release* of that phone number" and that other sources define "provide" as "to make (something) available," "to supply (something that is wanted or needed)," and to "supply or furnish for use; make available; yield, afford." *Id.* at 12 (internal citations omitted). The Court concluded that "[t]he word 'provide' suggests a quality of relinquishment." *Id.*

The Court denied Uber's motion to dismiss on the basis that it could not establish, *based on the Complaint alone*, that the Class B Plaintiffs had consented to receiving text messages from Uber. The Court only reached this conclusion after it solicited and received supplemental briefing from the parties on the issue of what constitutes "providing" a phone number within the meaning of the 1992 FCC Order. In Plaintiffs' supplemental briefing, Plaintiffs depicted Uber's sign-up page and onboarding process as an "application" that Plaintiffs never "submitted" to Uber. Pls.' Suppl. Br., Dkt. No 46, at 4. For example (directly contrary to what the undisputed facts show), Plaintiffs argued that because the sign-up process was online, Plaintiffs' information was "apparently captured even though the application was never completed or submitted." *Id.* Plaintiffs also sketched an analogy to a paper-based employment application process, and represented that Plaintiffs had "discarded" their applications or "simply decided not to submit" them. *Id.*

The Court adopted Plaintiffs' proposed analogy in its Order, and likened Plaintiffs' allegations to "a job applicant who goes in person to a local business." MTD Order at 15. If that job applicant writes her phone number on a job application, and later throws the application in the trash at home, the Court concluded, she probably has not "provided" her phone number to the employer. *Id.* at 15. However, the Court further noted that **"*the answer might differ if the applicant actually submitted the incomplete application, and the business then contacted her concerning that application*."** *Id.* at 15 n.7 (emphasis added). As demonstrated by the undisputed facts, that is almost precisely what happened in this case.

### 2.   Class B Plaintiffs Submitted Their Phone Numbers to Uber.

Here, the undisputed facts show that Plaintiffs *actually submitted sign-up forms to Uber and then Uber contacted them about the onboarding process to partner with Uber.* Because there

1  is no genuine dispute that Plaintiffs Bartolet, Grindell, Lathrop, and Reilly submitted sign-up

2  forms to Uber that included their phone numbers, and that Plaintiffs knew they were doing so,

3  Uber is entitled to judgment as a matter of law.

4           **a.**      **The Class B Plaintiffs Completed and Submitted the Uber Sign-Up Form.**

5        The undisputed facts show that each of the Plaintiffs *submitted and voluntarily*

6  *relinquished* their phone numbers to Uber by filling out partner sign-up forms that appeared on

7  Uber's websites, and clicking the buttons that appeared at the end of those forms.

8        *First*, the Class B Plaintiffs all admit that they themselves provided their phone numbers

9  to Uber:

10  • **Reilly:** Ms. Reilly alleged that she "started the application to become an Uber driver

11      through Uber's website." SAC ¶ 77. She testified that she gave Uber her cell phone

12      number. Reilly Tr. at 32:21-22 ("Q. You gave Uber your cell phone number? A. I did.").

13  • **Lathrop:** Mr. Lathrop alleged that he "provided his personal information [to Uber] at the

14      beginning of the sign-up process." SAC ¶ 34. He testified that he provided his cell phone

15      number to Uber during that process. Lathrop Tr. at 66:19-25, 66:10-25, 70:22-71:1 ("Q.

16      And then it has a number 360-XXX-XXXX. Do you believe you provided that phone

17      number to Uber? . . . A. Yes, I did."). Mr. Lathrop also testified that he would have

18      clicked a button to submit the information to Uber. *Id*. at 82:18-25.

19  • **Grindell:** Mr. Grindell alleged that "he began an application to become an Uber driver

20      through Uber's website" and that as "part of that application process, Grindell provided

21      Uber with his cellular phone number." SAC ¶ 50. He testified that he recalled submitting

22      his phone number to Uber. Grindell Tr. at 53:16-20; 54:2-4, ("Q. And you recall that you

23      submitted a phone number? A. Yes."), 58:11-23. He also testified that he recalled

24      clicking a button to submit the information. *Id.* at 54:11-19. Mr. Grindell additionally

25      testified that he recalled submitting his information to Uber on the date reflected in Uber's

26      records dated October 9, 2014. *Id.* at 59:25-60:6.

27

28

MOTION FOR SUMMARY JUDGMENT
Case No. 14-cv-05678-JST

- **Bartolet.** Mr. Bartolet alleged that he "began an application to become an Uber driver through Uber's website" and that "[a]s part of that application process, Bartolet provided Uber with his cellular phone number." SAC ¶ 90. He also testified that he submitted his phone number to Uber. Bartolet Tr. at 95:15-23, 96:22-97:1, 98:15-18 ("Q. And you submitted your contact number, 419-XXX-XXXX to Uber; correct? . . . A. Correct."). In fact, Mr. Bartolet testified that he submitted his information to Uber twice because he created two accounts with Uber. Bartolet Tr. at 99:18-20. He also testified that he submitted his information to Uber by clicking a button. *Id.* at 95:15-96:3.

The above testimony is further corroborated by testimony from each of the Plaintiffs confirming that the names and email addresses that were submitted together with their phone numbers on the Uber partner sign-up forms also belonged to them. Lathrop Tr. at 65:17-66:23, 82:10-25; Grindell Tr. at 57:24-58:23; Reilly Tr. at 12:18-21, 17:13-14; Bartolet Tr. at 98:15-18, 101:13-21.

*Second*, all the Class B Plaintiffs admit that they were interested in driving on the Uber platform and that they began the onboarding process to become an Uber partner. *See* SAC ¶ 34 (Lathrop), ¶ 50 (Grindell), ¶ 77 (Reilly), ¶ 90 (Bartolet); Reilly Tr. at 27:13-14; Lathrop Tr. at 18:20-23; Grindell Tr. at 50:11-51:9; Bartolet Tr. at 91:25-92:3. Moreover, each Plaintiff took steps *after* they submitted their phone numbers to Uber that confirm they knowingly released their information to Uber and had intended to sign up to drive using the Uber platform:

- **Reilly:** After signing up with Uber, Ms. Reilly also sent to Uber her date of birth, her license plate information, her driver's license number, her social security number, her vehicle information, and a picture of her driver's license. *See* Crooks Decl. ¶ 11, Ex. J; Reilly Tr. at 10:21-11:6. Ms. Reilly also consented to a background check, which required her to submit her social security number. Crooks Decl. ¶ 11, Ex. J.

- **Lathrop**: After signing up with Uber, Mr. Lathrop wrote an email to Uber explaining that he hoped to get his car inspected, his documents uploaded, and to come by the Uber office to complete onboarding. *Id.* ¶ 12, Ex. K, at Uber000154-155 ("I am hoping to get my car inspection done today and upload the files need [sic]. If I can get that done, I will be swinging by for the onboarding."); *see also* Lathrop Tr. at 96:11-97:5. This email was in

1  response to an email from Uber, sent to the email address that Mr. Lathrop provided to

2  Uber on the sign-up form.  Lathrop Tr. at 70:3-21.  Mr. Lathrop also submitted to Uber his

3  driver's license number, vehicle information, and date of birth, and consented to a

4  background check, which required him to submit his social security number.  Crooks

5  Decl. ¶ 11, Ex. J; Lathrop Tr. at 75:1-19, 76:8-78:23.

6  • **Grindell:** After signing up with Uber, Mr. Grindell wrote multiple emails to Uber about

7  questions and issues he was having with his background check, with entering his vehicle

8  information, and with respect to leasing a phone from Uber.  Crooks Decl. ¶ 12, Ex. K, at

9  Uber000158-75.  In one email, Mr. Grindell stated, "I had previously watched and passed

10  the online training course.  I will get the inspection when I have a chance provided the

11  inspection from the Toyota dealership earlier this year is not sufficient.  My plan is to join

12  Uber at the end of December after my Final Exams."  *Id.* at Uber000165.  Mr. Grindell

13  also provided Uber with his social security number, birthdate, driver's license number,

14  registration card, insurance identification card, evidence of a recent oil change, vehicle's

15  emission test report and other vehicle information, and consented to a background check,

16  which required him to submit his social security number.  Crooks Decl. ¶ 11, Ex. J;

17  Grindell Tr. at 62:16-11, 66:2-15, 67:8-18, 67:21-68:8, 68:10-25, 70:6-22.

18  • **Bartolet:**  After signing up with Uber, Mr. Bartolet consented to a background check,

19  which required him to submit his social security number.  Crooks Decl. ¶ 11, Ex. J,

20  at Uber000407-09; Bartolet Tr. at 104:10-106:12.  He also responded to a text message

21  from Uber stating that he had intended to apply in a different city.  Crooks Decl. ¶ 10,

22  Ex. I, at Uber000139; Bartolet Tr. at 119:25-121:1.  He then filled out a second sign-up

23  form and consented again to a background check agreement.  Crooks Decl. ¶ 11, Ex. J,

24  at Uber000410-11; Bartolet Tr. at 104:10-106:12.  He also uploaded a picture of his

25  driver's license, Crooks Decl. ¶ 11, Ex. J, at Uber000423; Bartolet Tr. at 113:16-22, and

26  provided information about his vehicle, Crooks Decl. ¶ 11, Ex. J, at Uber000407,

27  Uber001272; Bartolet Tr. at 98:23-99:9, 101:22-25, 114:17-116:22.  He then emailed an

28

1   Uber representative about having applied in the wrong city.  *See* Crooks Decl. ¶ 12, Ex. K,

2   at Uber000176-177; Bartolet Tr. at 119:25-121:1.

3   *Third*, Uber's systems show the specific dates and times that Uber received Plaintiffs'

4   sign-up information, including each of their phone numbers.  *See* Crooks Decl. ¶ 11, Ex. J,

5   at Uber000407.  Uber's systems also indicate the web portals through which Plaintiffs accessed

6   Uber's sign-up form and initiated the onboarding process.  Roth Decl. ¶ 3; Crooks Decl. ¶ 9,

7   Ex. H.  The web portals that Plaintiffs visited contained a sign-up form that required Plaintiffs to

8   input their name, email address, and phone number, create a password, and click a button to

9   submit the information to Uber.  *See* Roth Decl. ¶ 4; Crooks Decl. ¶ 3, Ex. B; Kadin Tr. at 516:9-

10   17 (noting that Uber's sign-up forms have always required the submission of at least this

11   information).  The partner sign-up form depicted below is substantially similar to the partner sign-

12   up forms that Plaintiffs would have seen when they signed up to drive with Uber in late 2014.

13   Roth Decl. ¶ 9; Crooks Decl. ¶ 9, Ex. H.

**Form appearing on** https://get.uber.com/cl **on Oct. 4, 2014**
(excerpted from Crooks Decl. ¶ 4, Ex. C, at Uber000307)



25   Thus, Uber provided prior notice to each Class B Plaintiff that it would contact him or her

26   about the onboarding process at the number that he or she provided.  On the dates that Mr.

27   Lathrop and Mr. Bartolet (for the first time) filled out the sign-up form that appeared on the

28   website https://www.get.uber.com/cl, the "legal copy" stated:

1
2

> By clicking Become A Driver, *I consent that Uber or its representative may contact me about my application*.  I understand that Uber is a request tool, not a transportation carrier.  Uber treats your information in accordance with its <u>Privacy Policy</u>.

3
4
5
6

Roth Decl. ¶ 8; *see also* Crooks Decl. ¶ 9, Ex. H (emphasis added).  The text that appeared on the submission button itself stated "Become A Driver."  Roth Decl. ¶ 8.  Between August and October 2014, when Mr. Grindell, Ms. Reilly, and Mr. Bartolet (for the second time) filled out the sign-up form that appeared on the website https://partners.uber.com, the "legal copy" stated:

7
8

> By signing up, I agree to the <u>Privacy Policy</u> and understand that Uber is a request tool, not a transportation carrier.

9

*Id.* ¶ 8.  The text that appeared on the submission button itself stated "Submit."  *Id.*

10
11
12
13

The words "Privacy Policy" that appeared alongside the submission buttons that each of the Plaintiffs clicked were hyperlinked to Uber's privacy policy, located at https://www.uber.com/legal/privacy.[5]  *Id.*  The privacy policy applicable when each of the named Plaintiffs submitted their telephone numbers to Uber stated in relevant part:

14
15
16

> Based upon the Personal Information you provide us when registering for an account, we may . . . communicate with you in response to your inquiries, to provide the services you request, and to manage your account. We will communicate with you by email, telephone, or *SMS or text message*, in accordance with your wishes.

17

Crooks Decl. ¶¶ 9, 14 Exs. H, M (emphasis added); *see also* Grindell Tr. at  56:7-57:4.

18
19
20
21
22
23
24
25
26

*Fourth*, the information that Plaintiffs provided in the partner sign-up forms was not submitted to Uber until the Plaintiffs clicked the submission buttons that appeared at the end of the forms.  *See* Crooks Decl. ¶ 3, Ex. B; *see also* Kadin Tr. at 334:5-23, 522:14-23.  This procedure—whereby information in a web form is submitted to a website owner upon the click of a button that follows the form—is a familiar process for transmitting contact and account-creation information to a business via the Internet.  *See, e.g.*, Bartolet Tr. at 102:20-25.  Indeed, Mr. Lathrop testified that when he learned about this lawsuit, he may have used a very similar online form to submit his contact information to his attorneys in this case.  Lathrop Tr. at 11:10-14:12 & Ex. 17.

27
28

---

[5] That the text "Privacy Policy" was hyperlinked means that a user who clicked on "Privacy Policy" would have been taken to the URL https://www.uber.com/legal/privacy.

MOTION FOR SUMMARY JUDGMENT
Case No. 14-cv-05678-JST

**b.      Because the Class B Plaintiffs Submitted Their Phone Numbers to Uber, They Consented to Receive Text Messages from Uber.**

The evidence shows that Plaintiffs Bartolet, Grindell, Lathrop, and Reilly voluntarily relinquished their telephone numbers to Uber through the partner sign-up form, which they each filled out and then submitted to Uber.  Thus, the Court should conclude as a matter of law that Plaintiffs consented to receive the text messages at issue from Uber.  *See* MTD Order at 11 (holding that "any plaintiff who provided her phone number as part of the Uber application process consented to receive Uber's texts about becoming an Uber driver"); *id.* at 14-15 (holding that Plaintiffs provided prior express consent to Uber to send text messages if they "actually 'provided' their numbers to Uber within the meaning of the 1992 FCC Order."); *see also, e.g.*, *Van Patten, LLC*, 22 F. Supp. 3d at 1078 (same).

In prior briefing on Uber's motion to dismiss, Plaintiffs argued that because they "never submitted completed applications to Uber," they did not "provide" their phone numbers to Uber. Pls.' Suppl. Br., Dkt. No. 46, at 3.  As discussed in the preceding section, the undisputed facts from Plaintiffs' own testimony establishes that each of the Class B Plaintiffs input their phone numbers into the partner sign-up form and *did* submit that form to Uber, thereby "providing" their numbers to Uber.  *See also* Crooks Decl. ¶ 4, Ex. C (screenshots of Uber's sign-up form); ¶ 11, Ex. J (phone numbers submitted to Uber); Reilly Tr. at 32:21-22; Lathrop Tr. at 65:15-66:25, 70:3-71:1, 68:14-18; Grindell Tr. at 53:16-20, 54:2-4, 58:11-23; Bartolet Tr. at 95:24-96:3, 96:22-97:5.  In fact, they did so because they wanted to drive on the Uber platform.  Reilly Tr. at 27:13-14; Lathrop Tr. at 18:20-23; Grindell Tr. at 50:11-51:9; Bartolet Tr. at 91:25-92:3.

Class B Plaintiffs also disingenuously suggested in their briefing that because they input the information "online," their information "was apparently captured even though the application was never completed or submitted."  Pls.' Suppl. Br., Dkt. No. 46, at 4.  An entity "captures" a number when it obtains the number without notice to the caller, such as through a caller ID or ANI device.  *See* 7 FCC Rcd. 8752, 8769, ¶ 31; *see also Hill v. Homeward Residential, Inc.*, No. 2:13-cv-388, 2014 WL 4105580, at *3-4 (S.D. Ohio Aug. 19, 2014).  There is no evidence whatsoever to support Plaintiffs' unsubstantiated suggestion that Uber "captured" their

1  information.  Indeed, Plaintiffs admit that they each gave their phone numbers to Uber on the

2  sign-up form.  Reilly Tr. at 32:21-22; Lathrop Tr. at 65:15-66:25, 70:3-71:1, 68:14-18; Grindell

3  Tr. at 53:16-20, 54:2-4, 58:11-23; Bartolet Tr. at 95:24-96:3, 96:22-97:5.  Not only that, but

4  Plaintiffs submitted a plethora of other information and documents to Uber in connection with the

5  onboarding process after they had submitted their phone numbers, making clear that their

6  submission was no mistake.  *See* Crooks Decl. ¶ 11, Ex. J.  Plaintiffs' prior representations to the

7  Court in connection with their legal argument, while imaginative, had no basis in fact.

8          The undisputed facts establish that Uber is entitled to judgment as a matter of law.  By

9  submitting their phone numbers to Uber, Class B Plaintiffs provided prior express consent to

10  receive text messages from Uber.  This is not the case of an aborted application, thrown in the

11  trash before its completion.  Each of the Class B Plaintiffs actually submitted a partner sign-up

12  form and never even indicated to Uber that he/she wished to withdraw his/her "application."  *See*

13  MTD Order at 15 n.7.  Uber respectfully requests that the Court find that as a matter of law each

14  of the Class B Plaintiffs provided prior express consent to Uber to send text messages to them.

**B.     Uber Stopped Sending Text Messages to Class B Plaintiffs Who Revoked Consent.**

15

16          The plain text of the TCPA authorizes calls to consumers who have provided prior express

17  consent, but does not address how that consent may be revoked.  *See* 47 U.S.C. § 227(b)(1).

18  Nonetheless, Class B Plaintiffs Reilly, Grindell, and Bartolet contend they are entitled to damages

19  under the TCPA for messages they received after they "ask[ed] Uber to stop sending them text

20  messages."  *See* MTD Order at 16.  The undisputed factual record belies their contention.

21          As a threshold matter, to the extent the July 2015 Omnibus Order alters the state of the

22  law with respect to opting out by text message, it cannot be applied retroactively to penalize

23  conduct predating its issuance.  Given the potential for "devastatingly large damages award[s]" to

24  arise when the TCPA's minimum statutory damages provision is combined with the class action

25  vehicle, *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 22 (2d Cir. 2003), retroactive

26  application of a new and expansive standard, which was neither contemplated nor foreshadowed

27  by prior authority, implicates significant due process concerns.  *Cf. Silver v. Pa. Higher Educ.*

28  *Assistance Agency*, No. 14-CV-0652-PJH, 2016 WL 1258629, at *3 (N.D. Cal. Mar. 31, 2016)

1    (retroactively applying newly enacted TCPA exception that "actually decrease[d] liability for past

2    conduct").  Accordingly, the Omnibus Order may only be applied to conduct predating its

3    existence if the Omnibus Order simply codified the law as it existed *prior* to its passage.

4            Before the Omnibus Order, the longstanding approved standard implicitly recognized by

5    the courts and the FCC for revoking consent via text message was to reply "STOP."  *See, e.g.*,

6    *Legg v. Voice Media Grp*, 20 F. Supp. 3d 1370, 1378 (S.D. Fla. 2014); *In re Matter of Cargo*

7    *Airline Association Petition for Expedited Declaratory Ruling ("Cargo Airline Order")*, 29 FCC

8    Rcd. 3432, 3438, ¶ 18 (Mar. 27, 2014).  This means that the Omnibus Order may only apply

9    retroactively to penalize those who sent non-exempt text messages to individuals who previously

10   replied "STOP."  This comports with the Omnibus Order itself, which explicitly re-endorsed the

11   "STOP" standard for revocation of consent.  Omnibus Order ¶ 64.

12           Uber complied with this standard—its first text message to each of the Class B Plaintiffs

13   specified they could "Reply STOP" to opt out of receiving text messages, and when Plaintiffs

14   complied with the opt-out instruction, the only text messages Uber sent to Plaintiffs were (a) text

15   messages confirming that Plaintiffs had opted out of text messages from Uber and (b) text

16   messages sent to Plaintiff Reilly after she consented anew to receive text messages from Uber.

17   Neither type of text message is actionable under the TCPA.  Because Uber only sent text

18   messages to Class B Plaintiffs who provided prior express consent, Uber is entitled to summary

19   judgment as to all of the Class B Plaintiffs.[6]

20

21

22

23

24   [6] In the alternative, Uber renews its request for a stay on this issue until the D.C. Circuit resolves
     the appeal currently pending before it.  *See* Uber's Motion to Stay, Dkt. No. 71.  An agency's
     position is arbitrary and capricious if it makes compliance impracticable, *see Almay, Inc. v.*
25   *Califano*, 569 F.2d 674, 682 (D.C. Cir. 1977), or imposes disproportionate burdens, *see*
     *Michigan v. EPA*, 135 S. Ct. 2699, 2709 (2015).  If the FCC's standard of revocation requires
26   companies like Uber to develop systems to recognize any possible permutation a consumer could
     use to opt-out of text messages, then the agency's position does both and should be vacated.  *See*
27   Order, *Fontes v. Time Warner Cable Inc.*, Case No. 2:14-cv-02060-CAS-CW, 2015 WL 9272790,
     at *5 (C.D. Cal. Dec. 17, 2015) (staying case pending resolution of the appeal of the Omnibus
28   Order).  This issue is now fully briefed in the D.C. Circuit appeal.

1    **1.    The Revocation of Consent Standard Announced in the Omnibus Order Cannot Be Applied Retroactively if It Requires Businesses to Discern and Honor Idiosyncratic Text Message Opt-Out Requests.**

In the Omnibus Order, issued on July 15, 2015, the FCC announced a potentially new and ambiguous standard by which a consumer may revoke previously given consent to be called: a "consumer may revoke his or her consent in any reasonable manner that clearly expresses his or her desire not to receive further calls, and . . . the consumer is not limited to using only a revocation method that the caller has established as one that it will accept."  Omnibus Order ¶ 70. To the extent that this standard purports to change the law regarding how consumers can revoke consent to receive text messages, it cannot apply to the text messages at issue here, all of which were sent between July 2014 and January 2015, well in advance of the new standard the FCC announced in the Omnibus Order.  *See* Crooks Decl. ¶ 10, Ex. I.

District courts have yet to consider whether the revocation of consent portion of the Omnibus Order applies retroactively.  *See Schweitzer v. Comenity Bank*, No. 9:15-CV-80665-DMM, 2016 WL 412837, at *5 (S.D. Fla. Jan. 28, 2016) ("It is unclear whether the 2015 FCC Ruling applies to this case, as it was issued after the purported revocation and after all the phone calls subject to this litigation."); *Wright v. Target Corp.*, No. 14-CV-3031 (SRN/HB), 2015 WL 8751582, at *5 (D. Minn. Dec. 14, 2015) (same).  But courts have previously declined to give retroactive application to FCC orders addressing revocation of consent under the TCPA.  *See Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 n.5 (3d Cir. 2013) ("*Chevron* deference appears to be inappropriate here because the FCC never articulated a rationale for deciding why the TCPA affords consumers the right to revoke their prior express consent."); *see also Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1256 (11th Cir. 2014) (same).  This Court should decline to apply the Omnibus Order retroactively as well.  If the Omnibus Order requires businesses to honor non-standard opt-out requests like those used by some of the Plaintiffs here— and imposes crippling liability for failing to do so—the law demands that application of the Omnibus Order be prospective only, since retroactive application would cause manifest injustice for businesses, like Uber, that complied with the law prior to the Order.

MOTION FOR SUMMARY JUDGMENT
Case No. 14-cv-05678-JST

First, as a general matter, rulemakings typically do not apply retroactively.  *See Hoffman-La Roche, Inc. v. Kleindienst*, 478 F.2d 1, 13 (3d Cir. 1973).  Here, although the revocation of consent portion of the Omnibus Order was styled as an adjudication, it "will apply across the board" to all businesses that use text messaging to communicate with their users and thus has the "generalized nature" of a rulemaking.  Accordingly, the ruling is a rulemaking and does not apply retroactively.  *Id.* ("Although the proceeding involved a concrete factual situation from which factual inferences provided the basis for the . . . order, the facts and inferences therefrom were used to formulate a basically legislative-type judgment of entirely prospective application.").

More critically, if the revocation of consent portion of the Omnibus Order were an adjudication and could apply retroactively, using it to impose liability for text messages Uber sent after receiving non-standard opt-out requests from Plaintiffs prior to the Order would result in "manifest injustice."  *See AT&T v. FCC*, 454 F.3d 329, 332 (D.C. Cir. 2006) (noting that courts can depart from retroactive application of adjudications when doing so would lead to "manifest injustice").  The legal landscape predating the Omnibus Order provided that revoking consent to receiving text messages could be effectuated by recognizing a "STOP" response as an unsubscribe request.  Uber did that here.  If the standard espoused in the Omnibus Order changed the law, suddenly rendering Uber's compliant opt-out system insufficient, it is nonsensical and manifestly unjust to apply the standard to conduct that predated the Order and that comported with the law at the time it occurred.

A brief history of revocation of consent under the TCPA illuminates the havoc and injustice that would result if a new standard were applied retroactively.  Although the TCPA was enacted in 1991, revocation of consent was not addressed by courts or by the FCC for over twenty years.  Even then, the initial authorities reached mixed results.  *See, e.g.*, *SoundBite Declaratory Ruling*, 27 FCC Rcd. 15391, 15397, ¶ 11 (Nov. 26, 2012) (ruling that prior express consent to receive text messages extends to a one-time opt-out confirmation text message, but that an opt-out request otherwise revokes prior express consent to receive such messages); *Osorio*, 746 F.3d at 1255 (recognizing revocation of consent under the TCPA); *Kenny v. Mercantile Adjustment Bureau, LLC*, No. 10-CV-1010, 2013 WL 1855782, at *7 (W.D.N.Y. May 1, 2013) (holding there

1    was no right to revoke consent under the TCPA); *Saunders v. NCO Fin. Sys., Inc.*, 910 F.

2    Supp. 2d 464, 468-69 (E.D.N.Y. 2012) (same).

3        Critically, when the FCC finally outlined how a company should recognize opt-out

4    requests, it explained that a company must provide "the ability for the recipient to opt out by

5    replying 'STOP.'"  *See Cargo Airline Order*, 29 FCC Rcd. at 3438, ¶ 18 (granting an exemption

6    to the prior express consent requirement to alert wireless consumers about package delivery, as

7    long as certain conditions were met, including that consumers could opt out of such messages).  It

8    did *not* require recognition of myriad permutations of potential non-standard opt-out requests,

9    such as "please stop" or "remove" or "cancel" or "shut up."  *Id.*  Similarly, in cases addressing

10   revocation of consent via text message, courts did not consider whether individuals could revoke

11   consent using idiosyncratic phrases and words sent via text message.  Rather, these cases

12   uniformly concerned individuals who sought to revoke consent to receive text messages by

13   replying with the word "STOP."  *See, e.g.*, *Munro v. King Broad Co.*, No. C13-1308JLR, 2013

14   WL 6185233, at *3 (W.D. Wash. Nov. 26, 2013) (plaintiff replied "STOP" dozens of times over

15   several months, and also called defendant and left a voicemail requesting that the text messages

16   stop); *Ibey v. Taco Bell Corp.*, No. 12-CV-0583-H WVG, 2012 WL 2401972, at *1 (S.D. Cal.

17   June 18, 2012) (plaintiff opted out by responding "STOP").  Thus, prior to the Omnibus Order, a

18   "STOP" response was the legally approved standard for automatically opting out of further text

19   messages.

20       This was the standard that applied when Plaintiffs in this case received text messages from

21   Uber, was the instruction included in the text messages sent to Plaintiffs, and was the standard in

22   effect when Plaintiffs filed this case.  Nonetheless, Plaintiffs Grindell, Reilly, and Bartolet

23   contend that Uber should be liable for sending them text messages after they purportedly

24   attempted to opt out by texting phrases *other than* "STOP."  *See* SAC ¶¶ 61, 82-83, 93.

25   Regardless of whether this is required under the new standard espoused in the Omnibus Order

26   (and Uber contends it is not), it certainly was never required prior to the Omnibus Order and,

27   based on the FCC's own rulings to date as well as those of the courts, Uber could not have

28   divined that its lawful conduct could result in the staggering damages that Plaintiffs seek here.

1    Thus, to the extent that the new standard espoused in the Omnibus Order purports to

2    impose untold sums of liability (based on a $500 or $1500 per text message penalty) for conduct

3    that was reasonably understood to be compliant and endorsed by the relevant authorities at the

4    time, applying the standard retroactively could very well violate due process rights.  *See, e.g.*,

5    *Parker*, 331 F.3d at 13 (acknowledging that a "devastatingly large damages award, out of all

6    reasonable proportion to the actual harm suffered by members of the plaintiff class, may raise due

7    process issues"); *see also Gager*, 727 F.3d at 271 n.5 (refusing to accord *Chevron* deference to

8    previous FCC ruling on revocation of consent); *see also Osorio*, 746 F.3d at 1256 (same).  The

9    Omnibus Order should not be applied retroactively to impose liability for conduct that was lawful

10   at the time it occurred.

11           **2.      The Omnibus Order Confirms that the "STOP" Convention Remains the
                    Standard for Revocation of Consent via Text Message.**

12   The issue of retroactive application need not be reached if the Court appropriately

13   interprets the Omnibus Order narrowly to confirm the pre-existing "STOP" standard for opting

14   out of text messages.  Courts have yet to interpret the reach of the FCC's new revocation of

15   consent standard as applied to text messages.  *Cf. Schweitzer*, 2016 WL 412837, at *5 (discussing

16   Omnibus Order standard applied to revocation of consent by phone); *Wright*, 2015 WL 8751582,

17   at *5 (same).  But a close reading of the Omnibus Order reveals that the FCC did not intend to

18   proliferate lawsuits and effectively terminate desired text message communications between

19   businesses and consumers by imposing an unworkably vague revocation of consent standard.

20   Nor did the FCC intend to impose a standard that would give rise to due process concerns if

21   imposed retroactively.  To the contrary, with respect to revocation of consent via text message,

22   the FCC codified the pre-existing standard of informing consumers how to directly opt out of

23   receiving future messages, such as by responding with the word "STOP."  *See* Omnibus Order

24   ¶ 64 (stating that "giv[ing] consumers a direct opt-out mechanism such as . . . a reply of 'STOP'

25   for text messages" is a "reasonable method in writing [] to prevent future calls" (citing *Cargo

26   Airline Order*, 29 FCC Rcd. at 3438, ¶ 18)).

27

28

The FCC stated in the Omnibus Order that "consumers may revoke consent through any reasonable means," Omnibus Order ¶ 55, and that "the consumer is not limited to using only a revocation method that the caller has established as one that it will accept," *id.* ¶ 70.  These statements are hardly models of clarity.  Even so, the words "means" and "methods" refer to *modes* of communication—for example, a written letter versus an oral statement.  *See, e.g.*, *Petition for Declaratory Ruling Regarding Revocation of Prior Express Consent for Non-Telemarketing Calls*, *Santander Consumer USA, Inc. Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278, __ FCC Rcd. __, at *9 (July 10, 2014) ("Santander Petition") (requesting that the FCC limit revocation methods to written methods).  Thus, a caller cannot prohibit a customer from revoking consent orally, or require that customers revoke consent by written letter sent to a specific address.  *Id.*; *see also* Omnibus Order ¶ 64 (concluding that consumers may revoke consent by any "reasonable method including orally or in writing").

The FCC did *not* prohibit callers from providing opt-out instructions *within* a particular mode of communication, such as by instructing a user to "Reply STOP" to opt out by text message.  To the contrary, the FCC specifically stated that "giv[ing] consumers a direct opt-out mechanism such as . . . a reply of 'STOP' for text messages" is a "reasonable method in writing [] to prevent future calls."  *Id.* ¶ 64 (citing *Cargo Airline Order*, 29 FCC Rcd. at 3438, ¶ 18).  Accordingly, the FCC's statements in the Omnibus Order should not result in sudden and unprecedented liability for infinite permutations of text message opt-out requests that purport to revoke consent but ignore instructions about how to properly opt out of future communications by texting "STOP"—particularly where the FCC had previously indicated that "STOP" was an appropriate opt-out command.  This interpretation is consistent with the FCC's previous pronouncement.  *See Cargo Airline Order*, 29 FCC Rcd. at 3438, ¶ 18.

### 3.   Uber Did Not Send Text Messages to Class B Plaintiffs After They Revoked Their Consent to Receive Such Messages.

The first text message that Uber sent to each of the Class B Plaintiffs included clear instructions about how to automatically opt out of receiving text messages (replying "STOP").  *See* Crooks Decl. ¶ 10, Ex. I.  Plaintiffs also could have revoked their consent to receive text

messages by sending an email to support@uber.com or by expressing their desire to unsubscribe to a representative at a partner support center.  *See* Kadin Tr. at 502:21-505:10, 508:3-19, 509:7-19; Crooks Decl. ¶ 13, Ex. L (response to Interrogatory 10).  Nonetheless, despite exchanging several emails with Uber support regarding other issues in the onboarding process, not one of the Plaintiffs communicated a desire to stop receiving text messages.  *See* Crooks Decl. ¶ 12, Ex. K.  And Uber recognized and honored the revocation of consent provided by Plaintiffs who "sought to unsubscribe by following [Uber]'s instructions" to reply "STOP."  *Legg*, 20 F. Supp. 3d at 1372.  When Plaintiffs Reilly and Bartolet texted the word "STOP" to Uber, Uber stopped sending them text messages.[7]  Plaintiffs Reilly, Grindell, and Bartolet contend they revoked consent to receive text messages from Uber when they texted Uber with other words and phrases, but these purported attempts to opt out of Uber text messages were not cognizable revocations of consent.  *See* Omnibus Order ¶¶ 63-64.

### a.   Uber Informed Class B Plaintiffs They Could Revoke Consent by Replying "STOP" and Honored All "STOP" Requests.

*Reilly:*  Ms. Reilly first provided her phone number to Uber on August 11, 2014, when she signed up as a rider with Uber.  Crooks Decl. ¶ 11, Ex. J, at Uber000406.  Uber immediately thereafter sent a Welcome text message, instructing her to "Reply GO to confirm" her telephone number.  Crooks Decl. ¶ 10, Ex. I, at Uber000148.  After she did so, Uber sent a follow-up text:

> "Welcome to Uber Alerts! Download our app at uber.com/app to request a ride. **Reply STOP to stop**. 8665761039. Std msg data rates may apply"

*Id.* at Uber000150-151 (emphasis added).  When Ms. Reilly responded "STOP," Uber sent her a single confirmation message confirming that she had been unsubscribed from Uber Alerts and referring her to support.uber.com for questions.  *Id.*  Uber never sent Ms. Reilly another rider text message.  *See id.* at Uber000148-149.

---

[7] Uber sent a single confirmatory text message to each Plaintiffs Reilly and Bartolet.  The messages stated, "SMS from Uber is now disabled. To re-enable, reply START."  Such messages are not actionable under the TCPA.  *See SoundBite Declaratory Ruling*, 27 FCC Rcd. at 15397; *Ibey*, 2012 WL 2401972, at *2-3.

1       The next day, August 12, 2014, Ms. Reilly provided her phone number to Uber a second

2    time by submitting the Uber partner sign-up form.  *See* Reilly Tr. at 32:21-22; Crooks Decl. ¶ 11,

3    Ex. J at Uber000407.  When she did so, Uber sent Ms. Reilly a new Welcome message:

4           "Welcome to Uber SMS! We'll send you updates and let you know when
            Uber is busy so you can make more $$. **Respond STOP to stop getting**
5           **texts.**"

6    Crooks Decl. ¶ 10, Ex. I, at Uber000149 (emphasis added).  This time, however, Ms. Reilly did

7    not immediately respond "STOP," but instead, two months later, sent Uber a text message stating

8    "Can you please take me off of this list?" on October 14, 2014.  *Id.* at Uber000151.  When

9    Ms. Reilly sent Uber a text message stating "STOP" on October 24, 2014, Uber immediately

10   confirmed that she had been unsubscribed in a text message stating "SMS from Uber is now

11   disabled. To re-enable, reply START."  *Id.* at Uber000150-151.  This was Uber's last text

12   message to Ms. Reilly.  *See id.* at Uber000148-149; Reilly Tr. at 36:23-37:21.

13       ***Grindell:***  Mr. Grindell similarly submitted his phone number to Uber through the online

14   partner sign-up form on October 9, 2014.  Grindell Tr. at 59:25-60:6.  Uber then sent him a

15   Welcome text message:

16          "Welcome to Uber! We'll send updates about the status of your application
            here. **Reply STOP to stop receiving texts.**"

17   Crooks Decl. ¶ 10, Ex. I, at Uber000143 (emphasis added).  Although Mr. Grindell recalls

18   receiving and seeing this text message, he never texted "STOP."  Grindell Tr. at 75:20-76:8.

19   Instead, he sent Uber the following text messages: "I got blank messages from this number…."

20   (October 12, 2014); "This came up as a blank txt message, as I don't have a snart phone [sic].  I

21   am going to join Uber in December after my final exams, so please don't message me til then"

22   (October 14, 2014); "The messages come up blank…." (October 16, 2014); and "Remove"

23   (December 30, 2014).  Crooks Decl. ¶ 10, Ex. I, at Uber000144-145.[8]

24       ***Bartolet:***  Shortly after Mr. Bartolet first submitted his phone number by signing up with

25   Uber on September 13, 2014, he received the following Welcome message from Uber:

26   _____

27   [8] Mr. Grindell also sent two text messages to Uber on December 30, 2014, that he intended to
     send to Alisa Finley, a former employee of Plaintiffs' counsel's law firm.  Crooks Decl. ¶ 10,
28   Ex. I, at Uber000144; Grindell Tr. at 111:25-113:6.

MOTION FOR SUMMARY JUDGMENT
                                              Case No. 14-cv-05678-JST

1

2

> "Welcome to Uber! We'll send updates about the status of your application
> here. **Reply STOP to stop receiving texts**."

Crooks Decl. ¶ 10, Ex. I, at Uber000138 (emphasis added).  Mr. Bartolet did not immediately

3

4

reply "STOP," but instead responded on September 19, 2014 in a text message stating "Hey Clay

thank you for getting in touch! I meant to apply for Toledo, sorry for the mistake!" *Id.*

5

6

at Uber000139.  After emailing Uber support regarding his mistaken application, Mr. Bartolet

signed up a second time on September 28, 2014, and received a second, identical Welcome

7

8

message.  *Id.* at Uber000135; *see also* Crooks Decl. ¶ 12, Ex. K at Uber000176-177; ¶ 11, Ex. J,

at Uber000407.  Despite the second Welcome message also containing instructions on how to

9

10

stop receiving texts, Mr. Bartolet still did not reply "STOP," but instead sent Uber the following

text messages: "Stop texting this number" (October 31, 2014); "It is Halloween idiot stop texting

11

12

this number" (October 31, 2014); "Stop texting pleaseeeeee." (January 26, 2015).  Crooks Decl.

¶ 10, Ex. I at Uber000139.  Uber immediately responded to Mr. Bartolet's January 26, 2015 text

13

message:

14

15

> Thanks for your response. Unfortunately, SMS replies are not monitored.
> Please email partnerstoledo@uber.com or visit UberOhio.com. **Text STOP
> to unsubscribe**.

16

17

*Id.* at Uber000116 (emphasis added).  When Mr. Bartolet subsequently replied, "STOP," Uber

immediately responded with a confirmatory text, stating "SMS from Uber is now disabled. To re-

18

19

enable, reply START."  *Id.* at Uber000139, Uber000116.  Uber never sent Mr. Bartolet another

text message.  Bartolet Tr. at 121:19-122:1.

20

> **b.**  **Plaintiffs' Non-Standard Opt-Out Requests Did Not Meet the
> Standard for Revocation of Consent Under the TCPA.**

21

22

The text messages that Plaintiffs Reilly, Grindell, and Bartolet sent to Uber that did not

use the simple word "STOP" did not legally revoke their consent to receive text messages from

23

24

Uber, and because Uber stopped sending text messages to each of the Plaintiffs who used the

word "STOP" to revoke consent (Bartolet and Reilly), Uber is entitled to summary judgment.

25

26

Uber provided clear instructions to each Plaintiff about how to opt out of receiving text

messages from Uber via text message: reply "STOP."  *See generally* Crooks Decl. ¶ 10, Ex. I, at

27

28

Uber 108-151.  This was the mechanism for opting out of text messages explicitly endorsed by

the FCC and the courts.  *See In re Cargo Airlines*, 29 FCC Rcd. at 3438, ¶ 18; *see also* Letter

from Jennifer Bagg, Counsel to Vibes Media LLC, to Marlene H. Dortch ("Vibes Letter"), FCC,

CG Docket No. 02-278 (filed June 11, 2015) (noting that "[t]he systems used for mobile

marketing must be pre-programmed to recognize certain words as an opt-out request" and that

"STOP" was a "widely recognized" opt-out key word); *see also* Omnibus Order ¶ 64.  And with

good reason.  Requiring manual review of all incoming text messages that Uber receives from its

users would be prohibitively burdensome.  *See, e.g.*, Joint Reply Br. for Pet'rs ACA Int'l, Sirius

XM, Pace, Salesforce.com, ExactTarget, Consumer Bankers Association, U.S. Chamber of

Commerce, Vibes, Media, and Portfolio Recovery Assocs., Dkt. No. 1599016, *ACA Int'l v. FCC*,

No. 15-1211 (D.C. Cir. Feb. 16, 2016) ("[S]peakers—schools, utilities, charities, and

businesses—cannot hire 'live operators' to review every response.  The point of these

communications, after all, is to provide quick information to those who request it.").

Accordingly, to the extent that Plaintiffs purportedly attempted to revoke consent by

ignoring Uber's opt-out instructions and failing to reach out to support, those attempts did not

result in the legal revocation of consent.  *See In re Cargo Airlines*, 29 FCC Rcd. at 3438, ¶ 18;

Omnibus Order ¶ 64.  Thus, the undisputed facts show that Uber is entitled to summary judgment

as to each of the Class B Plaintiffs.

## C.   Uber Is Entitled to Summary Judgment Against Plaintiff Pal Because Partner Referral Messages Are Not Actionable Under the TCPA.

Putative Class A Plaintiff Sandeep Pal claims Uber violated the TCPA because he

received three text messages in which Uber users invited him to sign up to drive on the Uber

platform.  SAC ¶¶ 63-76, 111-17.  But Mr. Pal's claims fail as a matter of law for two

independent but related reasons: first, because Uber itself did not "make" or "initiate" the text

messages he received and, second, because the messages were only transmitted after human

intervention and therefore were not sent using an automated telephone dialing system ("ATDS").

Thus, Mr. Pal cannot maintain this action as an individual lawsuit or as a putative class action,

and Uber is entitled to summary judgment on his claims.[9]

---

[9] Plaintiff Pal sent three messages in response to the partner referral messages he received, and
each time immediately received a response explaining that the line was not receiving text

1     **1.**     **Uber Is Not Liable Under the TCPA for Partner Referral Text Messages Because They Are Not "Made" or "Initiated" by Uber.**

Congress enacted the TCPA "in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). "[T]o protect consumers from the nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate," Congress "put the responsibility for compliance with the law directly on the party that 'makes' or 'initiates' automated and prerecorded message calls." Omnibus Order ¶ 29. Accordingly, the TCPA, the FCC's implementing regulations, and the FCC's declaratory rulings all establish that it is the person or entity that *makes* or *initiates* the call or text message that is liable for any TCPA violations. *See* 47 U.S.C. § 227(b)(1) (prohibiting "mak[ing] any call . . . using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service" and "initiat[ing] any telephone call to any residential telephone line using an artificial or prerecorded voice" without "the prior express consent of the called party"); 47 U.S.C. § 64.1200(a)(1) (prohibiting persons and entities from "initiat[ing] any telephone call" to certain specified recipients); *In re Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of Cal., Illinois. N. C., & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 FCC Rcd. 6574, at 6583 ¶¶ 26-27

---

messages. Crooks Decl. ¶ 10, Ex. I at Uber000146-147. These messages also are not actionable under the TCPA. First, like partner referral text messages, these confirmation messages are triggered by human intervention, specifically, by Mr. Pal's attempt to respond to the initial partner referral text message. *See, e.g., Derby v. AOL, Inc.*, No. 5:15-cv-00452-RMW, 2015 WL 5316403, at *5 (N.D. Cal. Sept. 11, 2015); *cf. Duguid v. Facebook, Inc.*, No. 15-CV-00985-JST, 2016 WL 1169365, at *5 (N.D. Cal. Mar. 24, 2016) (concluding that allegations that Facebook used an ATDS were not plausible because the text messages at issue were "targeted to specific phone numbers and [were] triggered by attempts to log in to Facebook accounts associated with those phone numbers"). Second, by sending a text message to a telephone number belonging to Uber, Plaintiff Pal "knowingly released his phone number to [Uber], thereby consenting to be texted back at that number." *Derby*, 2015 WL 5316403, at *2 (citing Order Granting Motion to Dismiss at 12, *Derby v. AOL, Inc.*, No. 15-CV-00452-RMW (N.D. Cal. June 1, 2015) (No. 28), 2015 WL 3477658, at *7). Finally, the FCC has recognized that automatic post-unsubscribe confirmation messages provide benefits to consumers that outweigh any costs imposed. *See* Soundbite Declaratory Ruling ¶ 10. Consumers receive similar benefits from confirmation messages outside the opt-out context, such as those at issue in this case, which informed Plaintiff Pal his messages were not received. *Cf. Derby*, 2015 WL 5316403, at *5 ("A confirmation message is not the type of harm—'the nuisance, invitation of privacy, cost, and inconvenience' of autodialed calls—that the TCPA was intended to address." (footnote omitted) (quoting Omnibus Order ¶ 29)).

1    (2013) ("*In re Dish Network*"); Omnibus Order ¶ 25 (explaining that the Order would "clarify

2    who makes a call under the TCPA and is thus liable for any TCPA violations").[10]

3        In the Omnibus Order, the FCC specified that the provider of a software application

4    ("app") is not liable for invitational text messages sent using the app when it is the app *user* who

5    decides whether to send an invitational message and to whom those messages will be sent.  By

6    controlling both the transmission and the recipients of an invitational text message, the app user

7    makes or initiates the message, and the app provider is not liable.  *See* Omnibus Order ¶ 35

8    (providing that the factors governing whether the app *user* or the app *provider* makes or initiates

9    the call include who "decid[es] whether to send the invitational text messages, [and] to whom to

10   send them").  For example, the app *user* has "made" or "initiated" text messages if, in the context

11   of an app feature that automatically sends text messages in response to voicemails, the feature

12   requires the *user* to choose whether to send an automatic response, to determine which categories

13   of callers would receive automatic responses, and to draft the content of the response message.

14   *See* Omnibus Order ¶ 31.  It is only where the app user lacks control over the transmission or

15   recipients of the message—for example, where an app "automatically sends invitational texts of

16   its own choosing to every contact in the app user's contact list with little or no obvious control by

17   the user"—that the app provider "made" or "initiated" the text message under the TCPA.  *See*

18   Omnibus Order ¶ 35.

19       In circumstances virtually identical to those presented here, the FCC determined that

20   invitational text messages fell outside the scope of the TCPA.  As described by the FCC in the

21   Omnibus Order, the TextMe app enabled users to send invitational text messages to contacts in

22   their phone's address books in order to increase the number of TextMe users.  Omnibus Order

23   ¶ 36.  Specifically, the app sent an invitational text message if the app user (1) tapped on a button

24   showing the text, "invite your friends," (2) chose whether to invite all friends or individually

25   selected contacts, and (3) clicked a third button to send.  Omnibus Order ¶ 36.  The content of the

26   message was controlled entirely by TextMe and generally identified the app user by username

27

28   ───────────────
     [10] Uber maintains its position that a text message does not constitute a "call" under the TCPA, but
     is not pursuing that argument here.

MOTION FOR SUMMARY JUDGMENT
                                               Case No. 14-cv-05678-JST

1   and invited the recipient to install the app.  Omnibus Order ¶ 37.  The FCC ruled that the app

2   user, not TextMe, made or initiated the invitational text message because "the app user's actions

3   and choices effectively program[med] the cloud-based dialer to such an extent that he or she

4   [was] so involved in the making of the call as to be deemed the initiator of the call."  Omnibus

5   Order ¶ 37; *see also Huricks v. Shopkick, Inc.*, No. C-14-2464 MMC, 2015 WL 5013299, at *2

6   (N.D. Cal. Aug. 24, 2015) ("In sum, the FCC found that, even though a provider of an app

7   controls the content of invitational text messages . . . , the provider is not deemed to be the sender

8   of those text messages where users of the app must make a series of 'affirmative choices' in order

9   to cause the messages to be sent.").  Because the need for user action meant TextMe did not

10  "program[] its cloud-based dialer to dial any call," the FCC ruled TextMe had only a minor role

11  "in the causal chain that results in the making of a telephone call," and granted its petition.

12  Omnibus Order ¶¶ 27, 37.

13          Uber is similarly not liable for the partner referral text messages Mr. Pal received.  Uber's

14  partner referral program enabled Uber users to invite friends and contacts to sign up to be an Uber

15  partner.  *See* Kadin Tr. at 541:17-20.  Just as the TextMe app user tapped on a button stating

16  "invite your friends," an Uber user could make a referral by clicking on a button to begin to refer

17  friends or contacts.  *See* Omnibus Order ¶ 36; Kadin Tr. at 560:6-25.  Next, the referring user,

18  like the TextMe app user, chose which contacts to invite.  *See* Omnibus Order ¶ 36; Kadin Tr.

19  at 564:24-565:20.  Indeed, the referring Uber user had to make even more affirmative choices

20  than the TextMe user because he or she had to input the contacts' telephone number manually,

21  rather than by selecting from a list of address book contacts or opting to send an invitation to all

22  contacts in the address book.  *Compare* Omnibus Order ¶ 36, *with* Kadin Tr. at 565:3-20.  Finally,

23  the Uber user and TextMe user both had to click a final submission button to send the invitational

24  text message.  *See* Omnibus Order ¶ 36; Kadin Tr. at 573:18-574:3; *see also* Crooks Decl. ¶ 15,

25  Ex. N (screenshot of partner referral interface on Uber's partner website).

26          Uber's partner referral text messages (which, like TextMe's app invitations, were

27  comprised of content generated by the app provider) are therefore materially indistinguishable

28  from the TextMe app invitations—indeed, an Uber referrer was even more "involved in the

MOTION FOR SUMMARY JUDGMENT
Case No. 14-cv-05678-JST

placing of a specific telephone call" than a TextMe app user because he had to manually enter the telephone numbers to be texted. *See* Omnibus Order ¶ 30; *see also id.* ¶ 36; Kadin Tr. at 572:3-15, 573:18-576:5. And as with the invitations in TextMe, partner referral messages are not "telemarketing" or a "commercial advertisement": in both instances, the text message identified the user who sent the message, and then invited the recipient to use a service. *See* Omnibus Order ¶ 37; Crooks Decl. ¶ 20, Ex. I (text messages log), at Uber000146; *see also* MTD Order at 9 (holding that text messages encouraging the recipients to become activated to drive on the Uber platform "do not constitute telemarketing"). Thus, just as the "affirmative choices by the app user" yield the conclusion that "the app user and not TextMe [was] the maker of the invitational text message," the affirmative choices by Uber users sending referrals render them, not Uber, the makers and initiators of the referral text messages received by Mr. Pal.

Recent case law from this District affirms this conclusion and supports summary judgment in Uber's favor. For example, in *Huricks v. Shopkick, Inc.*, plaintiffs received a text message inviting them to download Shopkick, a shopping rewards app. 2015 WL 5013299, at *1. The court held that because the evidence established that an invitational text would be sent only if the user "tapp[ed] a button stating 'invite your friends,' cho[se] which contacts to invite, and cho[se] to send the text messages by tapping another button," the steps at issue were "indistinguishable in all material respects from the steps a user of the TextMe app must take to cause the TextMe invitational texts to be sent." *Id.* at *3. Rejecting all of plaintiffs' various attempts to distinguish Shopkick from the TextMe app, the court granted summary judgment and held that Shopkick "ha[d] not violated the TCPA" by facilitating the transmission of invitational text messages. *Id.* at *5.

Similarly, in *McKenna v. WhisperText*, the court relied on the FCC's analysis of the TextMe app to dismiss the plaintiff's fourth amended complaint, in which the plaintiff alleged that the defendant app provider violated the TCPA by "allow[ing] users to select contacts and invite those contacts by SMS text to try [the app] for themselves." *See* No. 5:14-CV-00424-PSG, 2015 WL 5264750, at *5 (N.D. Cal. Sept. 9, 2015), *appeal filed*, No. 15-16997 (9th Cir. Oct. 7, 2015). The court observed that the FCC had determined that an app user "made" or "initiated" a

1    text message through making certain "affirmative choices," including tapping a button to begin

2    the invitation, choosing to invite some or all contacts, and pressing another button to transmit the

3    message.  *See id.* at *4-5.  Applying the FCC's analysis to the plaintiff's allegations, the court

4    concluded that the defendant was not "the maker or initiator of a call using an ATDS under the

5    TCPA," despite the fact that the defendant "use[d] automated processes to harvest and upload a

6    user's selected phone numbers and then send invitational messages."  *Id.* at 5.  Rather, the court

7    concluded that because the app "sends text invitations only at the user's affirmative direction,"

8    the app user had "effectively program[med] the cloud-based dialer to such an extent . . . as to be

9    deemed the initiator of the call."  *Id.* at *3, *5 (quoting Omnibus Order ¶ 37).  This Court should

10   reach the same conclusion here.

### 2. Partner Referral Messages Are Sent Through Human Intervention and Therefore Are Not Sent Using an ATDS.

12        These same undisputed facts regarding the process for sending partner referral text

13   messages establish a second legal basis for granting summary judgment in Uber's favor: such

14   messages are not sent using an ATDS because they are sent through human intervention.  The

15   TCPA does not prohibit *all* non-emergency calls or text messages to cellular telephone calls—

16   only those that are made "using any automatic telephone dialing system [ATDS] or an artificial or

17   prerecorded voice" without "the prior express consent of the called party."  47 U.S.C.

18   § 227(b)(1)(A)(iii).  The statute defines an ATDS, also called an "autodialer," as "equipment

19   which has the capacity . . . to store or produce telephone numbers to be called, using a random or

20   sequential number generator; and . . . to dial such numbers."  *Id.* § 227(a)(1).  Although the FCC

21   has recently purported to interpret this term to extend far beyond this statutory definition,[11] the

---

[11] Uber agrees with the petitioners currently challenging the Omnibus Order in the Court of Appeals for the D.C. Circuit that the only reasonable interpretation of the ATDS definition in the TCPA is that equipment must have the current, actual ability "to store or produce telephone numbers to be called, using a random or sequential generator[,] and . . . to dial such numbers," to qualify.  47 U.S.C. § 227(a)(1); Joint Br. for Pet'rs ACA International, Sirius XM, Salesforce.com, ExactTarget, Consumer Bankers Association, U.S. Chamber of Commerce, Vibes Media, *ACA Int'l v. FCC*, Dkt. No. 1585568, Case No. 15-1211 (D.C. Cir. Nov. 25, 2015).  Under the correct statutory definition, Uber's messaging platform lacks the requisite capacity.  *See* Kadin Tr. at 459:4-16, 469:10-17, 478:14-481:5.  Uber preserves its argument that it is entitled to summary judgment for this reason as well, should the D.C. Circuit decide in favor of petitioners.

1   agency has consistently maintained that the "basic function[] of an autodialer" is "to 'dial

2   numbers *without human intervention*' and to 'dial thousands of numbers in a short period of

3   time.'"  Omnibus Order ¶ 17 (emphasis added); *see also id.* ¶ 113 ("Congress intended the word

4   'dial' to mean initiating a communication with consumers through use of their telephone by an

5   *automated means that does not require direct human intervention*, recognizing that the specific

6   actions necessary to do so will depend on technical requirements of the carrier's network."

7   (emphasis added)); *Derby v. AOL, Inc.*, No. 5:15-cv-00452-RMW, 2015 WL 5316403, at *3

8   (N.D. Cal. Sept. 11, 2015) (according to the Omnibus Order, "the basic functions of an autodialer

9   are to dial numbers without human intervention, and to dial thousands of numbers in a short

10  period of time") (internal quotation marks and citations omitted).  How this element applies to a

11  piece of equipment is "a case-by-case determination" that "is specific to each individual piece of

12  equipment, based on how the equipment functions and depends on human intervention."

13  Omnibus Order at ¶ 17.

14          Here, as discussed above, partner referral text messages are transmitted only if an Uber

15  user (a) decides to send a partner referral text message, (b) decides to whom he or she would like

16  to send a message and manually inputs that person's telephone number, and (c) clicks a button to

17  actually send the message.  *See* Kadin Tr. at 560:6-25, 564:24-565:20, 573:18-574:3.  Substantial

18  recent authority from this District establishes that messages sent under these circumstances do not

19  use an ATDS.

20          In *McKenna v. WhisperText*, for example, the plaintiff alleged he received an SMS

21  inviting him "to join Whisper, a mobile social network for sharing secrets."  2015 WL 5264750,

22  at *1.  The plaintiff's complaint and motion papers "made it clear that" those invitations could be

23  sent "only at the user's affirmative direction to recipients selected by the user."  *Id.* at *2 (internal

24  quotation marks omitted).  Even though the court accepted the plaintiff's allegations "that

25  WhisperText uses automated processes to harvest phone numbers from a Whisper App user's

26  phone and upload them to a third-party platform, and that the platform uses automated processes

27  to send invitational messages to those numbers," the court granted the defendant's motion to

28  dismiss, concluding the equipment at issue was not an ATDS because "where an application

1   sends SMS invitations only at the user's affirmative direction, the action is taken with human

2   intervention."  *Id.* at *4; *see also Glauser v. GroupMe, Inc.*, No. C 11-2584 PJH, 2015 WL

3   475111, at *6 (N.D. Cal. Feb. 4, 2015) (holding pre-programmed welcome texts sent through

4   Twilio were not an ATDS and were "a direct response to the intervention of . . . the 'Poker' group

5   creator"); *cf. Duguid v. Facebook, Inc.*, No. 15-CV-00985-JST, 2016 WL 1169365, at *5 (N.D.

6   Cal. Mar. 24, 2016) (concluding plaintiff's allegations regarding an ATDS were not plausible

7   where the messages were "targeted to specific phone numbers and [were] triggered by attempts to

8   log in to Facebook accounts associated with those phone numbers").  Similarly, in *Luna v. Shac,*

9   *LLC*, the court granted summary judgment in favor of the defendant because the equipment at

10   issue was not an ATDS where "human intervention was involved in several stages of the process

11   prior to Plaintiff's receipt of the text message, including transferring of the telephone number into

12   the CallFire database, drafting the message, determining the timing of the message, and clicking

13   'send' on the website to transmit the message to Plaintiff."  122 F. Supp. 3d 936, 940 (N.D.

14   Cal. 2015).

15       So too here.  The undisputed facts establish that the partner referral text messages received

16   by Plaintiff Pal, like the text messages at issue in *McKenna*, *Glauser*, and *Luna*, were the result of

17   human intervention, not use of an ATDS.  Uber is accordingly entitled to summary judgment on

18   his claims.

19                        **V.    CONCLUSION**

20       For the foregoing reasons, Uber asks this Court to grant summary judgment in favor Uber.

21   DATED:  April 18, 2016                Respectfully submitted,

22
                                          **PERKINS COIE LLP**
23

24                                        By: /s/ Sarah J. Crooks
                                          _____
25                                             Sarah J. Crooks
                                          Attorney for Defendant Uber Technologies, Inc.
26

27

28

MOTION FOR SUMMARY JUDGMENT
                                          Case No. 14-cv-05678-JST